**X–IT PRODUCTS, L.L.C., Plaintiff,**

v.

**WALTER KIDDE PORTABLE EQUIPMENT, INC., Defendant.**

**No. CIV. A. 2:00CV513.**

United States District Court, E.D. Virginia, Norfolk Division.

July 9, 2001.

Robert M. Tata, Benjamin V. Madison, III, Brent L. Vannorman, Hunton & Williams, Norfolk, VA, for Plaintiff.

William F. Devine, Hofheimer Nusbaum, P.C., Norfolk, VA, Laura B. Luger, Moore & Van Allen, PLLC, Durham, NC, for Defendant.

## *OPINION & ORDER*

DOUMAR, District Judge.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment and Defendant's motion entitled "Motion to Dismiss, for Judgment on the Pleadings, and for Summary Judgment." Plaintiff, X–IT Products L.L.C. ("X–IT") moves for partial summary judgment against Defendant Walter Kidde Portable Equipment ("Kidde") on Counts I (Copyright Infringement), IV (Breach of Contract), and V (Misappropriation of Trade Secrets) of its eight-count Amended Complaint. Kidde, meanwhile, moves for summary judgment on all eight counts of X–IT's Amended Complaint, including Counts II (False Designations Under Section 43(a) of the Lanham Act), III (False Advertisement Under Section 43(a) of the Lanham Act), VI (Unfair Competition), VII (Tortious Interference), and VIII (Unjust Enrichment and Constructive Trust).

Kidde's Brief in Opposition to X–IT's Motion for Partial Summary Judgment raises an additional matter for the Court to consider as well. Specifically, Kidde argues that X–IT's unclean hands bar the entry of summary judgment in its favor and warrant the entry of summary judgment in Kidde's favor on all claims. On May 17, 2001, however, X–IT filed a Motion to Strike Kidde's Unclean Hands Evidence and Argument. Additionally, X–IT has filed a Rule 56(f) Motion to Refuse the Application for Judgment on Kidde's Motion for Summary Judgment, asserting that additional discovery is necessary to further rebut Kidde's Motion for Summary Judgment, and that entry of summary judgment in favor of Kidde is therefore inappropriate at this time.

This Court heard argument on all of these motions on May 23, 2001 and took the matter under advisement at that time. For the reasons set forth below, this Court **GRANTS** X–IT's Motion for Partial Summary Judgment on Count I on the issue of liability with respect to Kidde's infringement of X–IT's copyright for use in Kidde's packaging, sell-sheets, and PowerPoint presentation at the 1999 National Hardware Show. In addition, for the reasons set forth below, the Court **GRANTS** (1) Kidde's Motion for Summary Judgment on Count IV with regard to X–IT's claim that Kidde misused X–IT's actual and potential customer account list; (2) Kidde's Motion for Summary Judgment on Count V with regard to X–IT's claim that its customer account list constitutes a trade secret; and (3) Kidde's Motion for Sum-

mary Judgment on Count VII as to X–IT's tortious interference claim. X–IT's Motion to Strike Kidde's Unclean Hands Evidence and Argument is **GRANTED IN PART** and **DENIED IN PART.** The Court **STRIKES** Kidde's allegations of litigation misconduct on the part of X–IT, but will hear evidence regarding X–IT's alleged pre-litigation misconduct. In all other respects, X–IT's Motion for Partial Summary Judgment and Kidde's "Motion to Dismiss, for Judgment on the Pleadings, and for Summary Judgment" are hereby **DENIED.**

## I. *Factual Background*

### A. X–IT's Formation and the X–IT Ladder

Andrew Ive ("Ive") and Aldo DiBelardino ("DiBelardino") co-founded X–IT in July of 1997 while Ive and DiBelardino were classmates at Harvard Business School.[1] Ive and DiBelardino formed X–IT to produce and market a "web-style" emergency escape ladder that the two first conceived, designed, and created in 1996 and 1997 as a project for their Product Development course at Harvard. *See* Am. Compl. ¶¶ 5, 6, & 9. X–IT launched a production version of its Emergency Escape Ladder (hereinafter the "X–IT Ladder") in August of 1998. *See* Pl.'s Opp. Ex. 2, DiBelardino Dep. at 429. In June of 1998, Kevin Dodge ("Dodge"), a former classmate of Ive's and DiBelardino's at Harvard, joined X–IT as its Chief Financial Officer.[2]

---

**1.** *See* Def.'s Mot. Ex. 3, Ive Dep. at 46. For citation purposes throughout this Opinion & Order, "Def.'s Mot." refers to Kidde's Motion for Summary Judgment, while "Pl.'s Mot." refers to X–IT's Motion for Partial Summary Judgment. Similarly, "Def.'s Opp." refers to Kidde's Memorandum in Opposition to X–IT's Motion for Partial Summary Judgment, while

"Pl.'s Opp." refers to X–IT's Memorandum in Opposition to Kidde's Motion for Summary Judgment.

**2.** *See* Def.'s Mot. Ex. 7, Dodge Dep. at 45–47, 55–56. Dodge held this position with X–IT until his resignation in September of 1999. *See id.* at 21.

The X–IT ladder weighs approximately seven (7) pounds and is packaged for sale in a box measuring approximately 15 inches by 7-1/2 inches. *See* Am. Comp. ¶ 9. The ladder, which has a weight rating of over 1,000 pounds, is constructed of mesh-webbed railings and stackable or "nested" aluminum rungs. *See id.* ¶¶ 9, 11. The X–IT ladder's "nesting" design allows the rungs to easily fit together during storage. *See id.* ¶ 11. X–IT maintains that this feature also allows for compact storage and "quick tangle-free deployment in the event of an emergency." *Id.* According to X–IT, the smaller size of its ladder, the "unique nesting design," and the innovative graphics on the box made the X–IT ladder inherently distinctive from any other emergency fire escape ladder on the market at the time it was introduced. *See id.*

Some discussion of the unique graphics on X–IT's packaging is appropriate at this time, since many of X–IT's claims in the instant case center around the artwork contained therein. The undisputed evidence clearly indicates that the creativity behind X–IT's packaging artwork came from X–IT's founders, Ive and DiBelardino. X–IT (1) designed the house logo; (2) conceived the house diagram; (3) chose the fireman's picture; (4) chose the features to be listed in the bullet lists; (5) conceived the "1,2,3" deployment instructions; (6) built the set for the photograph that Becker eventually took; (7) selected the models (DiBelardino's nephew and sister-in-law) that appeared in the photograph; and (8) employed a photographer, Joel Becker ("Becker") of Becker–Cline Digital Photography to take a picture of the models and set that X–IT constructed. *See* Pl.'s Mot. Ex. 17, Ive Aff. ¶¶ 5–9, 11;

Pl.'s Mot. Ex. 2, DiBelardino Aff. ¶¶ 5–6; Pl.'s Mot. Ex. 3, Becker Aff. ¶¶ 3–4. Becker took the photograph in early June 1998, with X–IT paying the invoice for Becker's services on June 10, 1998. *See* Pl.'s Mot. Ex. 3, Becker Aff., ¶¶ 5–8. At the time of payment on June 10, 1998, Becker orally transferred all copyright rights to the photographs to X–IT. *See id.* ¶ 5; Pl.'s Mot. Ex. 17, Ive Aff. ¶ 10; Pl.'s Mot. Ex. 2, DiBelardino Aff. ¶ 7 & Exs. B, C. This oral assignment was subsequently memorialized in two written assignment agreements in April 2000 and April 2001. *See* Pl.'s Mot. Ex. 2, DiBelardino Aff. Exs. B & C. Finally, it is undisputed that on June 9, 2000 the U.S. Copyright Office issued two certificates of registration to X–IT covering both the photograph on X–IT's box and the cover art on X–IT's packaging. *See* Pl.'s Opp. Ex. 44, Kidde's Response to X–IT's First Request for Admission 48; Pl.'s Opp. Ex. 49, XIT 001266—XIT 001268 (X–IT's certificates of registration from the copyright office).

**B. The X–IT Case Study**

In April of 1998, Harvard Business School Publishing published a Case Study about X–IT and the X–IT ladder (hereinafter the "X–IT Case Study"). *See* Def.'s Mot. Ex. 13, X–IT Case Study. Professors Myra Hart ("Hart") and Marco Iansiti ("Iansiti"), both of whom invested in X–IT, prepared the X–IT Case Study.[3] Although the X–IT Case Study was premised on X–IT and the X–IT ladder, certain information included within the Case Study was not based on actual information from X–IT or its founders, but was deliberately conceived and used just for the Case Study. *See* Pl.'s Opp. Ex. 9, Hart Dep. at 21, 106–10; Pl.'s Opp. Ex. 10, Iansiti Dep.

---

**3.** *See* Def.'s Ex. 14, Hart Dep. at 17–19, 103–04, 56; Def.'s Ex. 15, Iansiti Dep. at 29, 41–43. Hart also served on X–IT's Board of

Directors until late October or early November of 1999. *See* Def.'s Ex. 14, Hart Dep. at 56.

at 194–95. The X–IT Case Study contained an "X–IT Business Plan," which included a detailed business description, market analysis, cost-benefit and risk analysis, marketing strategies and goals, long-term development plans, projected income statement, projected balance sheet, projected revenue and expense statements with lists of projected accounts, and resumes of X–IT's principals.[4]

The X–IT Case Study was taught and distributed to Harvard Business School students in April of 1998 and April of 1999. *See* Def.'s Mot. Ex. 14, Hart Dep. at 103–04. Students were under no obligation to maintain the confidentiality of the information presented in the X–IT Case Study and, once the X–IT Case Study was distributed, it became a matter of public record. *See id.* at 103–04. In April of 1999, the X–IT Case Study also became available for purchase and use by the general public. *See id.* at 18–19.

In both the X–IT Case Study and X–IT's initial offering memorandum to investors, X–IT identified Kidde as one of the two large competitors that X–IT would face in the marketplace. *See* Def.'s Mot. Ex. 13, X–IT Case Study; Def.'s Mot. Ex. 16, IVE 75–92. X–IT's offering memorandum also identified a number of risk factors associated with investing in X–IT, including the risk associated with the possibility of a competitor replicating the unpatented X–IT ladder. *See id.* at IVE 82. X–IT hoped to mitigate the risk of replication by obtaining "intellectual property protection," such as patenting the X–IT ladder. *See id.*

### C. The Introduction of X–IT's Ladder and X–IT's Initial Contact with Kidde

X–IT introduced its ladder at the August 1998 National Hardware Show (hereinafter referred to as the "1998 Show") in Chicago, Illinois. *See* Am. Compl. ¶ 17. The National Hardware Show, conducted in Chicago in August of each year, is one of the largest and most important trade shows throughout the world. *See* Pl.'s Opp. Ex. 46, Expert Report of Ken Cort, at 1. The show plays a major role in the sales process for hardware, building materials, and other related products. *See id.* X–IT's principals visited Kidde's booth at the 1998 Show and showed the X–IT ladder to representatives of Kidde. *See* Def.'s Ex. 3, Ive Dep. at 242–43; Def.'s Ex. 4, DiBelardino Dep. at 196–97. Prior to the 1998 Show, Kidde had not contemplated designing a web-type ladder. *See* Pl.'s Opp. Ex. 14, Tomeo Dep. at 9. At the time, Kidde was selling its own chain-link escape ladder, which had been available in retail since 1996. *See* Def.'s Ex. 3, Ive Dep. at 243; Am. Compl. ¶ 8. X–IT was aware of Kidde's chain-link ladder as DiBelardino had purchased it before X–IT developed its own ladder. *See* Def.'s Mot. Ex. 10, DiBelardino Dep. at 78.

X–IT maintains that Kidde's chain-link ladder was substantially larger and heavier than the X–IT ladder and that Kidde's chain-link ladder was comprised of steel rungs that were "subject to tangling, … difficult to deploy, and took up substantial storage space." *See* Am. Compl. ¶ 7. The Kidde chain-link ladder weighed approximately 15 pounds, with a weight rating of approximately 350 pounds for its rungs.

---

4. *See* Def.'s Mot. Ex. 13, X–IT Case Study. Nonetheless, X–IT maintains in the present litigation that the X–IT Case Study did not contain X–IT's actual business plan, and that the information contained in the X–IT Case Study is entirely different from the information supplied to Kidde, in confidence, during business negotiations between the parties. *See* Pl.'s Opp. Ex. 11, Ive Dep., at 83–84.

*See* Am. Compl. ¶ 8. Once collapsed, Kidde's chain-link ladder measured approximately 20 inches by 16–1/2 inches by 6 inches. *See id.* Moreover, the patent on Kidde's chain-link ladder had long since expired. *See* Am. Compl. ¶ 8.

### D. X–IT's Dealings with Kidde After the 1998 Show and X–IT's Increasing Publicity

After the 1998 Show, Kidde's Carl Tomeo ("Tomeo") contacted X–IT and requested samples of the X–IT ladder. *See* Pl.'s Opp. Ex. 14, Tomeo Dep. at 13. Ive responded to Tomeo's request by giving Kidde the option of purchasing X–IT ladders over the Internet or executing a confidentiality agreement. *See id.* at 14–15. Kidde ultimately decided to purchase several of X–IT's ladders over the Internet. *See id.* at 15, 17–18.

Kidde sent one of the X–IT ladders that it purchased over the Internet to its Chinese supplier, Funwick Development.[5] Kidde instructed the Chinese factory to examine the design and quality of the X–IT ladder, including an analysis of the cost of production of such a ladder. *See id.* at 19–20. Kidde also asked the Chinese factory to replicate X–IT's ladder, *see id.* at 20–21, in what Kidde characterizes as "the first step in creating [Kidde's] version of [a] more compact ladder."[6] Kidde received the Chinese factory's copy of the X–IT ladder sometime during March or April of 1999. *See* Def.'s Mot. Ex. 19, Apperson Dep. at 161.

In the interim, X–IT's ladder continued to receive a significant amount of publicity. In April of 1999, the X–IT ladder received

the Bronze "IDEA" (Industrial Design Excellence Award) from the Industrial Designers Society of America, which is sponsored by *Business Week* magazine. *See* Am. Compl. ¶ 18. The May 1999 issue of *Popular Mechanics* also featured the X–IT ladder as "Great Stuff" and a "Lifesaver." *See id.* ¶ 19. In July of 1999, *Inc.* magazine published an article identifying X–IT as one of the top-ten "start-up" companies and included a photograph of the ladder. *See id.* The X–IT ladder received additional publicity through profiles that appeared on NBC's "The Today Show" and CNBC's "Power Lunch." *See id.* X–IT also successfully arranged to place the X–IT ladder in retail outlets including Home Depot's Southwest region and catalogs such as SkyMall. *See id.* ¶ 20.

X–IT sold over 10,000 of its ladders during its first full-year in production. *See id.* Despite all of this success, X–IT was also experiencing its share of the difficulty inherent in any start-up company, including a lack of operating cash and a shortage of established distribution outlets. In an e-mail message to investors, Ive stated that "[g]etting distribution takes a significant amount of time, which from a cash perspective, X–IT does not have a great deal of either .... The accounts we do have ... are either tests or will take time to ramp up." Def.'s Ex. 2, IANSITI 496. In a different e-mail message written to Iansiti, Ive remarked that "[f]rankly, I am tired of the difficulties of an under capitalized company that has great products but without the financial leverage to do it properly." *Id.* at IANSITI 498.

---

5. *See id.* at 19. Funwick Development manufactured and supplied Kidde with its 1996 chain-link ladder as well. *See id.*

6. Def.'s Mot. at 5. Kidde, however, has not produced any evidence to support its assertion that the Chinese replication of X–IT's ladder was anything more than a copy of the X–IT ladder as opposed to the first step in creating a more compact version of Kidde's chain-link ladder.

### E. Representatives of X–IT and Kidde Meet to Discuss a Potential Business Deal

In the Spring of 1999, representatives of X–IT and Kidde arranged to meet and discuss a possible deal between the two companies, including either Kidde's purchase of X–IT ladders or Kidde's outright purchase of X–IT. *See* Pl.'s Opp. Ex. 14, Tomeo Dep. at 43–47; Def.'s Mot. Ex. 17, KS 0001. Consequently, on June 1, 1999, X–IT's Ive traveled to Kidde's headquarters in Mebane, North Carolina to meet with Michael Apperson ("Apperson"), Kidde's President and Chief Executive Officer, as well as Tomeo. *See* Def.'s Mot. Ex. 3, Ive Dep. at 315; Pl.'s Opp. Ex. 14, Tomeo Dep. at 47.

At the June 1, 1999 meeting, Apperson made it clear to Ive that Kidde was not interested in establishing a vendor-vendee relationship with X–IT. *See* Def.'s Opp. Ex. 3, Ive Dep. at 315–16. Instead, Kidde was interested in either acquiring X–IT or competing directly against X–IT with an alternative ladder, including the possibility that Kidde might purchase a German company that produced a ladder similar to the X–IT ladder. *See id.* at 318–21. Apperson even showed Ive a compact German escape ladder in a box. *See id.* at 318. Ive understood Apperson to say that if negotiations between X–IT and Kidde did not lead to a deal, Kidde would "compete with [X–IT] aggressively with an alternative ladder." *Id.* at 315–21, 325–27. Ive states, however, that neither Apperson nor Tomeo disclosed to him that Kidde had another ladder similar to X–IT's in development or that Kidde had replicated X–IT's ladder. *See* Pl.'s Opp. Ex. 47, Ive Aff. ¶ 7; Pl.'s Opp. Ex. 18, Ive Aff. ¶ 3.

### F. The Confidentiality Agreement

X–IT and Kidde executed a Confidentiality Agreement on June 8, 1999. *See* Am. Comp. ¶ 28 & Ex. 4; Pl.'s Opp. Ex.

34. Kidde's counsel ultimately drafted the Agreement, which was negotiated and reviewed by X–IT's counsel. *See* Def.'s Mot. Ex. 23, Interrog. No. 15. Sam Soloman ("Soloman"), Kidde's Chief Financial Officer, executed the Agreement on behalf of Kidde. *See* Am. Comp. ¶ 28 & Ex. 4; Pl.'s Opp. Ex. 34. Ive executed the Agreement on behalf of X–IT. *See* Pl's Opp. Ex. 34.

The Agreement, written in the form of a letter, acknowledges that X–IT and Kidde were in the process of "discussions concerning a potential transaction." Pl's Opp. Ex. 34. The Confidentiality Agreement contemplated that, during the course of these discussions, X–IT may furnish Kidde with "certain information concerning the business, financial condition, operations, assets and liabilities" of X–IT that may be "confidential" or "proprietary," which the Agreement termed "Confidential Information." *Id.* For purposes of the Agreement, the parties agreed that "Confidential Information" shall *not* include any information that

> (i) is in the public domain (other than through a breach of this agreement by [Kidde] or any of its representatives) at the time of its disclosure to or use by [Kidde], (ii) is in [Kidde's] possession prior to its disclosure by [X–IT] or is independently developed by [Kidde] (provided that the source of such Confidential Information was not bound by a confidentiality agreement with [X–IT] or otherwise subject to any applicable restriction on the use of such information), (iii) is obtained by [Kidde] from a third party without any applicable restriction on use, including, without limitation, a confidentiality agreement with [X–IT] or (iv) is disclosed pursuant to the order or requirement of a court, administrative agency or other governmental body.

*Id.*

Following this, the Agreement set forth certain restrictions that Kidde "agreed to

accept as a condition to [X–IT's] disclosure ... of Confidential Information." *Id.* The Agreement states that Kidde agrees that

(i) it and its representatives ... will use the Confidential Information only for the purposes of evaluating the potential transaction with [X–IT]; (ii) it will provide the Confidential Information only to its employees involved in the potential transaction with [X–IT] or outside advisors retained by [Kidde] in connection with such potential transaction and who agree to keep such information confidential, (iii) it will not disclose, in whole or in part, any Confidential Information (except to the extent [X–IT] gives its prior written consent or other than as specifically provided for herein); and (iv) it will promptly return to [X–IT], upon [X–IT's] request, all copies of any Confidential Information provided to [Kidde].

*Id.* Based on this language, the "only legitimate use" that Kidde could make of any of X–IT's disclosed confidential information was "to evaluate the potential transaction." Pl.'s Mot. Ex. 16, Soloman Dep. at 43–46. Lastly, the Agreement states that it shall be construed in accordance with North Carolina state law. *See id.*

## G. Kidde's Contact with a Buyer from Home Depot's Southwest Region

For the greater part of 1999, X–IT contends that it had "100% of the worldwide sales of emergency escape web ladders." Pl.'s Opp. Ex. 18, Ive Aff. ¶ 1. In that same year, X–IT's largest retail account was with Home Depot's Southwest Region.[7] X–IT's business relationship with Home Depot is substantiated by Andy Slanina ("Slanina"), a Home Depot buyer, who stated in his deposition that he purchased X–IT's ladder directly from X–IT for sale in Home Depot stores in Home Depot's Southwest Region. *See* Pl.'s Opp. Ex. 38, Slanina Dep. at 16, 24.

Sometime between June 8 and June 23 of 1999, Ive complained to Apperson that someone from Kidde had informed Slanina that X–IT and Kidde were in negotiations. *See* Def.'s Mot. Ex. 19, Apperson Dep. at 231–34. When approached by Ive, Apperson denied leaking any such information. *See* Def.'s Mot. Ex. 19, Apperson Dep. at 233. The evidence before the Court illustrates the context behind Ive's concerns.

Slanina testified in his deposition that Mark Traylor ("Traylor"), an independent sales representative for Kidde, informed him that Kidde was coming out with a ladder similar to X–IT's ladder and, as a result, that Slanina should hold off on ordering X–IT's ladder for sale in Home Depot. *See* Def.'s Mot. Ex. 26, Slanina Dep. at 51–52. Consequently, Slanina, who was concerned about the possible financial effect this might have on Home Depot,[8] inquired of both Ive and Francis

7. *See* Am. Compl. ¶ 20. The Southwest Region of Home Depot includes all of the Home Depot stores in Texas, New Mexico, Arkansas, Oklahoma, Louisiana, and parts of Mississippi. *See* Pl.'s Opp. Ex. 38, Slanina Dep. at 16. During 1999, X–IT's first full year of sales, it sold over 10,000 ladders. *See* Am. Comp. ¶ 20.

8. Specifically, Slanina testified that

according to Mr. Ive, there was nothing else like [X–IT's ladder] on the market. It was patented, designed—or is going to be patented, and at the same time I knew that Mr. Ive was an entrepreneur and that a lot of times a small company will develop something and then try to have a larger company purchase it from them. And in trying to represent my company's best interest, I wanted to make sure that I wasn't—I didn't want to assist Mr. Ive in getting that product developed and sold to another company that would make it to where I would have to buy it from the next company and absorb the cost of that transaction. Because my— one of my responsibilities is to make sure that I am getting the best cost [on an item].

Talty, X–IT's independent sales representative, about a "rumor" that Kidde may purchase X–IT. *See id.;* Pl.'s Opp. Ex. 18, Ive Aff. ¶ 4. When Slanina talked to Ive, Slanina acknowledges that he "made some assumptions at that point" and that he "may have said that [he] heard a rumor" that Kidde was purchasing X–IT in order to "get the information out of them." Def.'s Mot. Ex. 26, Slanina Dep. at 51–52.

Slanina admits, however, that he was the source of the "rumor." *See id.* Indeed, Slanina never heard a rumor that Kidde might be purchasing X–IT. *See id.* at 47. Instead, Slanina made an assumption, based on the information relayed to him from Traylor and based on Slanina's previous conversations with Ive, that Kidde might acquire X–IT. *See id.* at 48–51.

### H. Representatives from X–IT and Kidde Meet Again

On June 29, 1999, Ive, Dodge, Apperson, and Soloman met in a Chicago hotel suite, where X–IT's representatives discussed X–IT's sales efforts with various retail accounts. *See* Def.'s Mot. Ex. 3, Ive Dep. at 352–73. X–IT shared with Kidde, in detail, the status of X–IT's actual and potential customers. *See* Pl.'s Opp. Ex. 11, Ive Dep. at 83–84. Specifically, Ive informed Apperson at the second meeting about

> every single account who we were talking to, where we were in the process with them, what the buyers' names were, what the sales reps who were presenting to them were called, and their names and so on. In other words, a very detailed breakdown of what was happening with us in the marketplace.

Def.'s Mot. Ex. 3, Ive Dep. at 354. Despite X–IT's disclosures at this meeting, however, it is clear that X–IT knew—as reflected in the 1998 X–IT Case Study—

that Kidde possessed established distribution outlets, including many of the same national retailers. *See* Def.'s Mot. Ex. 13, X–IT Case Study at 12. Moreover, X–IT knew in 1998 that Kidde, along with First Alert, "dominated" the market in the area of fire protection. *See id.*

In the weeks following the June 29, 1999 meeting, X–IT supplied Kidde with certain additional documents and information that X–IT believed to be covered by the Confidentiality Agreement. *See* Pl.'s Opp. Ex. 26, Soloman Dep. at 39–45. These documents included X–IT's sales and customer lists as well as a valuation model. *See id.* at 40–41. Kidde, however, maintains that some of the documents and information supplied by X–IT, including news articles, product brochures, and information from the published 1998 X–IT Case Study, already existed in the public domain. *See* Def.'s Mot. at 9.

### I. Kidde Develops Its Own Emergency Escape Ladder

Simultaneous to Kidde's discussions with X–IT regarding the possible acquisition of X–IT, Kidde maintains that it "continued" to explore the possibility of competing directly against the X–IT ladder by developing its own "improved emergency escape ladder." *Id.* According to Henry Arnette's ("Arnette") Fire Ladder Diary, composed of Arnette's notes, the ladders received by Kidde from the Chinese factory in March or April of 1999 were of the "same design" as X–IT's emergency escape ladder. *See* Pl.'s Opp. Ex. 19; Pl.'s Opp. Ex. 21 at 1–2. As a result, on July 19, 1999, Kidde announced a factory-wide competition to redesign the hooking mechanism for securing the new Kidde escape ladder to the window. *See* Def.'s Mot. Ex. 31, Arnette Dep. at 134–35; Def.'s Ex. 17, KS0579.

*Id.*

The announcement for the competition reads as follows.

Kidde is preparing to market a new portable fire escape ladder and we want this to be the best product on the store shelf. We have selected a design for this new ladder, but the method of attaching the ladder to the windowsill needs improved [sic]. Safety and fitting in a small package are desirable features. This is where we need your ideas. To see what has to be accomplished, a demonstration will be held on Tuesday, July 20, at 1:30 PM . . . .

Def.'s Ex. 17, KS0579. Kidde selected a new design for the window hooking mechanism from contest submissions. *See* Def.'s Ex. 31, Arnette Dep. at 134–35.

Conversely, X–IT maintains that Kidde "began" to develop its own version of an emergency escape ladder no earlier than June 28, 1999. In support of this assertion, X–IT points to an e-mail message forwarded by Kidde's Daryl Gilbert to Arnette and Pam Calderwood ("Calderwood"), two Kidde employees responsible for the design of the new Kidde emergency escape ladder. This e-mail message, forwarded on June 28, 1999, informs Arnette and Calderwood, among others, that Kidde's Mark Schiefer

very quickly needs a new product to promote at a trade show this August. . . . Mark stressed the importance of speed of action on this. Henry [Arnette], this is your baby but I suggest that we all meet quickly to define the product (compare and contrast with 'X–IT' product, develop new attributes . . .) and then move quickly to document and test the product . . . .

Def.'s Ex. 17, KS 0374. Further, according to X–IT, virtually all of Kidde's development activities for its version of the X–IT ladder were kept hidden from X–IT until after the August 1999 National Hardware Show ("1999 Show"), and throughout this period Kidde continued to explore the possibility of acquiring X–IT outright. *See* Pl.'s Opp. Ex. 18, Ive Aff. ¶ 3; Pl.'s Opp. Ex. 20, Interrogatory Responses, at 5.

## J. Kidde's Initial Offer to Purchase X–IT

On July 19, 1999, Kidde offered to purchase X–IT for $600,000 plus a $2.00 per ladder royalty on future sales for an unspecified period of time. *See* Am. Compl. ¶ 36; Pl.'s Opp. Ex. 17, Ive Dep. at 385. Kidde's offer had a present value of $4,417,494 using a twenty-year payout, a 14% discount rate, and growth rates of 30%. *See* Pl.'s Opp. Ex. 27, Richard B. Troxel's Response to Rebuttal Report of Marc B. Sherman at ¶ 32. Nonetheless, this offer was well below X–IT's valuation and expected revenue projections. *See* Def.'s Mot. Ex. 11, HART 000951. Ive conveyed his displeasure with Kidde's offer to Kidde's management, stating first that he considered the offer too low to even take to X–IT's investors, *see* Def.'s Mot. Ex. 1, X–IT 1232, and then stating that he had taken the offer to investors, who deemed it insufficient, *see* Def.'s Mot. Ex. 17, KS 0032–KS 0033. Ive also informed Kidde that X–IT was in discussion with another suitor, but would prefer to reach a deal with Kidde should Kidde desire to raise its offer. *See id.* at KS 0044.

## K. Kidde's Analysis of X–IT's Potential Intellectual Property Protection

Kidde's valuation of X–IT also depended, in part, on whether X–IT's ladder had, or could obtain, intellectual property protection. *See* Pl.'s Opp. Ex. 33, Apperson Dep. at 131–32. As such, on or about July 20, 1999, Kidde indicated that it may raise its offer to acquire X–IT if Kidde found X–IT's intellectual property rights in the X–IT ladder to be strong. *See* Pl.'s Opp. Ex.

17, Ive Dep. at 390–92; Pl.'s Opp. Ex. 16, Hart 000307. X–IT then made arrangements to share its U.S. patent application with Kidde's outside patent attorney, Charles S. Oslakovic, Esq. ("Oslakovic"). *See* Pl.'s Opp. Ex. 18, Ive Aff. ¶ 9.

In reliance on the June 8, 1999 Confidentiality Agreement, as well as "additional oral commitments" between the two parties and Oslakovic regarding the scope of Oslakovic's review, X–IT shared its patent application with Oslakovic. *See* Am. Compl. ¶ 40. Specifically, the "oral commitments" concerned Kidde and Oslakovic's alleged promises to X–IT that Oslakovic would not share the details of X–IT's patent application with Kidde. *See* Pl.'s Opp. Ex. 18, Ive Aff. ¶ 9; Pl.'s Opp. Ex. 22, Oslakovic Dep. at 49–51. X–IT also points to a cover letter, written by Ive to Oslakovic and attached to the copy of X–IT's patent application sent to Oslakovic, which stated

> [a]s per our telephone conversation, we are attempting to ensure that the specific of the patent and the information contained within it are kept separate and not shared with Kidde Safety. Kidde and X–IT Products have agreed to have you and your organization give feedback on the patent without giving Kidde specific wording or diagrams from the patent. If possible, we would like to get your thoughts on its strength and the potential it has to protect the product from infringement when it is awarded.

Def.'s Mot. Ex. 17, KS0060. Prior to sharing its patent application with Kidde, X–IT asserts that it safeguarded this information in a reasonable manner to maintain its secrecy and confidentiality. *See* Pl.'s Mot. Ex. 2, DiBelardino Aff. ¶ 16.

Although Oslakovic agreed to safeguard X–IT's patent application pursuant to the terms of the June 8, 1999 Confidentiality Agreement between Kidde and X–IT, *see* Pl.'s Opp. Ex. 22, Oslakovic Dep. at 25–26, Oslakovic had never actually read the Agreement. *See id.* at 39. Nonetheless, as per the oral agreement, Oslakovic understood that he was not to share with Kidde the specific details contained within X–IT's patent application. *See id.* at 50. The parties disagree as to whether X–IT had abandoned its patent application at the time it was provided to Oslakovic on August 10, 1999.

Oslakovic received a copy of X–IT's patent application on August 10, 1999, five (5) days *before* the 1999 Show.[9] Oslakovic analyzed the patent application *prior to* the 1999 Show and communicated "some of [his] conclusions" to Kidde *prior to* the 1999 Show. *See* Def.'s Mot. Ex. 32, Oslakovic Dep. at 64. Specifically, Oslakovic spoke with Apperson on "at least two" occasions after receiving X–IT's patent application and *prior to* the 1999 Show. *See* Pl.'s Opp. Ex. 22, Oslakovic Dep. at 74. *Before* the 1999 Show, Oslakovic advised Kidde that X–IT had patent claims that "dealt generally with overwrapping," *id.* at 65, and that X–IT's patent application made three independent claims that pertained to the X–IT ladder's cover or overwrap. *See id.* at 63, 83.

Oslakovic also informed Apperson, *prior to* the 1999 Show, that the claims in X–IT's patent application "were not strong" and that the patent application did not appear to add to the potential value of X–IT in any transaction. *Id.* at 71; Def.'s Mot. Ex. 32, Oslakovic Dep. at 104–05, 110–11, 139. Although Apperson acknowledges that Os-

---

9. It is important to note that prior to Oslakovic's receipt of X–IT's patent application, Kidde had already planned to introduce its own "prototype web-style ladder" at the 1999 Show. *See, e.g.,* Def.'s Ex. 17, KS 0374, KS 0049.

lakovic asked him, *prior to* the 1999 Show, what Kidde was "intending to do relative to overwapping," he denies that he spoke with Oslakovic *before* the 1999 Show about X–IT's "patent claims around the overwrap." Pl.'s Opp. Ex. 23, Apperson Dep. at 42–43. In fact, Apperson states that he "do[es] not think [Oslakovic] mentioned that X–IT's primary goals were around overwrapping." *Id.* at 43.

Also *prior to* the 1999 Show, Oslakovic informed Apperson that he "needed to know about what Kidde was intending to use" for Kidde's new prototype ladder, in order to compare the X–IT ladder to the new Kidde ladder. Pl.'s Opp. Ex. 22, Oslokovic Dep. at 65. Indeed, Apperson testified that Oslakovic asked him "somewhere between 10 and 20 questions" about Kidde's new ladder prior to the 1999 Show. *See* Def.'s Ex. 19, Apperson Dep. at 146. Oslakovic admits that he learned, in conversations with Apperson *prior to* the 1999 Show, that Kidde's new ladder had an overwrap. *See* Pl.'s Opp. Ex. 22, Oslokovic Dep. at 68. At the 1999 Show, Oslakovic compared Kidde's web-style ladder to X–IT's patent application. *See* Def.'s Mot. Ex. 32, Oslakovic Dep. at 72, 98–99. Such a comparison of the two products was, according to X–IT, not permissible and against X–IT's wishes. *See* Pl.'s Opp. Ex. 48, Ive Aff. ¶ 5; Pl.'s Opp. Ex. 18, Ive Aff. ¶ 21.

Oslakovic also admitted to using X–IT's patent application, *before* the 1999 Show, to order some of the prior art contained within X–IT's patent application. *See* Pl.'s Opp. Ex. 22, Oslakovic Dep. at 73. Before receiving X–IT's patent application, Oslakovic had not seen or reviewed any prior art relating to emergency fire escape ladders. *See id.* at 77. Ultimately, Oslakovic obtained all of the prior art identified in X–IT's patent application. *See id.* at 73. Despite obtaining all of the prior art contained within X–IT's patent application, Oslakovic denies using such information to later prepare Kidde's patent application on its new web-style emergency escape ladder. *See id.* at 77. As expected, X–IT argues to the contrary.

It is undisputed that an associate from Oslakovic's law firm prepared the patent application on Kidde's ladder. *See id.* at 77–78. Although the file that the associate used to prepare Kidde's patent application contained the prior art obtained by reference to X–IT's patent application, Oslakovic states that "[w]hether [the associate] looked at it or not, I really don't know." *Id.* at 78. Oslakovic maintains that

> [w]e had some art from [X–IT's patent application], some art from other sources. Some of it overlapped. There was art. . . . Whether he looked at the copy that I ordered as a result of getting it from X–IT or whether he looked at a copy that came from a searcher independently, I don't know, but he looked at the art.

*Id.* at 78–79. Further, Oslakovic provided X–IT's ladder to his associate in order "to make sure that we considered that to be part of the prior art." *Id.*

### L. August 1999 National Hardware Show

To briefly recap, by mid-August 1999, X–IT and Kidde were still discussing the possibility of the possible acquisition of X–IT by Kidde. Towards that end, X–IT sent Kidde's patent attorney (Oslakovic) a copy of X–IT's patent application on August 10, 1999 to enable Kidde to better evaluate the potential value of any intellectual property rights possessed by X–IT. Meanwhile, Kidde was developing its own version of the X–IT ladder for debut on August 15, 1999 at the National Hardware Show in Chicago (hereinafter the "1999 Show"), only five days after Oslakovic re-

ceived X–IT's patent application. These events—Kidde's possible acquisition of X–IT, and Kidde's introduction of a competitive product—would come to a head at the 1999 Show.

Again, the National Hardware Show, conducted in Chicago in August of each year, is one of the largest and most important trade shows throughout the world. *See* Pl.'s Opp. Ex. 46, Expert Report of Ken Cort, at 1. The show plays a major role in the sales process for hardware, building materials, and other related products. *See id.* The show exposes and generates great interest in thousands of products, with new items (such as X–IT's ladder at the 1998 Show and Kidde's ladder at the 1999 Show) dominating interest. *See id.* Appointments are made between vendors, such as Kidde and X–IT, and retailers, such as Home Depot, for showing and viewing products in addition to having buyers walk the aisles to look at the different products. *See id.* Naturally, in such a competitive environment, packaging and marketing draw attention to new products and generate retailer interest.

The Court can only imagine X–IT's surprise, therefore, when X–IT's principals called on the Kidde booth on the first day of the 1999 Show and observed Kidde's new "prototype" ladder, which, to X–IT, appeared to be nothing more than an exact copy of the X–IT ladder with the exception of a different and somewhat larger hooking mechanism. The Kidde web-style ladder on display at the 1999 Show even contained an "overwrap" similar to X–IT's cover or overwrap. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 63, 91–92.

Perhaps more shocking to X–IT's principals was the packaging for Kidde's new ladder that was also on display at Kidde's booth. The undisputed evidence makes clear that Kidde displayed at least four identical boxes at the 1999 Show, and that each of these Kidde boxes contained elements of X–IT's packaging that were scanned off of and directly copied from X–IT's packaging. Specifically, although the photograph on Kidde's box at the 1999 Show contains a different hooking mechanism superimposed on the body of an X–IT ladder, the models depicted in the photograph on Kidde's 1999 Show box as well as the set are the same as those depicted on X–IT's box. *Compare* Def.'s Mot. Ex. 17, KS 0242 (Kidde's 1999 Show box packaging layout), *with* Pl.'s Opp. Ex. 50, DiBelardino Aff. Ex. G. (X–IT's packaging). In addition, Kidde's box at the 1999 Show also contained diagrams that were scanned off of X–IT's packaging, including the diagram of a house that shows the proper placement of emergency escape ladders and the diagram of the ladder with the slogan "RUNGS TESTED TO 1000 lbs" superimposed thereon. *See id.*

According to Kidde, the packages were created by printing a computerized version of a packaging layout and using a spray adhesive to attach this cover to the cardboard boxes. *See* Def.'s Mot. Ex. 35, Pendergast Dep. at 55–57. Todd Pendergast ("Pendergast"), one of Kidde's creative designers, admitted that he scanned the X–IT artwork for use at the 1999 Show. At his deposition, Pendergast stated that the photo on the Kidde box, sell sheets, and PowerPoint slide at the 1999 show "was the photo that I created by scanning the X–IT box at the time and then photomanipulating our current hook technology onto this prototype photo." Pl.'s Mot. Ex. 5, Pendergast Dep. at 59. Pendergast stated that his actions with respect to the scanning and copying of X–IT's cover art were directed by Mark Schiefer ("Schiefer"), Kidde's vice-president for marketing. *See id.* at 20, 21, & 31. When Schiefer was asked during his

deposition whether "the [Kidde] art work at the 1999 Hardware Show had a scanned and modified X–IT photograph on it," Shiefer responded "[y]es." Pl.'s Mot. Ex. 6, Schiefer Dep. at 61. Finally, in X–IT's Supplemental Requests for Admission, Kidde admitted that Kidde "scanned the photograph of a boy and a woman which was on the box for the X–IT ladder." *See* Pl.'s Mot. Ex. 12, Kidde's Supplemental Resps. to X–IT's Supplemental Reqs. for Admis., at 5 (Admis.No. 8). The woman and child appearing in the X–IT photograph are DiBelardino's ex-sister-in-law and nephew. *See* Am. Compl. ¶ 13, 60. It is undisputed that Kidde did not have the permission of and paid no royalties to these models for the use of their images. *See* Pl.'s Opp. Ex. 33, Apperson Dep. at 66–67.

In addition to the four packages that were on display at the 1999 Show, it is undisputed that Kidde also employed the scanned photograph from X–IT's box on twenty sell-sheets for the new Kidde ladder at the 1999 Show, although there is no evidence that any of the sell sheets were actually distributed. *See* Def.'s Mot. Ex. 10, DiBelardino Dep. at 62–63. Kidde also included the photograph from X–IT's package in a PowerPoint slide presentation at a private meeting of its manufacturers' representatives held in conjunction with the 1999 Show on August 14, 1999. *See* Def.'s Mot. Ex. 17, KS 0757–0775. In total, therefore, according to X–IT, Kidde had at least two "prototype" ladders at the 1999 Show, at least four "prototype" packages containing X–IT–scanned images at the 1999 Show, at least twenty sell-sheets containing X–IT–scanned images at the Show, and presented a PowerPoint presentation to between fifty and seventy Kidde

employees and independent sales representatives at the 1999 Show that contained images scanned from X–IT's packaging. *See* Pl.'s Opp. Ex. 31, Apperson Dep. at 9–14; Pl.'s Opp. Ex. 23, Apperson Dep. at 31; Pl.'s Opp. Ex. 40, Schiefer Dep. at 134–36; Pl.'s Opp. Ex. 5, Hoover Dep. at 23.

In addition to the scanned artwork, Kidde's packaging at the 1999 Show also made the following claims regarding the new Kidde ladder: (1) that the new Kidde ladder was the "strongest"; (2) that it was "tested to 1,000 pounds"; (3) that the new ladder was "fire resistant"; and (4) that the new ladder was "safe." *See* Def.'s Mot. Ex. 17, KS 0242. X–IT argues in the current litigation, however, that, in fact, the new Kidde ladder on display at the 1999 Show was *not* the "strongest," was *not* "tested to 1,000 lbs," was *not* "fire resistant," and was *not* "safe," and cites to evidence in the record that supports these assertions. *See* Pl.'s Opp. Ex. 43, Kidde Am. Resp. to X–IT's Second Supplemental Req. for Admis. Nos. 20, 24; Pl.'s Opp. Ex. 5, Hoover Dep. at 42–43; Pl.'s Opp. Ex. 33, Apperson Dep. at 77; Pl.'s Opp. Ex. 23, Apperson Dep. at 78–83.[10] It is undisputed, however, that Kidde actually solicited sales for its new ladder at the 1999 Show, and employed the "prototype" ladder and "prototype" packages in that regard. *See* Pl.'s Opp. Ex. 38, Slanina Dep. at 36–38.

On August 16, 1999, representatives of Kidde and X–IT met at the 1999 Show to discuss X–IT's complaints about Kidde's display, including X–IT's claim that the ladder at the Kidde display was in fact an X–IT ladder, and X–IT's complaint concerning Kidde's copying of X–IT's packaging. *See* Def.'s Mot. Ex. 42, Ive Aff. ¶¶ 13–21. The parties do agree that, after

---

**10.** Kidde calls this "puffing." Others would use different terminology to describe these statements.

Ive complained to Kidde representatives about the use of the photograph, Kidde representatives used a black, felt-tip marker to "black-out" the faces on Kidde's packages but otherwise continued to sell the new Kidde ladder. *See* Am. Compl. ¶ 70.[11] The parties also discussed Kidde's possible violation of X–IT's intellectual property rights were X–IT to be successful in ultimately obtaining a patent. In response to Ive's statements that Kidde's ladder would infringe on X–IT's patent, Oslakovic purportedly "introduced the concept of claim groups and tried to see that it was okay [with X–IT and Ive] to discuss the subject matter of [X–IT's] patent application at that level." Def.'s Mot. Ex. 32, Oslakovic Dep. at 98. According to Kidde, Oslakovic "only spoke to the items that [Ive] brought out" regarding the X–IT patent, and did not speak of items that were not first brought out by Ive. Def.'s Mot. Ex. 19, Apperson Dep. at 139. At the meeting, Kidde's Apperson also expressed his belief that the Kidde prototype did not violate X–IT's intellectual property rights because X–IT's patent was still pending. *See id.* at 130. According to X–IT, however, it was obvious from Apperson's comments that Apperson knew details about X–IT's patent application that could only have been shared with him by Oslakovic. *See* Pl.'s Opp. Ex. 11, Ive Dep. at 83–90; Pl.'s Opp. Ex. 47, Ive Aff. ¶ 15; Pl.'s Ex. 18, Ive Aff. ¶ 9.

## M. Relevant Facts Post–1999 Show

As this protracted litigation makes clear, any talks of X–IT's possible acquisition by Kidde quickly evaporated in the wake of the 1999 Show. Consequently, on August 19, 1999, Ive requested that Oslakovic return X–IT's patent application along with a statement that no copies of the patent were made or retained. *See* Def.'s Mot. Ex. 17, KS 84. Oslakovic complied with this request on August 20, 1999. *See id.* at 297.

It is undisputed that Kidde destroyed its boxes and ladders on display at the 1999 Show shortly after the 1999 Show. *See* Pl.'s Opp. Ex. 5, Hoover Dep. at 32–33; Pl.'s Opp. Ex. 37, Arnette Dep. at 269–71. Moreover, Kidde apparently did nothing to develop its own photographs until after X–IT complained of Kidde's unauthorized use of X–IT's photographs at the 1999 Show. *See, e.g.,* Pl.'s Opp. Ex. 41, Pendergrast Dep. at 98–99. Kidde thereafter contracted with Axiom, Inc. to provide a new photograph of a woman and boy exiting from a window to replace the photograph scanned from X–IT's box. *See* Pl.'s Mot. Ex. 5., Pendergast Dep. at 98.

## N. Kidde's Commercially Available Ladder and Package as Compared to X–IT's

Kidde began accepting orders on the new Kidde ladder on October 20, 1999, when Kidde's marketing bulletin first advertised the product. *See* Def.'s Mot. Ex. 17, KS 0179–180. The ladders that Kidde began delivering in late 1999 were made of polypropylene webbing and allegedly failed Kidde's internal testing for flame resistance, conducted according to National Fire Protection Association ("NFPA") Standard No. 701. *See* Pl.'s Opp. Ex. 33, Apperson Dep. at 55–59. The Kidde ladders also contained a 1–inch wide strap (later increased to a 2–inch wide strap) in place of the overwrap on X–IT's ladders. *See* Pl.'s Mot. Ex. 24, Apperson Dep. at

---

11. It is unclear from the material currently before the Court how long the original, unmarked packages were on display in the Kidde booth prior to their being "blacked-out," although Kidde asserts without citation support that the unaltered photographs were on display for approximately 12 hours.

10–25; Pl.'s Mot. Ex. 23, Hoover Dep. at 45. The production-run Kidde ladder also differs from the X–IT ladder, *inter alia*, in that the hooking mechanism on the Kidde ladder is substantially larger than the hooking mechanism on the X–IT ladder.[12]

Kidde's commercially available packaging is also somewhat similar to X–IT's. In support of X–IT's trade dress infringement claim against Kidde, X–IT first points to the overall size of the X–IT package[13] as compared to the Kidde package: the X–IT box measures 14.5″ tall by 7.5″ wide by 5.5″ deep, while the Kidde box is approximately 16″ tall by 8.25″ wide by 6″ deep. *See* Pl.'s Mot. Ex. 2, DiBelardino Aff. Exs. F & G. Both boxes feature a woman standing at the bottom of a ladder while a young boy is exiting the house from a window above, with the models in similar poses, right down to the placement of the women's hands. *See id.* In fact, the photographer who took the picture that appears on Kidde's current box, Chuck Carlton ("Carlton") of Axiom, Inc., stated in his deposition that the X–IT photograph and the Kidde photograph are similar enough that, had he seen the X–IT photograph before taking the Kidde photograph, he would have altered his photograph. *See* Pl.'s Rep. Ex. 4, Axiom, Inc. Dep. at 70–79. In Carlton's own words, the similarity in the two photographs would have caused him "trepidation." *See id.* at 78.

Both boxes also share numerous functional elements or components in similar places. For instance, the front and back of both boxes features a "bullet" list of each ladder's key features, and both boxes carry the identical phrases "Easy to Use" and "Tangle Free" within those bullet lists. *See* Pl.'s Mot. Ex. 2, DiBelardino Aff. Exs. F & G. Both boxes identify the ladder inside as a "13 foot model for 2 story home."[14] Both boxes include the following statement on the side panel in the same location: "Eighty percent of all deaths from fire occur in the home. Provide your family with a safe way out with" [X–IT] or [the Kidde Emergency Escape Ladder]. *Id.* Immediately under this statement both boxes contain the following statement: "[The X–IT/Kidde ladder] has these superior features:" *Id.* This statement is followed on both boxes by an expanded "bullet" list of features, presented in the same manner. *See id.* The bullet lists on the sides of both boxes include the following features: "EASY TO USE," "TANGLE FREE," and "ANTI–SLIP RUNGS." The X–IT box states that the X–IT ladder's "Rungs [are] tested to 1000 lbs." *Id.* The Kidde box states that the Kidde "Ladder [is] tested to 1000 lbs." *Id.* Both boxes depict a schematic cut away of a house in the bottom portion of the side panel. *See id.* Each of these house diagrams identify, with a rectangular box, the proper location for the escape ladder. *See id.* Immediately under the house on both boxes is the following statement: "[Keep an X–IT] or [Place a Kidde Escape] Ladder in every upper floor room." *Id.*

---

**12.** Several other functional differences exist between the X–IT and Kidde ladders that are not relevant to this litigation.

**13.** X–IT maintains that the overall size of the package is important because, prior to X–IT's introduction of the X–IT ladder in 1998, emergency escape ladders were large, somewhat bulky items that were sold in large boxes. *See* Pl.'s Opp. Ex. 2, DiBelardino Aff. ¶ 9. The X–IT ladder's compact design and small

package "footprint" (or amount of shelf space required to display the X–IT ladder) therefore made it unique among the industry and somewhat desirable to retailers. *See id.*

**14.** *Id.* The Kidde box spells out the word "foot" in capital letters while the X–IT box uses the abbreviation "ft" in lower-case letters.

The presentation on the remaining side panel of the Kidde box also bears some resemblance to the X–IT box. *See id.* Both side panels are labeled in large, all capital letters with "[X–IT or KIDDE] EMERGENCY ESCAPE LADDER." *Id.* The first paragraphs of text carry the following identical language: "Equipped with … your new [X–IT/Kidde] Emergency Escape Ladder is always tangle free [and/. It is] ready-to-use in an emergency, opening in a matter of seconds, when every second counts!" *Id.* The remainder of the side panel is composed of a pictorial display on how to deploy the ladder. *See id.* Although X–IT concedes that the verbiage differs between the two pictorial displays, the presentations are similar. *See id.* Both feature three diagrams, labeled "1," "2," and "3." *Id.* Each label consists of a white number on a red background. *See id.* The first diagram on each box depicts the ladder, while the second diagram on each box depicts hooking the ladder on the window, and the third diagram on each box depicts the ladder being deployed and uses the phrase "your ladder will extend under its own weight." *Id.*

The packages are not entirely alike, however, and Kidde has pointed to several differences between the two packages. First, the background for Kidde's cover art is black with red lettering, while the background for X–IT's cover art is blue with orange-yellow lettering. *See id.* The top portion of the front and rear of each box is dominated by the companies' respective trade names, X–IT and Kidde Safety. *See id.* Kidde also contends that other alleged similarities between the boxes—primarily the photograph of a woman and child using the product to escape from the house and artwork demonstrating the use of the product—are found on many other packages in the market, including Kidde's chain-link ladder that predated the X–IT box by years. *See id.*

In any event, it is undisputed that Kidde has sold over 100,000 units of its web-style ladder since November 1999. *See* Pl.'s Mot. Ex. 18, Apperson Dep. at 95; Pl.'s Mot. Ex. 16, Solomon Dep. at 98.

## II. *Procedural Background*

Against that factual backdrop, X–IT initiated this action on July 10, 2000 by filing an eight-count Verified Complaint against Kidde. Litigation has been fast and furious since that date. The parties apparently have been able to agree among themselves on very little, thus necessitating the involvement of the Court on every facet of this case, particularly with respect to numerous discovery disputes. Although this matter was originally set for a jury trial on February 27, 2001, that date has twice been continued, and the matter is now set for a jury trial on July 23, 2001. The entire procedural history of this case is far too elongated to fully recite here; nonetheless, the Court will briefly recite a few of the more important moments in the history of this litigation so as to provide the reader with some context for the instant motions.

X–IT's Verified Complaint raises causes of action for (1) copyright infringement (Count I); (2) false designations under the Lanham Act (Count II); (3) false advertisement under the Lanham Act (Count III); (4) breach of contract (Count IV); (5) misappropriation of trade secrets (Count V); (6) unfair competition (Count VI); (7) tortious interference (Count VII); and (8) unjust enrichment and constructive trust (Count VIII). In X–IT's Prayer for Judgment, X–IT seeks (1) $7,500,000 in compensatory damages; (2) injunctive relief against Kidde; (3) Kidde's profits; (4) punitive damages; (5) attorneys' fees; and (6) X–IT's costs in bringing this action. Kidde answered X–IT's Complaint on August 16, 2000. After receiving permission

from the Court, X–IT filed an Amended Complaint on March 27, 2001, raising additional claims for, *inter alia,* breach of contract and unfair competition.

On March 28, 2001—while the trial of this matter was still set for May 14, 2001— Kidde moved the Court for leave to file a summary judgment motion with a supporting memorandum in excess of the Court's 30–page limit, as well as leave to schedule oral argument on this motion *after* the final pretrial conference. X–IT opposed this motion. On April 10, 2001, prior to receiving permission from the Court, Kidde filed the instant motion entitled "Motion to Dismiss, for Judgment on the Pleadings, and for Summary Judgment." Kidde's memorandum in support of this motion totals 75 pages, inclusive of introductory materials. At a hearing in front of Magistrate Judge Stillman on April 12, 2001, the Court (1) granted Kidde's motion to file its summary judgment motion and supporting memorandum; (2) allowed X–IT to file 67 pages of memorandum in opposition to Kidde's motion; (3) allowed X–IT to file a Motion for Summary Judgment, with supporting memorandum not to exceed 45 pages; and (4) continued the trial in this matter from the then-scheduled date (May 14, 2001) to the current date (July 23, 2001). X–IT thereafter responded to Kidde's motion, and also filed its own Motion for Partial Summary Judgment on April 26, 2001. The Court notes that the briefing on these cross-motions has been mountainous. All told, over 240 pages of memoranda have been filed with the Court, along with roughly 2,000 pages of exhibits. Also, in addition to X–IT's Motion for Partial Summary Judgment, on May 10, 2001 X–IT filed a Rule 56(f) Motion, asserting that additional discovery may be necessary to raise genuine issues of material fact to defeat Kidde's Motion for Summary Judgment.

Within the context of the cross-motions for summary judgment, the parties have also engaged in warfare over who comes before the Court with the cleanest hands. The Fort Sumter for this dispute was Kidde's Brief in Opposition to X–IT's Motion for Partial Summary Judgment, filed on May 10, 2001, which Kidde concluded with a section entitled "X–IT's Unclean Hands Bar the Entry of Summary Judgment in X–IT's Favor and Warrant the Entry of Judgment in Kidde Safety's Favor on All Claims." X–IT responded by filing, on May 17, 2001, a Motion to Strike Kidde's Unclean Hands Evidence and Argument, which of course necessitated a memorandum in opposition from Kidde (filed on May 29, 2001), as well as a reply memorandum from X–IT (filed on June 1, 2001).

The Court heard oral argument on these various motions on May 23, 2001, and at that time took the entire matter under advisement. Still, even after the conclusion of oral argument and the submission of this matter for disposition, the ebb and flow of the tide continued to carry numerous, additional filings related to these cross-motions to the courthouse door. For example, on June 14, 2001, Kidde filed a Motion with Memorandum in Support for Leave to File Correction to Summary Judgment Record. Both parties also attempted to file "Corrections" to their previously submitted memoranda. By Order entered June 20, 2001, the Court denied Kidde's Motion for Leave to File Correction to Summary Judgment Record, and directed the Clerk to return to counsel an additional document filed by Kidde entitled "Correction to Kidde Safety's Brief in Opposition to X–IT's Motion for Partial Summary Judgment."

As this brief procedural discussion makes clear, this matter has doubtlessly been fully briefed, and the memoranda were further supplemented through oral

argument. Consequently, the matter is fully ripe for disposition.

### III. *Facts Admitted for Purposes of Summary Judgment and Trial*

Local Rule of Practice 56(B) for the Eastern District of Virginia addresses certain obligations of both a party moving for summary judgment and a party opposing a motion for summary judgment. Specifically, Local Rule of Practice 56(B) states that

Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and **citing parts of the record relied on to support the listed facts as alleged to be undisputed.** A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and **citing the parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.**

(emphasis added). Additionally, Federal Rule of Civil Procedure 56(d) states, in pertinent part, that

[i]f on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court . . . shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. **It shall thereupon make an order specifying the facts that appear without substantial controversy . . . . Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.**

(emphasis added).

Based on the above-cited rules, the Court has examined the parties' briefs and finds it necessary to set forth the material facts that exist without substantial controversy as well as those facts that the parties have not contested. As such, the following facts are deemed admitted for purposes of summary judgment and trial.

1. Kidde scanned and used the art on the X–IT ladder's box, without X–IT's permission, for Kidde's own "prototype web-based ladder" at the 1999 National Hardware Show. *See* Pl.'s Mot. Ex. 1, Kidde's Resps. to X–IT's First Reqs. for Admis., at 11 (Admis.No. 44); Pl.'s Mot. Ex. 5, Pendergast Dep. at 30–32, 34, 36–37, 40–45, 47.

2. After the 1999 Show, Kidde contracted with Axiom, Inc. to provide a new photograph of a woman and boy exiting from a window, which was to replace the photograph scanned from the X–IT ladder's box. *See* Pl.'s Mot. Ex. 5, Pendergast Dep. at 98.

3. Kidde first sought non-X-IT artwork for its box after the 1999 Show. *See id.* at 99.

4. The Confidentiality Agreement, Pl.'s Mot. Ex. 14, is a true and accurate copy of the original Confidentiality Agreement.

5. Representatives of X–IT and Kidde executed the Confidentiality Agreement on June 8, 1999. *See id.*

6. The Confidentiality Agreement is valid and binding on both parties. *See* Pl.'s Mot. Ex. 15, Kidde's Am. Resp. to Supplemental Reqs. for Admis. No. 13, at 1 (Admis.No. 13).

7. As per the Confidentiality Agreement, Kidde agreed that it would use X–IT's confidential information "only for the purposes of evaluating the potential transaction with" X–IT. *See* Pl.'s Mot. Ex. 1, Kidde's Resps. to X–IT's First Reqs. for Admis., at 2 (Admis.No. 12); Pl.'s Mot. Ex. 16, Soloman Dep. at 42–46.

8. As per the Confidentiality Agreement, Kidde could not use X–IT's confidential information to introduce a competitive product. *See* Pl.'s Mot. Ex. 16, Soloman Dep. at 45–46.

9. X–IT sent its U.S. patent application to Kidde's outside patent attorney, Oslakovic, on or about August 10, 1999. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 165–68; Def.'s Mot. Ex. 17, KS 0060.

10. In between August 10, 1999 and August 15, 1999, Oslakovic analyzed the X–IT patent application and discovered that two of three sets of claims for patent protection and, in fact, three of the five actual claims in the patent application, pertained to X–IT's overwrap. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 60–61, 171.

11. Oslakovic advised Kidde of the fact that X–IT had claims regarding the overwrap prior to the 1999 Show. *See id.* at 64–65.

12. Prior to meeting with X–IT representatives at the 1999 Show, Oslakovic rendered a conclusory opinion to Kidde regarding whether the X–IT patent application covered Kidde's "prototype web-based ladder." *See* Pl.'s Mot. Ex. 22, Kidde's Resps. to X–IT's Supplemental Reqs. for Admis., at 1 (Admis.No. 1).

13. Kidde's ladder had an overwrap on it at the 1999 Show. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 63, 91; Pl.'s Mot. Ex. 23, Hoover Dep. at 45.

14. After the 1999 Show, Kidde removed the overwrap that was on its ladder and replaced it with a 1″ wide strap (later increased to 2″ wide). *See* Pl.'s Mot. Ex 24, Apperson Dep. at 22–25; Pl.'s Mot. Ex. 23, Hoover Dep. at 45.

15. The strap on Kidde's current ladder is not similar to the overwrap that Kidde had on its ladder at the 1999 Show. *See* Pl.'s Mot. Ex. 23, Hoover Dep. at 45; Pl.'s Mot. Ex. 19, Oslakovic Dep. at 177.

16. Kidde used X–IT's patent application to order prior art. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 73–80.

17. Kidde will not sell a product if it believes it is infringing another company's patent. *See* Pl.'s Mot. Ex. 10, Apperson Dep. at 108–09.

18. If Kidde's ladder was infringing X–IT's patent pending, Kidde would "remedy" the problem. *See* Pl.'s Mot. Ex. 13, Harper Dep. at 175–76.

19. Kidde has sold over 100,000 units of its web-style ladder since November 1999. *See* Pl.'s Mot. Ex. 18, Apperson Dep., at 95; Pl.'s Mot. Ex. 16, Solomon Dep., at 98.

## IV. *X–IT's Motion to Strike Kidde's Unclean Hands Evidence and Argument*

In its Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment, Kidde argues that X–IT's unclean hands should bar X–IT from any equitable relief in this case. Specifically, Kidde argues that X–IT has (1) made material misrepresentations during the course of pre-litigation business negotiations with Kidde and (2) engaged in certain litigation misconduct. In response, X–IT filed a Motion to Strike Kidde's Unclean Hands Evidence and Argument, in which X–IT contends

that "if any hands are unclean, they are Kidde's."

It is clear to the Court that Kidde raised X–IT's unclean hands as an affirmative defense in the Answer to X–IT's Amended Complaint. *See* Answer to Am. Compl. ¶ 145. As this affirmative defense is properly before the Court, X–IT's Motion to Strike is **DENIED IN PART.** The Court will now turn to the substance of Kidde's arguments relating to X–IT's alleged unclean hands.

■ With respect to Kidde's allegation that X–IT has engaged in litigation misconduct, including numerous discovery failures and frauds, the Court finds that the appropriate remedy is for Kidde to file a motion to compel and/or a motion for sanctions in this Court. Indeed, Kidde has already filed both such motions with the Court. Not surprisingly, X–IT likewise has filed a motion to compel and a motion for sanctions with the Court. The procedures and remedies available in the Federal Rules of Civil Procedure were specifically designed to apply to a case such as this in which the parties dispute anything and everything. As Kidde has alternative remedies available to it with regard to X–IT's alleged litigation conduct, the Court **STRIKES** Kidde's unclean hands argument in so far as it relates to alleged litigation misconduct only. The question remains as to X–IT's alleged unclean hands at the time of filing this lawsuit.

Next, the Court turns to Kidde's allegation that X–IT has engaged in pre-litigation misconduct that should bar its recovery of equitable relief. Specifically, Kidde alleges that X–IT made a number of material misrepresentations to Kidde during the parties' business negotiations prior to the commencement of this lawsuit. Conversely, X–IT disputes every fact set forth by Kidde in support of its unclean hands

argument and contends that Kidde has no evidence to support many of its assertions.

As a result, the Court finds that it is necessary to have an evidentiary hearing. As all of the material facts are in dispute, Kidde's unclean hands argument is not appropriate for summary judgment. The Court also finds that this matter must be resolved before the jury hears evidence in this case. Accordingly, the Court will hear the matter, with respect to pre-litigation misconduct only, on the first day of trial, outside of the presence of the jury and after the jury has been impaneled.

### V. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court explained that, "[i]n such situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. *See Anderson,* 477 U.S. at 250, 106 S.Ct.

2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991).

## VI. *Analysis*

### A. *Count I: Copyright Infringement*

#### 1. **Introduction**

In Count I of X–IT's Amended Complaint, X–IT asserts a claim against Kidde for violations of Section 106 of the Copyright Act by reproducing and displaying X–IT's photograph and cover art on Kidde's packaging, sell sheets, and Power-Point presentations at the 1999 Show as well as on Kidde's commercially available packaging. Kidde has moved for summary judgment against Count I, and X–IT has also moved for partial summary judgment on the issue of liability, but not damages, on Count I.

Kidde asserts that summary judgment should be granted in its favor on Count I because (1) X–IT did not own any copyright in the photograph at the time of any alleged infringement; (2) apart from the photograph, the elements of X–IT's cover art that were allegedly infringed do not qualify for copyright protection; (3) there is insufficient similarity between Kidde's cover art and X–IT's cover art to constitute copying under the copyright laws; (4) X–IT is not entitled to statutory damages under the Copyright Act because it had not registered any copyright at the time of the alleged infringement; and (5) there is no evidence of any actual damages caused by the alleged infringement.

Conversely, X–IT argues that partial summary judgment should be granted in its favor on Count I because (1) X–IT has standing to bring a copyright infringement action against Kidde for both Kidde's alleged copyright violations at the 1999 National Hardware Show and Kidde's alleged ongoing copyright violations with respect to Kidde's commercially available packaging; (2) Kidde has admitted to copying X–IT's photograph and package prior to the 1999 Show without X–IT's permission; and (3) Kidde's commercially available packaging is a knock-off of X–IT's packaging and therefore constitutes an ongoing infringement. The Court will address the issues raised by the parties cross-motions under Count I *seriatim.*

#### 2. **General Standards**

Copyright protection for original artwork is provided by 17 U.S.C § 102(a). That section states that:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works.

17 U.S.C. § 102(a).

■ Only the copyright owner, or the owner of exclusive rights under the copyright, at the time the alleged acts of infringement occur, has standing to bring an action for infringement of those rights. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 944 F.2d 971, 980 (2d Cir. 1991). Moreover, the Copyright Act provides, in relevant part, that "[t]he legal or

beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). Therefore, in order to establish a claim of copyright infringement, a plaintiff must prove both (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *See Feist Publications v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Alternatively, copyright protection is denied to so-called "functional" material on product labels or packaging. *See Gray v. Eskimo Pie Corp.,* 244 F.Supp. 785, 788 (D.Del.1965) (functional items such as "slogans, names, listing of ingredients or contents, are not subject to copyright").

### 3. When Did X–IT Acquire Copyright Rights to the Photograph?

 The Court begins its analysis of the various issues raised by the cross-motions for summary judgment under Count I with the preliminary issue of whether X–IT has standing to maintain a copyright infringement claim. As the above discussion makes clear, only the copyright owner, or the owner of exclusive rights under the copyright, as of the time the alleged acts of infringement occur, has standing to bring an action for infringement of those rights. *See ABKCO,* 944 F.2d at 980. Moreover, the Copyright Act provides in relevant part that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). Finally, transfers and assignments of copyrights must be in writing to be valid. *See* 17 U.S.C. § 204(a). That section provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instru-

ment of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." *Id.*

Kidde argues that X–IT lacks standing to maintain a copyright infringement claim with respect to the photograph Kidde copied and used on its boxes, sell-sheets, and PowerPoint presentation at the 1999 Show, asserting that (1) the photographer, Joel Becker ("Becker"), and not X–IT, owned the copyright to the photo from June of 1998 until the written assignment of those rights to X–IT in June of 2000 and (2) Becker never assigned any claim for past infringement to X–IT. In response, X–IT argues that Becker orally assigned all substantial rights in the photograph on June 10, 1998 after X–IT paid the invoice for Becker's services, and that the subsequent written memorializations of that assignment in June of 2000 and April of 2001 constitute a sufficient assignment under the Copyright Act, 17 U.S.C. § 204(a), so as to give X–IT standing to sue for Kidde's alleged infringement at the 1999 Show, as well as Kidde's allegedly continuing infringement with respect to Kidde's commercially available packaging. In addition, X–IT argues that Becker has also expressly assigned to X–IT any choses or causes of action that Becker might have against Kidde for Kidde's alleged infringement, thereby curing any perceived defect in the actual assignment of the copyright rights.

X–IT has brought numerous authorities to the Court's attention that support the proposition that an oral assignment of copyright rights is an effective assignment if the oral assignment is subsequently memorialized in a written document. *See Valente–Kritzer Video v. Pinckney,* 881 F.2d 772, 775 (9th Cir.1989) (holding that an oral transfer of copyright license that is

later confirmed in writing is a valid transfer); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982) (holding that the writing requirement under the Copyright Act is satisfied by a copyright owner's later execution of a writing that confirms the agreement); *Great Southern Homes, Inc. v. Johnson & Thompson Realtors*, 797 F.Supp. 609, 611 (M.D.Tenn.1992) (holding that a subsequent writing signed by a copyright owner and transferee memorializing their oral transfer agreement related back to the oral agreement and cured any defects in the transferee's standing to maintain a copyright infringement action, even though the writing was signed after the suit was filed); *Wales Indus. Inc. v. Hasbro Bradley, Inc.*, 612 F.Supp. 510, 516 (S.D.N.Y. 1985) (holding that a writing that confirms a prior oral agreement is sufficient, at least where there is no evidence of any dispute between the owner and licensee as to the validity of the allegedly oral grant). Moreover, the written memorialization relates back to the date of the oral assignment such that the assignee takes his interest in the copyright as of the time of the oral assignment. *See Nimmer on Copyright* § 10.03[A][3] (stating that 17 U.S.C. § 204(a) "codifies the judge-made rule under the 1909 Act that if a prior oral grant is subsequently confirmed in writing, it validates the grant *ab initio* as of the time of the oral grant"). Finally, as the Second Circuit stated in *Eden Toys*, when there is no dispute between the original copyright owner and his licensee or assignee, "it would be anomalous to permit a third-party infringer to invoke this [writing] provision against the licensee." *Eden Toys*, 697 F.2d at 37.

Kidde does not seriously question the validity of these authorities, nor has Kidde brought any other authorities to the Court's attention that cast doubt on these general principles. Kidde also does not seriously challenge the affidavits of Becker, Ive, and DiBelardino, and the language within the June 2000 and April 2001 assignment agreements between X–IT and Becker, all of which state that Becker orally assigned to X–IT all copyright rights to the photograph at issue in June 1998, with written memorializations of that assignment in June of 2000 and April of 2001. Rather, Kidde relies on two excerpts from Becker's deposition as evidence that there never was an oral assignment of copyright rights in June of 1998, and thus X–IT did not acquire all copyright rights to the photograph until the first written assignment from Becker and Becker–Cline Digital Photography to X–IT in June of 2000. Therefore, under Kidde's interpretation of the assignment agreements, X–IT does not have standing to sue for Kidde's alleged infringement at the 1999 Show because, according to Kidde, X–IT did not acquire an ownership interest in the copyright rights to the photograph until June of 2000.

Kidde's arguments aside, the Court finds that the undisputed evidence in this case makes clear that X–IT does have standing to sue Kidde for Kidde's alleged infringement at the 1999 Show and Kidde's allegedly continuing infringement of X–IT's copyright. According to unchallenged affidavits submitted by Ive, DiBelardino, and Becker, as well as the June 2000 and April 2001 assignment agreements, X–IT has owned the copyright to the photograph by virtue of an oral assignment from Becker and Becker–Cline Digital Photography since X–IT paid the invoice for the photograph to Becker–Cline Digital Photography on June 10, 1998. *See* Pl.'s Mot. Ex. 17, Ive Aff. ¶ 10; Pl.'s Mot. Ex. 2, DiBelardino Aff. ¶ 7 & Exs. B, C; Pl.'s Mot. Ex. 3, Becker Aff. ¶ 5. Specifically, DiBelardino states in his affidavit, dated April 26, 2001, that

[i]t was agreed that once X–IT paid [Becker–Cline's] invoice, X–IT owned the copyright in the picture that Mr. Becker took. *I understood that we retained all rights to the photographs and that we had granted Mr. Becker a limited license to the photographs as an example of the kind of photography of which he was capable. Under no circumstances was Becker or Becker–Cline given any rights to control the use of our copyrighted work.*

In June 2000, X–IT registered its copyright in both the photograph and the derivative artwork with the Copyright Office.... Subsequently, Joel Becker and Becker–Cline Digital Photography have executed two written assignments memorializing the oral agreement that existed between the parties in 1998.... The most recent assignment explicitly granted to X–IT the right to sue for all prior acts of infringement as the parties had originally intended.

Pl.'s Mot. Ex. 2, DiBelardino Aff. ¶¶ 7–8 (emphasis added).

Similarly, Becker, in his March 3, 2001 affidavit, stated that

I delivered the photographs to X–IT on or about June 8, 1998. The photographs were paid for on or about June 10, 1998. *At that time, Becker–Cline intended to and did convey all remaining rights, if any, Becker–Cline may have had to the photographs, to X–IT.*

Becker–Cline does not currently own the copyrights to the photographs taken by me on behalf of X–IT. *X–IT has owned the copyrights since at least the time the photographs were delivered to and paid for by X–IT in June of 1998.*

In the fall of 1999, X–IT advised me that Walter Kidde Portable Equipment Company, Inc. had scanned and used images off [X–IT's] packaging. X–IT asked me

to confirm my understanding that all copyrights in the photographs were owned by X–IT since at least June of 1998. I executed a "Copyright Assignment" at that time.

To the extent Becker–Cline had any remaining interest in the copyrights to the photographs at the time of Kidde's scanning and use of X–IT's cover art, Becker–Cline has assigned such rights, including the right to bring suit for past acts of infringement, to X–IT as well.

Pl.'s Mot. Ex. 3, Becker Aff. ¶¶ 5–8 (emphasis added).

Finally, Ive, in his April 25, 2001 affidavit, stated that

I understood that once X–IT paid the invoice [to Becker–Cline] in June 1998, X–IT owned the copyright in the picture that Mr. Becker took. *I understood that we retained all rights to the photograph and that we had granted Mr. Becker a limited license to display the photograph as an example of the kind of photography for which he was capable. Under no circumstances was Becker or Becker–Cline given any rights to control the use of our copyrighted work.*

Pl.'s Mot. Ex. 17, Ive Aff. ¶ 10 (emphasis added).

The June 2000 and April 2001 written memorializations of the oral assignment both confirm the DiBelardino, Becker, and Ive affidavits. The June 2000 written memorialization is very simple and straightforward and states that "Joel Becker hereby assigns Copyright Rights for photos taken for X–IT Products, LLC to X–IT Products, LLC." Pl.'s Mot. Ex. 2, DiBelardino Aff. Ex. B. The document is undated, however, it is undisputed that the document was prepared immediately prior to X–IT's registration of its copyright with the Copyright Office on June 9, 2000 be-

cause the document was submitted with X–IT's copyright application. The April 2001 written memorialization is more specific. That document, which is dated April 26, 2001, expressly provides that Becker and Becker–Cline

by instrument of assignment recorded with the Copyright Office on June 9, 2000 (the "Copyright Assignment"), memorialized its previous oral agreement of June 1998 by which [Becker and Becker–Cline] sold, granted, conveyed, assigned and set over unto [X–IT] all [Becker's and Becker–Cline's] rights, title and interest in and to the copyrights in photographs taken by [Becker and Becker–Cline] for [X–IT].

*Id.* Ex. C. In addition, the April 2001 written memorialization expressly conveys an assignment of any choses in action for infringement of the photograph at issue in this lawsuit. *See id.*

Despite the unchallenged affidavits from Ive, DiBelardino, and Becker, and the express language of the June 2000 and April 2001 written memorializations, Kidde relies exclusively on two excerpts from Becker's March 15, 2001 deposition (almost two weeks after Becker's March 3, 2001 affidavit) in support of the proposition that Becker did not orally transfer any copyright rights under the photograph to X–IT in June of 1998. In the first excerpt relied upon by Kidde, Becker testified as follows in response to questions from Kidde's counsel.

Q: Let me just make sure I understand. In 1998 you released—you gave a limited release of copyright; is that true?

A: Yes.

 \* \* \* \* \* \*

Q: And did you—you retained the broader copyright to own the photo

for whatever purposes you might put to it; is that correct?

A: That's correct.

Q: Do you still own the copyright?

A: No, I do not.

Q: Did the subsequent document that you provided to Mr. DiBelardino release your ownership in total?

A: Yes.

Q: And that occurred at a time ... some months or some other period after the August 1999 show; is that correct?

A: Yes, it seems that way.

Def.'s Opp. Ex. 1, Becker Dep. at 19–21. In the second excerpt relied upon by Kidde, Becker stated as follows in response to a question from X–IT's counsel and over the objection of Kidde's counsel.

Q: Well, let me ask the question. Were you—was it your understanding that [X–IT] had the rights of a copyright owner to say whether others could use or not use those images?

A: No.

*Id.* at 68 (objection omitted). Thus, Kidde relies on these two excerpts for the proposition that Becker did not orally transfer all copyright rights to the photograph to X–IT in June of 1998, and thus X–IT does not have standing to sue Kidde for Kidde's alleged infringement at the 1999 Show.

The Court has reviewed the entire excerpt of Becker's deposition that is attached as Exhibit 1 to Kidde's Memorandum in Opposition to X–IT's Motion for Partial Summary Judgment, and it is readily apparent to the Court that the two excerpts relied upon by Kidde do not paint the full picture of Becker's deposition testimony. First, Becker stated that the only "use" he made of the photograph between the period of 1998 and the final assignment document dated April 26, 2001 was the posting of the photograph on his Web page

to illustrate his firm's ability to create sets to fulfill clients' needs. *See id.* at 27. Second, although the invoice for the photograph at issue in this lawsuit—unlike an invoice that Becker issued for a prior photograph for X–IT—did not contain language relating to Becker's release of the copyright for the photograph upon payment, at his deposition Becker was asked the following question by Kidde's counsel.

Q: Did you have an understanding as of [June 10, 1998] that X–IT was released to reproduce this image?

A: Yes, upon payment.

Q: So the limited release was contingent upon payment for services and expenses; is that correct?

A: Correct.

*See id.* at 31. Later in his deposition, the following exchange occurred between Becker and Kidde's counsel.

Q: Did a point in time come when Mr. DiBelardino advised you that he wanted to register the copyright to the photograph, formally register the copyright to the photograph?

A: Yes.

Q: And was it at that point in time that he asked you for the assignment document?

A: I believe it was.

Q: And did you participate in the review of the application for certificate of registration?

A: No, I did not.

Q: But did you provide the assignment so that Mr. DiBelardino at that time could make that filing with the government?

A: I believe it was at that time. I'm not sure.

\* \* \* \* \* \*

Q: And this is the assignment that was requested by Mr. DiBelardino in order for him to make his registration?

A: Correct.

Q: And this was the general assignment that you gave him that was distinct from the limited release that you had previously given; is that correct?

A: Yes, *until that time it was only verbal.*

*Id.* at 46–47 (emphasis added). This excerpt makes clear that a verbal assignment was in fact made in June of 1998. The following exchange between Becker and Kidde's counsel illustrates that the June 1998 assignment was in fact a general assignment and not a limited assignment.

Q: [T]o follow up on what [counsel for X–IT] established, is it also true, that to the extent that the X–IT Products images currently, and have, appeared on your company's web site, you have had Mr. DiBelardino's expressed permission for that use; is that correct?

A: Correct.

Q: And is it your understanding that you had his expressed permission both prior to your general assignment and after your general assignment?

A: Yes. *Upon completion of the photograph in 1998, I gave Mr. DiBelardino permission to use the photograph any way he wanted and that would retain the right to use it for my own sales purposes only, meaning that I couldn't sell it to anybody else.*

*Id.* at page 60 (objection omitted) (emphasis added).

Although Becker's testimony, as a whole, is somewhat ambiguous regarding whether the assignment Becker granted to X–IT in June of 1998 is more properly characterized as a general or a limited assignment, it is abundantly clear that Becker did in fact make an oral assign-

ment of copyright rights to X–IT in June of 1998 for the photograph at issue after X–IT paid the invoice for Becker's services. Any ambiguity regarding the nature of the assignment disappears in light of the clear and uncontroverted evidence presented by X–IT by way of the Ive, DiBelardino, and Becker affidavits, as well as the express language of the June 2000 and April 2001 assignment agreements.[15] These exhibits all illustrate that the oral assignment from Becker to X–IT in June of 1998 was a general assignment, not a limited assignment, and the Court finds that the written memorializations of that assignment in June of 2000 and April of 2001 clearly satisfy the "in writing" requirement of 17 U.S.C. § 204(a). *See, e.g., Valente–Kritzer*, 881 F.2d at 774; *Eden Toys*, 697 F.2d at 37. Moreover, as in the instant case, where there is no disagreement between the assignor and the assignee over the nature of the assignment (here, Becker and X–IT), the Court agrees with the Second Circuit that "it would be anomalous to permit a third-party infringer to invoke this [writing] provision against the licensee." *Eden Toys*, 697 F.2d at 37. The Court finds that the undisputed evidence necessarily points to X–IT having received an oral assignment of all copyright rights to the photograph in June of

1998, with X–IT and Becker properly executing written memorializations of that assignment in June of 2000 and April of 2001. Consequently, the Court finds that X–IT does have standing to maintain its copyright infringement claim against Kidde for the entire period at issue, including the 1999 Show.[16] Having adjudicated the preliminary issue of whether and when X–IT acquired all copyright rights to the artwork and photographs at issue, the Court now turns to the merits of X–IT's copyright infringement claim.

### 4. Does X–IT's Packaging or Cover Art Qualify for Copyright Protection?

■ The next question that confronts the Court is whether X–IT has a valid copyright in both its photograph and cover art. It is undisputed that on June 9, 2000, the U.S. Copyright Office issued two certificates of registration to X–IT covering both the photograph on X–IT's box and the cover art on X–IT's packaging. *See* Pl.'s Opp. Ex. 44, Kidde's Resp. to X–IT's First Reqs. for Admis., at 12 (Admis.No. 48); Pl.'s Opp. Ex. 49, XIT 001266—XIT 001268 (X–IT's certificates of registration from the copyright office). Despite the issuance of these certificates of registra-

**15.** In a footnote to Kidde's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment, Kidde also argues that, for summary judgment purposes, the Court should view the perceived ambiguity in Becker's deposition concerning the nature of the oral assignment to X–IT as somehow trumping Becker's unambiguous affidavit. In support, Kidde cites four Fourth Circuit cases that stand for the proposition that a "party may not create a genuine issue of material fact by merely submitting declarations which contradict prior deposition testimony." Def.'s Opp. at 9 n.10 (citing *S.P. v. City of Takoma Park*, 134 F.3d 260, 273 n. 12 (4th Cir.1998); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir.1997); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975–76 (4th Cir.

1990); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984)). The cases relied upon by Kidde, however, all deal with conflicting statements by *parties* to the action, and Becker is not a party to this case. Moreover, unlike the cases relied upon by Kidde, Becker's unambiguous affidavit actually predated his deposition testimony by nearly two weeks.

**16.** Having resolved the assignment issue in X–IT's favor, the Court does not address X–IT's alternative argument that it has standing to sue for Kidde's alleged infringement via Becker's assignment of any choses in action for copyright infringement with respect to the photograph at issue.

tion, Kidde argues that aside from X–IT's photograph, the remainder of X–IT's cover art does not qualify for copyright protection. In support, Kidde states that copyright protection is denied to functional material on product labels such as the words and short phrases that appear on X–IT's packaging. *See Gray v. Eskimo Pie Corp.* 244 F.Supp. 785, 788 (D.Del.1965) (holding that functional items such as "slogans, names, listing of ingredients or contents, are not subject to copyright"). In response, X–IT argues that it does not claim a separate copyright in the words, slogans, or phrases on its box, nor the exclusive right to use bullet points in its packaging design. Rather, citing *Bouchat v. Baltimore Ravens,* 241 F.3d 350, 356 (4th Cir. 2001), X–IT claims that it is entitled to protection against Kidde's scanning and copying of the total embodiment of the numerous elements of its original packaging, and thus X–IT claims a copyright in its artwork *as a whole,* and not the individual elements contained therein. In *Bouchat,* the Fourth Circuit found sufficient originality in the selection, coordination, and arrangement of several public domain elements in the plaintiff's drawing to merit copyright protection. *See id.* at 356 (citing *Feist Publications, Inc. v. Rural Telephone Serv. Co.,* 499 U.S. 340, 345–46, 358, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)).

The starting point for the Court's analysis on this issue is the Copyright Act itself. The Copyright Act expressly provides that a copyright registration certificate, when issued within five years of publication of the work, constitutes prima facie evidence of ownership of a valid copyright. *See* 17 U.S.C. § 410(c). This presumption of validity applies to both the requirements of originality and susceptibility to copyright. *See Donald Frederick Evans & Assoc., Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir.1986). As it is undisputed that X–IT received its certificates of

registration within five years of publication of the work, the presumption of validity that attaches to these certificates has the effect of shifting the burden of proof to the challenging party—in this case, Kidde—to demonstrate why the item at issue is not copyrightable. *See id.*

To meet this burden, Kidde relies on two cases for the proposition that X–IT's cover art is not susceptible of copyright protection. In the first case, *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.,* 266 F.2d 541 (2d Cir.1959), the Second Circuit held that copyright protection could not be extended to "an entire cake cover" that topped a popular line of frozen cakes. *See id.* at 545. The Second Circuit held that although the plaintiff's photographs of the fresh cakes were entitled to copyright protection, other features of plaintiff's labeling, such as "circular, rectangular, or octagonal shapes or the serving directions or the ingredients" were not susceptible of copyright protection, either individually or as an entire composition. *See id.* The second case relied on by Kidde is *Alberto–Culver Co. v. Andrea Dumon, Inc.,* 466 F.2d 705, 710 (7th Cir.1972). In *Alberto–Culver,* the Seventh Circuit agreed with the district court that the plaintiff's "label as a whole—as a pictorial composition—is copyrightable," but nonetheless held that "the phrase 'the most personal sort of deodorant' is not subject to copyright protection," since it is "merely a 'short phrase or expression.'" *Id.* at 711.

In response to the *Kitchens of Sara Lee* and *Alberto–Culver* decisions relied upon by Kidde, X–IT has brought numerous cases to the Court's attention that support the proposition that, although certain elements of a product's labeling such as particular words and slogans are not copyrightable, artistic packaging, design, and labels *as a whole* are. *See Drop Dead Co. v. S.C. Johnson & Son, Inc.,* 326 F.2d 87,

93 (9th Cir.1963) (holding that a copyright in the whole PLEDGE label, including the laudatory and instructional words as well as the label design, is valid); *Tienshan, Inc. v. C.C.A. Int'l, Inc.*, 895 F.Supp. 651, 656 (S.D.N.Y.1995) (holding that a plaintiff had a valid copyright in its box design, including the photograph and arrangement of factual matter listed on the sides of the box); *S.C. Johnson & Son v. Turtle Wax, Inc.*, No. 89C5792, 1989 WL 134802, at *1–2 (N.D.Ill. Oct.17, 1989) (finding a whole label containing reddish vertical pin striping on a yellowish background and a large dark area with a ribbon extending below the company name copyrightable and not restricting the plaintiff's copyright claim to textual elements of the plaintiff's label); *Sebastian Int'l v. Consumer Contact (PTY) Ltd.*, 664 F.Supp. 909, 913 (D.N.J. 1987), *rev'd on other grounds*, 847 F.2d 1093 (3d Cir.1988) (holding that a whole label containing the language "WET is not oily, won't flake and keeps hair wet looking for hours, allowing you to sculpture, contour, wave or curl" contained a "modicum of creativity" and was thus copyrightable); *Ford Motor Co. v. B & H Supply, Inc.*, 646 F.Supp. 975, 987 (D.Minn.1986) (recognizing copyright protection in Ford's speeding car packaging, including the color schemes); *Abli Inc. v. Standard Brands Paint Co.*, 323 F.Supp. 1400 (C.D.Cal.1970) (holding that a label contained sufficient pictorial and written material so as to render it copyrightable where the label contained such phrases as "Cut to desired length. . . . Will not run. . . . Simply slide top bead into rod as illustrated").

The Court agrees with X–IT and finds that X–IT's cover art *as a whole* is susceptible of copyright protection. Indeed, the Seventh Circuit's decision in *Alberto–Culver* that Kidde heavily relies upon recognized that labels as a whole are copyrightable, even if they contain certain elements that exist in the public domain. *See*

*Alberto–Culver*, 466 F.2d at 710–11. X–IT does not—indeed it cannot—claim a copyright in the individual words or slogans that comprise X–IT's cover art. X–IT does have a valid copyright, however, in the creation and composition of X–IT's cover art as a whole, which necessarily includes the arrangement of the individual elements. This result is mandated by the Fourth Circuit's decision in *Bouchat*, where the Fourth Circuit found sufficient originality in the selection, coordination, and arrangement of several public domain elements in the plaintiff's drawing to merit copyright protection. *See Bouchat*, 241 F.3d at 356. Although the Fourth Circuit's 2001 decision in *Bouchat* alone is enough to trump the Second Circuit's 1959 decision in *Kitchens of Sara Lee* and the Seventh Circuit's 1972 decision in *Alberto–Culver* upon which Kidde relies, the Court finds that the greater weight of authorities favors extending copyright protection to X–IT's labeling and cover art *as a whole.*

Having determined that X–IT's cover art, which includes both X–IT's photograph as well as the composition of the various functional elements on X–IT's packaging, is susceptible to copyright protection, one issue remains in order to determine that X–IT has a valid copyright: whether X–IT's cover art is original. For the purpose of copyright protection, originality means only that the author created the work independently and did not copy it from another work. " '[A] work is original and may command copyright protection, even if it is completely identical with a prior work, provided it was not copied from such prior work but is rather a product of the independent efforts of its author.' " *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 n. 3 (2d Cir.1977) (quoting *Nimmer on Copyright* § 10.1, at 34). Moreover, the originality required is minimal. *See Feist Pub-*

*lications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The Supreme Court has stated that the originality requirement requires "independent creation plus a modicum of creativity." *Id.* at 346, 111 S.Ct. 1282.

Kidde does not allege that X–IT copied its cover art from any previously existing source, nor does Kidde seriously challenge the originality of X–IT's cover art. Indeed, any challenge would be futile because the undisputed evidence clearly indicates that the creativity behind X–IT's packaging artwork came from X–IT's founders, Ive and DiBelardino. X–IT (1) designed the house logo; (2) conceived the house diagram; (3) chose the fireman's picture; (4) chose the features to be listed in the bullet lists; (5) conceived the "1,2,3" deployment instructions; (6) built the set for the photograph that Becker eventually took; (7) selected the models (DiBelardino's nephew and sister-in-law) that appeared in the photograph; and (8) employed a photographer (Becker) to take a picture of the models and set that X–IT constructed. *See* Pl.'s Mot. Ex. 17, Ive Aff. ¶¶ 5–9, 11; Pl.'s Mot. Ex. 2, DiBelardino Aff. ¶¶ 5–6; Pl.'s Mot. Ex. 3, Becker Aff. ¶¶ 3–4. Consequently, the Court finds that X–IT's unique cover art is the product of X–IT's "independent creation plus a modicum of creativity," *Feist,* 499 U.S. at 346, 111 S.Ct. 1282, and therefore original to X–IT and capable of obtaining copyright protection.

**5. Did Kidde Copy X–IT's Cover Art?**

As noted above, to prevail on a copyright infringement claim, "a plaintiff must show first that she owned the copyright to the work that was allegedly copied, and second, that the defendant copied protected elements of that work." *Towler v. Sayles,* 76 F.3d 579, 581 (4th Cir.1996). At

this Opinion & Order has made clear, X–IT has shown that it owns a valid copyright in both its photograph and its cover art as a whole. Consequently, the Court now turns to the second element of an infringement claim, whether Kidde copied protected elements of X–IT's work. An attempt to show copying by Kidde involves two steps: (1) whether Kidde had access to X–IT's protected work; and (2) whether the two works are "substantially similar." *See id.* at 582. The Court will divide this portion of the analysis into two parts: (1) Kidde's alleged copying of X–IT's cover art at the 1999 Show and (2) Kidde's alleged copying of X–IT's cover art with respect to Kidde's commercially available packaging.

**a. The 1999 Show**

It is undisputed that Kidde copied certain elements of X–IT's cover art, including X–IT's photograph, and used these copies on Kidde's packaging, sell-sheets, and PowerPoint slides at the 1999 Show. Kidde has admitted that it scanned the X–IT image onto a computer and then transferred this image, after superimposing a different hooking mechanism on the escape ladder, onto the display boxes, sell sheets, and PowerPoint slides for use at the 1999 Show. Todd Pendergast ("Pendergast"), one of Kidde's creative designers, conceded that he scanned the X–IT artwork for use at the 1999 Show. At his deposition, Pendergast stated that the photo on the Kidde box, sell sheets, and PowerPoint slide at the 1999 show "was the photo that I created by scanning the X–IT box at the time and then photomanipulating our current hook technology onto this prototype photo." Pl.'s Mot. Ex. 5, Pendergast Dep. at 59. Pendergast stated that his actions with respect to the scanning and copying of X–IT's cover art were directed by Mark Schiefer ("Schiefer"), Kidde's vice-president for marketing. *See id.* at 20, 21, &

31. When Schiefer was asked during his deposition whether "the [Kidde] art work at the 1999 Hardware Show had a scanned and modified X–IT photograph on it," Shiefer responded "[y]es." Pl.'s Mot. Ex. 6, Schiefer Dep. at 61. Finally, in X–IT's Supplemental Requests for Admission, Kidde admitted that Kidde "scanned the photograph of a boy and a woman which was on the box for the X–IT ladder." *See* Pl.'s Mot. Ex. 12, Kidde's Supplemental Resps. to X–IT's Supplemental Reqs. for Admis., at 5 (Admis.No. 8).

As Kidde has admitted to copying X–IT's copyrighted photograph for use on Kidde's boxes, sell sheets, and PowerPoint slides at the 1999 Show, the Court need not address the issue of whether Kidde had access to X–IT's copyrighted artwork nor the issue of substantial similarity between X–IT's photograph and the photograph used by Kidde at the 1999 Show. Only when there is no direct evidence of copying is it necessary to prove copyright infringement through circumstantial evidence, such as proof of access and substantial similarity. *See Bouchat,* 241 F.3d at 353–54; *Towler,* 76 F.3d at 581–82 (holding that only when direct evidence is lacking is there a need to show access and substantial similarity). Where, as in this case, there is direct evidence including admissions by Kidde that the X–IT artwork was copied and used at the 1999 Show, no reliance on circumstantial evidence is required. Accordingly, the Court **GRANTS** summary judgment to X–IT on Count I on the issue of liability with respect to Kidde's infringement of X–IT's copyright for use in Kidde's packaging, sell sheets, and PowerPoint slides at the 1999 Show. All that remains for trial on the issue of Kidde's infringement of X–IT's copyrights with re-

spect to Kidde's packages, sell sheets, and PowerPoint presentation at the 1999 Show is the question of damages, which are discussed in greater detail *infra.*

**b. Kidde's Commercially Available Packaging**

■ Unlike Kidde's actions *prior to* the 1999 Show, there is no evidence that Kidde directly copied X–IT's artwork *after* the 1999 Show for use on Kidde's commercially available packaging. Consequently, X–IT can only prevail on its claims that Kidde's current packaging infringes X–IT's copyright upon a showing of substantial similarity between the two packages, because it is undisputed that Kidde had access to X–IT's package and cover art.

A showing of substantial similarity or improper appropriation is two-fold. *See Baldine v. Furniture Comfort Corp.,* 956 F.Supp. 580, 585 (M.D.N.C.1996) (citing *Towler,* 76 F.3d at 583–84). First, "a plaintiff must show—typically by expert testimony—that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection." *Id.* Second, "a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed." *Id.* This portion of the test considers whether the intended audience could determine that the works are substantially similar, without the benefit of expert testimony. *See id.*

In support of X–IT's Motion for Partial Summary Judgment on Count I, X–IT states that Kidde's current package is substantially similar to X–IT's package. X–IT first points to the overall size of the X–IT package[17] as compared to the Kidde

---

**17.** X–IT maintains that the overall size of the package is important because, prior to X–IT's introduction of the X–IT ladder in 1998, emergency escape ladders were large, somewhat bulky items that were sold in large boxes. *See* Pl.'s Opp. Ex. 2, DiBelardino Aff. ¶ 9.

package: the X–IT box measures 14.5″ tall by 7.5″ wide by 5.5″ deep, while the Kidde box is approximately 16″ tall by 8.25″ wide by 6″ deep. *See* Pl.'s Mot. Ex. 2, DiBelardino Aff. Exs. F & G. Both boxes feature a woman standing at the bottom of a ladder while a young boy is exiting the house from a window above, with the models in similar poses, right down to the placement of the women's hands. *See id.* In fact, the photographer who took the picture that appears on Kidde's current box, Chuck Carlton ("Carlton") of Axiom, Inc., stated in his deposition that the X–IT photograph and the Kidde photograph are similar enough that, had he seen the X–IT photograph before taking the Kidde photograph, he would have altered his photograph. *See* Pl.'s Rep. Ex. 4, Axiom, Inc. Dep. at 70–79. In Carlton's own words, the similarity in the two photographs would have caused him "trepidation." *See id.* at 78.

Both boxes also share numerous functional elements or components in similar places. For instance, the front and back of both boxes features a "bullet" list of each ladder's key features, and both boxes carry the identical phrases "Easy to Use" and "Tangle Free" within those bullet lists. *See* Pl.'s Mot. Ex. 2, DiBelardino Aff. Exs. F & G. Both boxes identify the ladder inside as a "13 foot model for 2 story home." *Id.*[18] Both boxes include the following statement on the side panel in the same location: "Eighty percent of all deaths from fire occur in the home. Provide your family with a safe way out with" [X–IT] or [the Kidde Emergency Escape Ladder]. *Id.* Immediately under this statement, both boxes contain the following statement: "[The X–IT/Kidde ladder]

has these superior features:" *Id.* This statement is followed on both boxes by an expanded "bullet" list of features, presented in the same manner. *See id.* The bullet lists on the sides of both boxes include the following features: "EASY TO USE," "TANGLE FREE," and "ANTI–SLIP RUNGS." The X–IT box states that the X–IT ladder's "Rungs [are] tested to 1000 lbs." *Id.* The Kidde box states that the Kidde "Ladder [is] tested to 1000 lbs." *Id.* Both boxes depict a schematic cut away of a house in the bottom portion of the side panel. *See id.* Each of these house diagrams identify, with a rectangular box, the proper location for the escape ladder. *See id.* Immediately under the house on both boxes is the following statement: "[Keep an X–IT] or [Place a Kidde Escape] Ladder in every upper floor room." *Id.*

The presentation on the remaining side panel of the Kidde box also bears some resemblance to the X–IT box. *See id.* Both side panels are labeled in large, all capital letters with "[X–IT or KIDDE] EMERGENCY ESCAPE LADDER." *Id.* The first paragraphs of text carry the following identical language: "Equipped with … your new [X–IT/Kidde] Emergency Escape Ladder is always tangle free [and/. It is] ready-to-use in an emergency, opening in a matter of seconds, when every second counts!" *Id.* The remainder of the side panel is composed of a pictorial display on how to deploy the ladder. *See id.* Although X–IT concedes that the verbiage differs between the two pictorial displays, the presentations are similar. *See id.* Both feature three diagrams, labeled "1," "2," and "3." *Id.* Each label consists of

---

The X–IT ladder's compact design and small package "footprint" (or amount of shelf space required to display the X–IT ladder) therefore made it unique among the industry and somewhat desirable to retailers. *See id.*

**18.** The Kidde box spells out the word "foot" in capital letters while the X–IT box uses the abbreviation "ft"in lower-case letters.

a white number on a red background. *See id.* The first diagram on each box depicts the ladder, while the second diagram on each box depicts hooking the ladder on the window, and the third diagram on each box depicts the ladder being deployed and uses the phrase "your ladder will extend under its own weight." *Id.*

The packages are not entirely alike, however, and Kidde has pointed to several differences between the two packages. First, the background for Kidde's cover art is black with red lettering, while the background for X–IT's cover art is blue with orange-yellow lettering. *See id.* The top portion of the front and rear of each box is dominated by the companies' respective trade names, X–IT and Kidde Safety. *See id.* Kidde also contends that other alleged similarities between the boxes—primarily the photograph of a woman and child using the product to escape from the house and artwork demonstrating the use of the product—are found on many other packages in the market, including Kidde's chain-link ladder that predated the X–IT box by years. *See id.*

As this factually intense discussion makes clear, whether the current Kidde package is substantially similar to and thereby infringes upon X–IT's copyright is largely a matter of fact and thus not appropriate for the Court's disposition on cross-motions for summary judgment. Consequently, this issue must be resolved by a finder of fact. At this stage in the litigation, X–IT has pointed to enough similarities between Kidde's current packaging and X–IT's copyright to survive a motion for summary judgment, although the Court cannot say that the packages are substantially similar so as to remove this question from the province of the jury and grant X–IT's motion for partial summary judgment on the issue of .liability with respect to Kidde's commercially available

packaging. Therefore, both X–IT's and Kidde's motions for summary judgment on the issue of Kidde's infringement of X–IT's copyright with respect to Kidde's commercially available packaging are hereby **DENIED.**

### 6. Damages

The final issue remaining for disposition of the pending motions with respect to Count I is the question of what damages are potentially recoverable by X–IT. Although damages are not an element of the prima facie case for copyright infringement, *see Davidov v. Tapemeasure Enters. Inc.*, 27 U.S.P.Q.2d 1382, 1386, 1993 WL 88234 (S.D.N.Y.1993), the Court will nonetheless address some of the outstanding issues that have been fully briefed concerning X–IT's damage claims in an effort to resolve these disputes prior to trial.

### a. Is X–IT Entitled to Statutory Damages?

The first issue that Kidde raises is that, under the Copyright Act, statutory damages—an alternative to actual damages and profits—are available to a plaintiff in a copyright infringement action only where the plaintiff has registered his or her copyright pursuant to the requirements of the Copyright Act. *See* 17 U.S.C. § 412. More importantly, a plaintiff is not entitled to recover statutory damages, which include costs and attorneys' fees, for any infringement of plaintiff's copyright that commenced *prior to* the effective date of copyright registration, regardless of whether the infringement continues *after* the effective date of copyright registration. *See id.; see also Johnson v. University of Virginia,* 606 F.Supp. 321, 324 (W.D.Va.1985) (holding that the recovery of statutory damages and attorney fees is barred for an infringement of photographs that occurred before the copyright was registered, and

continuing use of photographs after registration does not reestablish the right to recover statutory damages and attorneys' fees).

In the instant case, it is undisputed that X–IT's copyrights for the artwork on its packaging were not registered with the U.S. Copyright Office at the time of Kidde's infringement of those copyrights on August 15, 1999 at the trade show. Indeed, X–IT's copyrights were not registered until June 9, 2000—more than six (6) months after the alleged infringement of X–IT's copyrights began with respect to Kidde's commercially available packaging. Consequently, the Court finds that X–IT may not recover statutory damages under 17 U.S.C. §§ 504 and 505 for either Kidde's infringement of X–IT's copyrights at the 1999 Show or Kidde's alleged infringement of X–IT's copyrights with respect to Kidde's commercially available packaging that went on the market during the last quarter of 1999. This does not mandate the entry of summary judgment on Count I in favor of Kidde, however; X–IT still has a claim for actual damages as well as Kidde's profits.

**b. Can X–IT Establish Any Actual Damages or Entitlement to Kidde's Profits?**

■ Damages are typically a question of fact and therefore not an appropriate topic for summary judgment. Nonetheless, as Kidde argues that summary judgment should be granted in its favor on Count I due to X–IT's alleged lack of actual damages, the Court shall address the evidence that X–IT has thus far produced on this issue to demonstrate why X–IT's damage claim must ultimately be resolved by a jury.

Once infringement is established, X–IT is entitled to recover "the actual damage suffered by [X–IT] as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). That section also provides that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*

The evidence produced thus far by X–IT establishes a genuine issue of material fact as to X–IT's actual losses, including both the damage to the value of X–IT's copyrighted works and sales lost by X–IT as a result of Kidde's alleged infringement of X–IT's photograph and packaging design. For example, X–IT has put in the record evidence that William Driscoll ("Driscoll"), the owner of DeTech Firesense Technologies ("DeTech") in Mequon, Wisconsin, did not buy X–IT ladders due to Kidde's alleged copyright infringement. *See* Pl.'s Opp. Ex. 51, Driscoll Decl. ¶ 9.

According to Driscoll's declaration, DeTech supplies fire safety products to dealers throughout the United States. *See id.* ¶ 2. In early 2000, Driscoll saw an advertisement for the X–IT ladder in a catalog, and decided to stock and sell the ladder through DeTech. *See id.* ¶ 3. Consequently, Driscoll ordered an X–IT ladder and, upon inspection, considered the X–IT ladder to be an improvement over other emergency escape ladders on the market. *See id.* ¶ 4. While Driscoll was "in the process of preparing to place orders for substantial orders of X–IT ladders," he displayed the X–IT ladder to a group of sales representatives so that they would be able to explain the X–IT ladder's qualities to prospective purchasers. *See id.* ¶ 5. One of Driscoll's sales representatives called shortly after the meeting to say he

had been in a store in Kentucky and seen a ladder identical to the X–IT ladder, except being sold at a lower price than what DeTech was quoted. *See id.* ¶ 6. Driscoll then went to a Home Depot in Wisconsin where he "saw a ladder that appeared to me to be identical to the X–IT emergency escape ladder." *See id.* ¶ 7. According to Driscoll,

> [t]he fact that it had 'Kidde' on the packaging did not make me believe that the ladder was any different. The photograph on the packaging, the package design (including the selection and placement of the same points) and the ladder itself appeared to be identical to me. I was convinced that it was the same ladder I planned to buy from X–IT and that X–IT must have worked out some arrangement whereby X–IT made ladders and allowed Kidde to put its name on them.

*Id.* ¶ 7. Driscoll then informed DiBelardino of his dismay that X–IT "was allowing Kidde to sell the X–IT ladder under an arrangement in which Kidde was able to charge only $37.77 retail." *Id.* ¶ 8. Driscoll thereafter "refused to buy any ladders from X–IT" because Driscoll "remained convinced that X–IT was making the ladders for Kidde and allowing Kidde to put its label on them." *Id.* ¶ 9. According to Driscoll, "[i]f it had not been for my discovering the ladders being sold by Kidde that I considered identical to X–IT's, I would have been ordering during this time from X–IT, as originally planned." *Id.* ¶ 10. Six (6) months later, when Driscoll allegedly saw evidence that X–IT initiated this lawsuit against Kidde, Driscoll "realized that I had been mistaken in the conviction that X–IT was permitting Kidde to sell the X–IT ladder." *Id.* ¶ 10. Consequently, in December of 2000, Driscoll placed an order for over 70 X–IT ladders, and DeTech has sold an average of 15 X–

IT ladders per month out of this shipment. *See id.* ¶¶ 10–11.

In addition to the DeTech experience that X–IT has placed in the record, X–IT's former CEO, Andrew Ive, has also offered deposition and affidavit testimony regarding damages X–IT allegedly suffered as a result of Kidde's alleged actions in this case. *See* Pl.'s Opp. Ex. 11, Ive Dep. at 84–89; Pl.'s Opp. Ex. 18, Ive Aff. at ¶¶ 3, 7, 8, 10, 12–17. The Court is not passing on whether or in what amounts such alleged damages are recoverable—that is ultimately a question for the jury—or even whether all of X–IT's alleged damage evidence will be admissible at trial. Instead, the Court merely notes that, at this stage in the litigation, the record contains enough evidence of actual damages to X–IT due to Kidde's infringement of X–IT's copyright at the 1999 Show, as well as Kidde's alleged infringement with respect to Kidde's current packaging, from which a jury reasonably could find actual damages for X–IT.

Moreover, even if X–IT is unable to prove actual damages, X–IT may still be entitled to Kidde's profits that are earned as a result of the alleged infringement. *See* 17 U.S.C. § 504(b). Again, that statute states that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* Thus, as the Fourth Circuit held in *Konor Enterprises v. Eagle Publications*, 878 F.2d 138, 140 (4th Cir.1989), "regardless of the magnitude of the infringement," once there is a finding of copyright infringement and a demonstration by the plaintiff of the defendant's revenues, the burden shifts to the defendant to prove what portion of its revenue

did not result from the infringement. *See id.* X–IT has introduced evidence in the record that Kidde's gross revenues to date on the sales of Kidde's web-style ladder amount to $2,827,183. *See* Pl.'s Opp. Ex. 52, Troxel Dep. Ex. 5. Consequently, as this discussion makes clear, even in the absence of actual damages to X–IT, X–IT may still be entitled to recover Kidde's profits that are attributable to the infringement, *see id.,* and therefore it is inaccurate for Kidde to assert that summary judgment should be granted to Kidde because X–IT may not be able to show actual damages.

In conclusion, although X–IT is not entitled to statutory damages under 17 U.S.C. § 504(c) or costs and attorneys' fees under 17 U.S.C. § 505, X–IT has put enough evidence in the record to support the conclusion that a reasonable jury could award X–IT actual damages as well as Kidde's profits. Consequently, Kidde's Motion for Summary Judgment under Count I must be DENIED.

## B. *Count II: False Designations Under § 43(a) of the Lanham Act*

### 1. Introduction

Count II of X–IT's Amended Complaint is a false designations/trade dress infringement claim arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In Count II, X–IT complains that "Kidde's use of X–IT's photograph, cover art, box and design constitutes uses in commerce in connection with the sale and advertising of emergency escape ladders, of false designation of origin or description or representation, including words and other symbols tending to falsely describe or represent same," all in violation of 15 U.S.C. § 1125(a). Am. Compl. ¶ 97. Essentially, X–IT's claim under Count II is that both Kidde's current cover art and the cover art employed by Kidde at the 1999 Show are confusingly similar to X–IT's cover art, and thus consumers have been and will be misled into purchasing the Kidde ladder over the X–IT ladder.

Section 43(a) of the Lanham Act provides, in pertinent part:

> Any person who, on or in connection with any goods ... uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which (A) is likely to cause confusion ... or to deceive as to the affiliation, connection, or association of such person with another person as to the origin, sponsorship, or approval of his or her goods ... by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

█ In order to establish liability for trade dress infringement under the Lanham Act, X–IT must prove (1) that its trade dress is either (a) inherently distinctive or (b) has acquired secondary meaning so that it is perceived as identifying and distinguishing the source of the goods; (2) that its trade dress is nonfunctional; and (3) that Kidde's trade dress is likely to cause confusion among the relevant purchasing public. *See, e.g., Prufrock Ltd. v. Lasater,* 781 F.2d 129 (8th Cir.1986).

Kidde argues that it is entitled to summary judgment under Count II because (1) all of the design features at issue are functional; (2) there is no credible evidence that X–IT's product, packaging, or trade dress acquired secondary meaning at any time; (3) there is no evidence of likelihood of confusion between Kidde's product or packaging and X–IT's product or packaging; and (4) there is no evidence to support an award of damages.

In response, X–IT argues that summary judgment is not appropriate at this time

because (1) X–IT's false designations claim is not based on the functional design features of the ladder, but rather on the photograph, cover art, and box design of X–IT's package, and thus X–IT's Lanham Act claim is a packaging trade dress claim, not a product trade dress claim; (2) a presumption of "inherent distinctiveness" or "secondary meaning" arises where Kidde intentionally copied X–IT's photograph and package design, *see Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 163, 165 (4th Cir.1990) (stating that evidence of copying gives rise to a presumption of secondary meaning); (3) there is substantial evidence in the record, including the depositions of X–IT customers, that consumers have actually confused Kidde's packaging trade dress with X–IT's; and (4) where there is proof of actual copying, such as Kidde's copying of X–IT's photograph, the Court must presume that the newcomer (Kidde) intended to confuse the buying public. *See Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 466 (4th Cir.1996) ("When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the good will of the competitor's customers by getting them to believe that the new product is either the same or originates from the same source as the product whose trade dress was copied.").

Finally, in response to Kidde's argument that X–IT cannot show any actual damages, X–IT asserts that (1) the record establishes a genuine issue of material fact regarding X–IT's actual damages and (2) the Lanham Act provides X–IT with monetary relief regardless of evidence of actual damages. *See* 15 U.S.C. § 117(a) (stating that a plaintiff who proves a Lanham Act violation is entitled, subject to the principles of equity, to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action").

The Court will address these arguments *seriatim.*

## 2. Are the Design Features at Issue Functional and Thus Not Actionable?

Kidde first argues that, to the extent that X–IT's Lanham Act claims relate to the design features of Kidde's ladder, then Kidde is entitled to summary judgment on such claims under Count II because all design features of the Kidde ladder are functional and thus not actionable under the Lanham Act. *See, e.g., Sunbeam Corp. v. Equity Indus. Corp.*, 635 F.Supp. 625, 635 (E.D.Va.1986) (stating that "[m]ere similarity between products is not actionable under the Lanham Act," and "functional features which are not the subject of a valid patent or copyright may be imitated with impunity"). In response, X–IT asserts that Kidde misunderstands X–IT's false designations claim under Count II, which is not a "product trade dress" claim based on the appearance or functionability of the ladders at issue in this case, but rather is a "packaging trade dress" claim based on the photograph, cover art, and box design of Kidde's box at the 1999 Show as well as Kidde's current box. *See* Am. Compl. ¶¶ 96–99.

Indeed, a review of X–IT's Amended Complaint reveals that Count II relates solely to a packaging trade dress claim against Kidde based on the appearance of Kidde's packaging as compared to X–IT's packaging and not a product trade dress claim based on the similarity between the ladders themselves. Therefore, Kidde's argument regarding the functional nature of emergency escape ladders misses the mark, and Kidde's motion for summary judgment under Count II cannot be sustained on this basis. The Court now turns to Kidde's second argument in support of summary judgment under Count II, which

focuses on whether there is any evidence that X–IT's packaging trade dress is inherently distinctive or has acquired secondary meaning.

### 3. Can X–IT Prove that Its Packaging Trade Dress Is Inherently Distinctive or Has Acquired Secondary Meaning?

To satisfy the first element of a packaging trade dress claim under the Lanham Act, X–IT must show that its packaging trade dress is either (1) inherently distinctive or (2) has acquired secondary meaning. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The Fourth Circuit has recently stated that whether a product's trade dress is inherently distinctive "almost always involves heavily disputed facts and so is not ordinarily amenable to summary judgment." *Ashley Furniture Indus., Inc. v. Sangiacomo N.A. Ltd.,* 187 F.3d 363, 377 (4th Cir.1999) (citing *Mana Products, Inc. v. Columbia Cosmetics Mfg.,* 65 F.3d 1063, 1069 (2d Cir.1995)). Nonetheless, Kidde argues that X–IT's false designation of origin claim under Count II fails as a matter of law because X–IT's packaging trade dress is not inherently distinctive, and because X–IT has failed to put forth any evidence that X–IT's packaging trade dress acquired secondary meaning.

#### a. Is X–IT's Trade Dress Inherently Distinctive?

■ Factors that are considered in determining inherent distinctiveness include (1) whether the trade dress is a common basic shape or design; (2) whether the trade dress is unique or unusual in a particular field; and (3) whether the trade dress is a " 'mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods

viewed by the public as a dress or ornamentation for goods.' " *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1536 (11th Cir. 1986) (quoting *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854, 858 (11th Cir.1983)). In evaluating these factors, the "total image" of the packaging design must be considered such that the relevant inquiry is not whether the individual components or elements of a design are common or not, but rather whether the alleged trade dress *as a whole* is inherently distinctive. *See Two Pesos,* 505 U.S. at 764 n. 1, 112 S.Ct. 2753 (explaining that trade dress "involves the total image of a product, and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques"); *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.,* 87 F.3d 654, 657 (4th Cir.1996).

■ Kidde asserts that X–IT's trade dress is not inherently distinctive because certain individual elements of X–IT's packaging trade dress—a small rectangular box with dimensions similar to the size of the ladder, a picture of a mother and child using the ladder to escape from a burning house, and a vertical listing of the product's attributes—cannot be seen as inherently distinctive in light of the fact that a number of other emergency escape ladders that predated X–IT's ladder incorporated similar elements in their packaging trade dress. As such, Kidde maintains that if these elements are considered inherently distinctive, thus giving rise to liability without a showing of secondary meaning, then X–IT would be guilty of infringing the trade dress of numerous emergency escape ladders that predated X–IT's.

Nonetheless, as X–IT correctly points out, because one must look at the totality of the trade dress, even the fact that the "design elements have been used separately before does not foreclose the possibility

that their combination in a new, unique way will create an inherently distinctive trade dress." *Ashley Furniture*, 187 F.3d at 373. For instance, in *AmBrit*, the Eleventh Circuit affirmed the district court's finding of inherent distinctiveness in the packaging of the Klondike ice cream bar despite the fact that various elements of the alleged trade dress were previously used by others. *See AmBrit*, 812 F.2d at 1537; *see also Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 936 (7th Cir.1989) (affirming a finding that a line of greeting cards were inherently distinctive even though the cards "incorporated several common features such as stripes, dots, [and] hand-writing ... which are indigenous to all greeting cards" because of evidence that the "same combination of elements" were not previously used in other cards); *Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063, 1069 (7th Cir. 1992) ("Where the plaintiff's overall trade dress is distinctive, the fact that it uses descriptive (or generic) elements does not render it nonprotectable.").

Again, the Fourth Circuit has expressly stated that whether a product's trade dress is inherently distinctive "almost always involves heavily disputed facts and so is not ordinarily amenable to summary judgment." *Ashley Furniture*, 187 F.3d at 377 (4th Cir.1999) (citing *Mana Products*, 65 F.3d at 1069 (2d Cir.1995)). In the instant case, X–IT has put forth evidence that, in the opinion of X–IT's marketing expert, the packaging artwork before the introduction of the X–IT ladder was entirely different from X–IT's packaging and artwork. *See* Pl.'s Opp. Ex. 4, Kiecker Decl. ¶ 13; *see also* Pl.'s Opp. Ex. 58, Ive Aff. ¶ 12. According to X–IT's marketing expert, X–IT's packaging and artwork redefined the packaging and artwork in the escape ladder market due to, among other things, the larger, dominant photograph on X–IT's box that showed a fully deployed ladder, as well as the change from the large, square or rectangular boxes that predated the X–IT ladder to X–IT's tall, narrow box, which gave the X–IT ladder a smaller shelf "footprint" and allowed X–IT's photograph to show the side of a burning house with a fully deployed ladder. *See* Pl.'s Opp. Ex. 4, Kiecker Decl. ¶¶ 13, 14. Kidde has not submitted any evidence in the record to rebut the opinion of X–IT's expert that X–IT's trade dress is inherently distinctive. Consequently, X–IT has clearly raised a genuine issue of fact regarding the inherent distinctiveness of the X–IT ladder's packaging, and the Court finds that a reasonable jury could conclude on the facts submitted that X–IT's packaging trade dress is inherently distinctive. Summary judgment, therefore, in favor of Kidde under Count II is not appropriate on this basis.

**b. Has X–IT's Packaging Trade Dress Acquired Secondary Meaning?**

Although X–IT has put forth enough evidence to demonstrate that a jury might find X–IT's packaging trade dress to be inherently distinctive, the Court will also discuss whether X–IT's packaging trade dress acquired secondary meaning.

In the absence of inherent distinctiveness, a plaintiff must show that the trade dress at issue acquired secondary meaning in order to prevail on a Lanham Act claim. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. A product's overall appearance is said to have "secondary meaning" when the purchasing public associates the product's appearance with a single producer or source. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

Similar to inherent distinctiveness, whether a particular trade dress acquired

secondary meaning is a question of fact typically proven by, among other things, evidence of phenomenal sales success, extensive advertising outlays, and by expert testimony based on market surveys. *See Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 292 (7th Cir.1998); *Sunbeam,* 635 F.Supp. at 629–30. More importantly, in the Fourth Circuit, evidence of copying gives rise to a presumption of secondary meaning, such that the defendant has the burden of establishing a lack of secondary meaning at trial. *See Osem Food Indus. Ltd. v. Sherwood Foods, Inc.,* 917 F.2d 161, 163, 165 (4th Cir.1990); *M. Kramer Mfg. Co., Inc., v. Andrews,* 783 F.2d 421, 428 (4th Cir.1986). The rationale for this presumption is that when a defendant copies the trade dress of a competitor, "it is likely that he intended to appropriate some commercial advantage or benefit that his competitor derived from the use of" the trade dress. *See M. Kramer Mfg. Co.,* 783 F.2d at 449. This is not merely a shifting of the burden of proof, but a " 'presumption' upon which a judgment 'must issue' in the absence of rebutting proof." *Osem Food Indus. Ltd.,* 917 F.2d at 165.

Kidde asserts that X–IT has not put forward any evidence from which a reasonable jury could determine that X–IT's packaging trade dress acquired secondary meaning either at the time of the 1999 Show [19] or in late 1999 when Kidde's new ladder became commercially available.

Kidde further argues that X–IT's packaging was routine in every respect and therefore not capable of acquiring secondary meaning. In the instant case, however, it is undisputed that Kidde intentionally copied elements of X–IT's cover art and packaging design for use in promoting the new Kidde ladder at the 1999 Show. *See* Pl.'s Opp. Ex. 43, Kidde's Am. Resp. to X–IT's Second Supplemental Req. for Admis., at 1 (Admis.No. 18) (admitting that "Todd Pendergast, a Kidde Safety Creative Designer, scanned images off X–IT's box and developed a prototype layout that was affixed to mock-up boxes and displayed by Kidde at the 1999 National Hardware Show"); Pl.'s Opp. Ex. 40, Schiefer Dep. at 43–46; Pl.'s Ex. 41, Pendergast Dep. at 19–22. Under the controlling authority in the Fourth Circuit,[20] therefore, such intentional copying gives rise to a presumption of secondary meaning in X–IT's packaging at the time of the 1999 Show. *See Osem Food Indus. Ltd.,* 917 F.2d at 163, 165. Conclusory allegations aside, Kidde failed to put forward any evidence to rebut the presumption of secondary meaning that attaches to X–IT's packaging trade dress due to Kidde's intentional copying of that trade dress prior to the 1999 Show. Kidde has presented no studies or disclosed any expert testimony on this issue. Consequently, a reasonable jury could indeed find that X–IT's packaging trade dress acquired secondary meaning at the time of the 1999 Show, and, at trial, in the absence of rebutting proof,

---

**19.** In support of this assertion, Kidde states that, prior to the 1999 Show, the X–IT ladder "was being distributed in only a very few channels," "X–IT sold fewer than 10,000 ladders as of the 1999 Show," and "X–IT's marketing budget was very small." Def.'s Mot. at 36. Kidde cites to no factual evidence in the record to support these bare assertions, however.

**20.** It matters not that Kidde labels the Fourth Circuit's stance on this issue as the "minori-

ty" view—as long as the Eastern District of Virginia is within the bailiwick of the Fourth Circuit, the law of the Fourth Circuit is the law of this case. At the encouragement of Kidde, the Court has also reviewed the Supreme Court's recent decision in *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), however, the Court finds nothing therein that changes the law that is applicable to the instant case.

judgment must enter against Kidde on this issue. *See id.* at 165.

█ Going forward from the 1999 Show, X–IT has put evidence in the record to the effect that Kidde's later modifications did not change the fundamental appearance and similarity between X–IT's packaging and Kidde's current packaging. *See* Pl.'s Opp. Ex. 4, Kiecker Decl. ¶ 15; Pl.'s Opp. Ex. 53, Spitznagel Dep. at 14. The fact that the concept for Kidde's current packaging originated with Kidde's copy of X–IT's packaging therefore places an even greater burden on Kidde to rebut the presumption of secondary meaning that attaches to Kidde's intentional copying. For example, in *Osem Food Indus. Ltd.*, the Fourth Circuit addressed a situation closely analogous to the instant case. There, the defendant initially copied the plaintiff's trade dress on its food packaging, and the defendant later modified its packaging to create some differences between its packaging and the plaintiff's packaging. *See Osem Food Indus. Ltd.*, 917 F.2d at 163. Due to the differences between the defendant's redesigned packaging and the plaintiff's packaging, the district court did not give effect to the presumption of secondary meaning that should have attached to the defendant's initial and intentional copying of plaintiff's trade dress. *See id.* at 162. On appeal, the Fourth Circuit held that the district court erred by not properly considering the presumption of secondary meaning that arose from the defendant's initial copying. *See id.* at 163. The rationale for this result is well-founded, since failure to apply the presumption and thereby approving such redesigns would only encourage infringers. Accordingly, the Fourth Circuit in *Osem Food Indus., Ltd.* cited with approval those "courts that have indicated persuasively that once a company commits an unfair business practice it

'should thereafter be required to keep a safe distance away from the margin line.'" *Id.* at 164 n. 4 (quoting *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695 (5th Cir.1981) and citing *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 (6th Cir.1930) and *Kimberly Knitwear, Inc. v. Kimberly Stores, Inc.*, 331 F.Supp. 1339 (W.D.Mich.1971)). In fact, the Court finds that the instant case is precisely the factual scenario that requires a presumption of secondary meaning to arise simultaneous with Kidde's copying: If X–IT's cover art did not give X–IT a significant commercial advantage, then why did Kidde desire to copy the artwork in the first place?

Finally, as the experience of DeTech demonstrates, *see supra*, consumers had come to associate X–IT's packaging with X–IT's ladder. Consequently, on the record currently before the Court, a reasonable jury could conclude that X–IT's packaging trade dress acquired secondary meaning, especially in light of the presumption of secondary meaning that attaches to Kidde's intentional copying of certain elements of X–IT's packaging prior to the 1999 Show. Accordingly, since X–IT has put forth evidence from which a reasonable jury might conclude that X–IT's packaging was either inherently distinctive or acquired secondary meaning, summary judgment in favor of Kidde under Count II is not appropriate on this basis.

### 4. Does X–IT Have Any Evidence of Likelihood of Confusion?

█ Kidde next argues that it is entitled to summary judgment under Count II because there is no likelihood of confusion between Kidde's packaging or trade dress and X–IT's packaging or trade dress.

The Lanham Act requires a plaintiff to show that the defendant's allegedly infringing product creates a "likelihood of

confusion" among consumers in the marketplace. This inquiry asks whether the purchasing public is likely to mistake the source of particular goods, or to assume some association, relationship, or sponsorship between the parties or their goods when no such association actually exists. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 933 (4th Cir.1995).

Like the Court's analysis of whether X–IT's packaging trade dress is inherently distinctive or acquired secondary meaning, whether a Lanham Act plaintiff can establish likelihood of confusion is, by necessity, a fact-specific inquiry. In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements, including (1) the distinctiveness of the senior trade dress; (2) the similarity of the two trade dresses; (3) the similarity of the goods that the marks identify; (4) the similarity of the facilities employed by the parties to transact business; (5) the similarity of the advertising used by the parties; (6) the defendant's intent in adopting the same or similar trade dress; and (7) actual confusion. *See Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 463 (4th Cir.1996). Of these factors, actual confusion is "patently the best evidence [of a] likelihood of confusion." *Black & Decker v. Pro–Tech Power Inc.,* 26 F.Supp.2d 834, 852 (E.D.Va.1998).

In the instant case, X–IT has put forth evidence of actual consumer confusion. For example, Joyce Spitznagel ("Spitznagel"), a consumer in Louisville, Kentucky, stated in her deposition that she purchased an emergency escape ladder from X–IT through the mail-order catalog "Improvements." Then, several months after her X–IT ladder arrived, she visited a Home Depot store in Clarksville, Indiana and saw a display of Kidde's web-style ladder packages. Spitznagel testified as follows.

Q: Can you describe the [Kidde] emergency escape ladder box that you saw?

A: It was very similar to the X–IT box. You know, the pictures were the same. The wording pretty—I thought was the same. The wording was pretty much the same. So I stopped to see the price. Still thinking—I thought it was the same product.

\* \* \* \* \* \*

Q: Going back to the day that you were shopping that we were talking about earlier, what, if anything did you think when you saw the emergency escape ladder box at the Home Depot?

A: I thought it was the exact same ladder that I had purchased prior through the mail, and I wondered if it was the same price as I paid for mine. So I stopped and looked and, no, it was not. It was a cheaper ladder in price. So I felt like I had been taken advantage of.

\* \* \* \* \* \*

Q: Why did you think it was the exact same ladder that you had purchased?

A: Because of the pictures on it with the little boy climbing down the ladder and the words "escape ladder."

Pl.'s Opp. Ex. 53, Spitznagel Dep. at 14, 17–18. In addition to Spitznagel's testimony, X–IT also cites the experiences of De-Tech, discussed *supra,* as evidence of actual consumer confusion.

Even a few instances of actual confusion may be sufficient, by themselves, to establish a likelihood of confusion. *See Sara Lee Corp.,* 81 F.3d at 466 (characterizing six (6) instances of actual confusion as "nearly overwhelming" anecdotal evidence of actual confusion). In addition to evidence of actual confusion, however, X–IT has also presented evidence that a consum-

er survey conducted by X–IT's marketing expert, Dr. Pam Kiecker, showed that a significant number of consumers found X–IT's packaging artwork to be confusingly similar to Kidde's packaging artwork. *See* Pl.'s Opp. Ex. 4, Kiecker Decl. ¶ 24. Extrapolating the survey results to the relevant marketplace, Dr. Kiecker stated that "there is sufficient evidence to conclude that 40% of the relevant market would find the X–IT and Kidde packaging to be confusingly similar." *Id.* This expert testimony further bolsters X–IT's argument that a likelihood of confusion exists between Kidde's packaging and X–IT's packaging.

Finally, where there is proof of actual copying, as in this case, the Court presumes that the newcomer (here, Kidde) intended to confuse the buying public. *See Sara Lee*, 81 F.3d at 466 (citing *Osem Food Indus. Ltd.*, 917 F.2d at 165) ("When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied."). Therefore, because of Kidde's intentional copying of X–IT's packaging at the 1999 Show, a presumption of likelihood of confusion arises, thereby shifting the burden to Kidde to establish that consumers have not been deceived. *See Osem Food Indus. Ltd.*, 917 F.2d at 165.

Thus far, Kidde has failed to put forth any evidence that rebuts this presumption. Although Kidde exerts a great deal of effort in its brief listing the palpable differences between the X–IT and Kidde *ladders*, X–IT's claim under Count II concerns *packaging*.[21] Although Kidde relies on the fact that the two packages bear different labels—that is, the Kidde name appears across the top of the Kidde box while the X–IT name appears across the top of the X–IT box—"labels alone cannot insulate an infringer." *Samara Bros. Inc. v. Wal–Mart Stores, Inc.*, 165 F.3d 120, 127 (2d Cir.1998), *rev'd on other grounds*, 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). If having a company name on the package were dispositive, there could be no packaging trade dress claims. *See Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir.1987).

■ In sum, therefore, X–IT has put forth enough evidence from which a reasonable jury could conclude that a likelihood of confusion exists among consumers in the marketplace concerning X–IT's trade dress as compared to Kidde's trade dress. The evidence in the record reflects both actual confusion and the potential for confusion. Moreover, because of the "binding presumption of consumer confusion absent any effective rebuttal" created by Kidde's intentional and direct copying of X–IT's trade dress at the 1999 Show and the lack of any direct evidence from Kidde to rebut this presumption, summary judgment on this basis in favor of Kidde under Count II is not appropriate.

### 5. Damages

■ Finally, Kidde argues that summary judgment is appropriate against X–IT on Count II because no genuine issue of fact exists regarding X–IT's actual damages under Count II. Obviously, X–IT dis-

---

**21.** Consequently, Kidde's reliance on Judge Clark's opinion in *Sunbeam*, a case involving a *product* trade dress claim as opposed to *packaging* trade dress claim, is misplaced. "[T]he law which permits one to market an identical copy of his competitor's product does not give him freedom to imitate the appearance of the package in which the article is sold ...." *San Francisco Mercantile v. Beeba's Creations*, 704 F.Supp. 1005, 1007 (C.D.Cal.1988).

agrees, and cites to the experiences of DeTech, discussed *supra,* as evidence that X–IT incurred actual damages due to Kidde's alleged Lanham Act violation. Without delving further into this "he said/she said" debate over the extent of damage allegedly suffered by X–IT, which, like the other factual disputes in this case, will ultimately be resolved by a jury, the Court notes that the Lanham Act does not tie an award of monetary relief into an assessment of the plaintiff's actual damages. *See Wesco Mfg. Inc. v. Tropical Attractions of Palm Beach, Inc.,* 833 F.2d 1484 (11th Cir.1987) (reversing the district court's denial of an accounting and noting that a plaintiff need not prove actual damages to obtain an accounting of the infringer's profits). Rather, the Lanham Act provides that a plaintiff is entitled, subject to the principles of equity, to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 117(a). As Judge Cacheris wrote in *Black & Decker,* the "trial court's primary function is to make violations of the Lanham Act unprofitable to the [violating] party." *Black & Decker,* 26 F.Supp.2d at 855. To obtain an accounting of an infringer's profits under the Lanham Act, "[i]t is enough that the plaintiff proves the infringer's sales. The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales." *Wesco Mfg. Inc.,* 833 F.2d at 1488. Consequently, as a jury might reasonably conclude that X–IT has suffered actual damages due to Kidde's alleged conduct under Count II, and because X–IT need not show actual damages to obtain an accounting of Kidde's profits under Count II, Kidde is not entitled to summary judgment under Count II, and Kidde's Motion for Summary Judgment is hereby **DENIED** as to Count II.

## C. *Count III: False Advertisement Under § 43(a) of the Lanham Act*

### 1. Introduction

Count III of X–IT's Amended Complaint is a claim for false advertisement under the Lanham Act, 15 U.S.C. § 1125(a). Two separate incidents of alleged false advertising comprise Count III. First, X–IT complains of Kidde's actions at the 1999 Show, where Kidde's packaging for its new emergency escape ladder stated that the new Kidde ladder was "flame resistant," "tested to 1,000 lbs.," "fit[s] any window," and that the new Kidde ladder was "the strongest, safest, smallest emergency escape ladder." X–IT contends that all of these statements were literally false or misleading. Second, X–IT complains that Kidde's current, commercially available packaging also makes the following false claims: that the new Kidde ladder is "flame resistant," "tested to 1,000 pounds," "attaches quickly to any window," and is "safe."

The Lanham Act provides that any "false or misleading description of fact" or "false or misleading representation of fact" is actionable. 15 U.S.C. § 1125. In order to establish a false advertising claim under the Lanham Act, the plaintiff must show that the defendant

(1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff.

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971 (7th Cir.1999).

As to Count III, Kidde contends that (1) its "prototype" packaging at the 1999 Show did not contain any "claims" as that

term is used in the Lanham Act; (2) there is no evidence of any false claims on its packaging that could constitute a Lanham Act violation; (3) there is no evidence to support a finding that the claims at issue were material; and (4) there is no evidence to support an award of actual damages. Consequently, Kidde asserts that summary judgment should issue against X–IT on Count III.

In response, X–IT argues that summary judgment is not appropriate because (1) neither Kidde's packaging at the 1999 Show nor Kidde's booth at the 1999 Show warned buyers that the claims made on the packages were not really "claims" about the product; (2) genuine issues of fact exist regarding the literal falseness and misleading nature of Kidde's commercially available packaging; (3) the claims made by Kidde in its packaging were material; and (4) enough evidence in the record exists to support a finding of damages for X–IT and thus the issue of damages is a question for the jury. Once again, the Court will step into this fire fight and address each issue raised under Count III *seriatim.*

### 2. Did Kidde's Packaging at the 1999 Show Make Any Actionable "Claims" Under the Lanham Act?

■ Again, as with X–IT's infringement claims, X–IT's false advertisement claims must be broken down between (1) Kidde's packaging, sell-sheets, and PowerPoint slides at the 1999 Show and (2) Kidde's packaging on its commercially available ladder. With respect to X–IT's claims under Count III for Kidde's actions at the 1999 Show, Kidde contends that its packaging displays at the 1999 Show were obvious "mark-ups," and that no reasonable observer would have associated the claims or wording on Kidde's packaging at the 1999 Show with the ladder Kidde dis-

played at the 1999 Show. Rather, Kidde maintains that the packaging at the 1999 Show was "intended to demonstrate the general packaging style which would accompany the ladder when it became commercially available, and to set forth the qualities Kidde Safety anticipated its web-style ladder would have when it became commercially available." Def.'s Mot. at 44. Consequently, Kidde argues—without citation support—that the claims made on Kidde's packaging at the 1999 Show are not actionable under the Lanham Act.

Essentially, Kidde seeks to escape liability for its alleged false advertisements at the 1999 Show on the basis that its packaging at the 1999 show was merely a "prototype" or "mock-up." There is nothing in the record, however, to support Kidde's naked assertion that "[i]t was readily apparent to any observer that the wording on Kidde Safety's box made no current claims about the prototype ladder being displayed at the show," Def.'s Mot. at 44, and Kidde's destruction of the boxes after the 1999 Show precludes an independent assessment of the validity of this statement. Moreover, neither the packaging nor the booth warned potential buyers that the claims made on the packaging were not really claims about Kidde's new ladder. To the contrary, X–IT has put evidence in the record that the National Hardware Show, conducted in Chicago, Illinois in August of each year, is one of the largest and most important trade shows throughout the world. *See* Pl.'s Opp. Ex. 46, Expert Report of Ken Cort, at 1. The show plays a major role in the sales process for hardware, building materials, and other related products. *See id.* The show exposes and generates great interest in thousands of products, with new items (such as X–IT's ladder at the 1998 Show and Kidde's ladder at the 1999 Show) dominating interest. *See id.* Appointments are made between vendors, such as Kidde and X–IT, and

retailers, such as Home Depot, for showing and viewing products in addition to having buyers walk the aisles to look at the different products. *See id.* Naturally, in such a competitive environment, packaging and marketing draw attention to new products and generate retailer interest, and it is undisputed that Kidde solicited sales at the 1999 Show. *See* Pl.'s Opp. Ex. 38, Slanina Dep. at 36–38. Kidde is obviously well aware of the importance of trade shows to commerce as Kidde refrains from arguing that its actions at the 1999 Show do not constitute advertisement of goods entering interstate commerce under the Lanham Act.[22]

Moreover, Kidde has admitted that "at the time of the 1999 National Hardware Show, the Kidde 'prototype' ladder had not successfully had its rungs tested to one thousand pounds," nor had it "been successfully tested for flame resistance." Pl.'s Opp. Ex. 43, Kidde's Am. Resps. to X–IT's Second Supplemental Reqs. for Admis., at 2 (Admis.Nos.20, 24). Kidde also concedes that its ladder could not "fit any window." *See* Pl.'s Opp. Ex. 31, Apperson Dep. at 66–67. Consequently, a jury might very well conclude that these claims on Kidde's packaging at the 1999 Show were literally false. Here, Kidde would have the Court establish a rule of law that allows the introduction of fraudulent "prototypes" into the stream of commerce. The Court declines to adopt such a rule, especially where there is no evidence that either Kidde's packaging at the 1999 Show or Kidde's booth warned potential buyers that the claims made on the packaging were not really "claims" about the product. Consequently, Kidde's Motion for Summary Judgment against Count III cannot be sustained on this basis. The Court now

turns to the second issue raised by Kidde under Count III regarding whether there is any evidence of any false claims on Kidde's current packaging that could constitute a Lanham Act violation.

### 3. Does Kidde's Commercially Available Packaging Make Any False Claims that Could Constitute a Lanham Act Violation?

In addition to the allegedly false claims made on Kidde's packaging at the 1999 Show, X–IT also argues under Count III that Kidde's commercially available packaging contained literally false or misleading claims, including that the new Kidde ladder was "flame resistant," was "tested to 1,000 pounds," "attaches quickly to any window," and was "safe." In response, Kidde argues that it is entitled to summary judgment on this issue because no industry standards exist to determine flame resistance, and that any statements on Kidde's commercially available packaging amount to mere puffery. Kidde does not address X–IT's contention that, contrary to Kidde's packaging, the new Kidde ladder was unsafe and was *not* "tested to 1,000 pounds."

Again, whether an advertisement is literally false, so as to support a false advertising claim under the Lanham Act, is typically a question of fact. *See Clorox Co. Puerto Rico v. Proctor & Gamble Co.,* 228 F.3d 24, 34 (1st Cir.2000); *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.,* 83 F.Supp.2d 1016, 1023 (D.Minn.2000) (stating that the issue of literal falsity in a Lanham Act false advertising claim, including the interpretation of a commercial's message, is a question of fact that is highly dependent upon context and inference). In the instant case, the Court finds

---

**22.** The Court notes that this may be the only concession made by either party in the history of this litigation.

that X–IT has introduced ample evidence into the record from which a reasonable jury could conclude that Kidde's commercially available packaging contained literally false or misleading claims.

Before turning to this evidence, however, the Court will address Kidde's argument that "flame resistant," "tested to 1,000 pounds," "attaches quickly to any window," and "safe" amount to mere puffery that is not actionable under the Lanham Act. The Court finds that these statements are *not* "mere puffery." "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language.". *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir.1993) (holding that the claim that motor oil provides "longer engine life and better engine protection" was *not* puffery). By contrast, therefore, specific assertions that can be objectively confirmed may be actionable. The specific assertions at issue in the instant case involving claims made on Kidde's commercially available packaging are all capable of objective confirmation or rejectance, and are therefore not puffery. Assuming that X–IT can produce enough evidence of the falsity of these assertions to withstand Kidde's summary judgment motion, whether the statements at issue are literally false and thus actionable claims under the Lanham Act presents a question for the jury. The Court will now examine the evidence X–IT has produced with respect to the alleged falsity of each specific assertion at issue on Kidde's commercially available package.

▌ First, with respect to Kidde's claim that its commercially available ladder is "flame resistant," X–IT has introduced evidence that, according to testing conducted pursuant to accepted industry standards by third-party testing facilities, both the ladder Kidde displayed at the

1999 Show and Kidde's commercially available ladder were not flame resistant. *See* Pl.'s Opp. Ex. 55, Block Decl. ¶¶ 4–8. X–IT's expert on this issue, Dr. Ira Block, stated in his declaration that "[t]he testing performed at Kidde's own request in the fall of 1999 by an independent testing laboratory established that Kidde's web ladders failed the flame resistance test most widely accepted in the industry as the test for determining flame resistance of products such as the ladder webbing at issue here—a test referred to as National Fire Protection Association (NFPA) No. 701." *Id.* Aside from this alleged failure in the fall of 1999, Dr. Block also details several other, more recent testings of the Kidde ladder for flame resistance, which indicate that, each time, the Kidde ladder failed. *See id.* Although Kidde argues that no established standard exists in the emergency escape ladder industry for measuring the flame resistance of emergency escape ladders as a group, the individual components of these ladders are certainly subject to a full range of testing under numerous other accepted industry standards for measuring flame resistance. It is not the job for the Court on a summary judgment motion to determine whether one fire resistance standard is more accepted and thus applicable over another fire resistance standard and whether the Kidde ladder measures up to whatever industry standard is used. Such a task is more properly assignable to a jury. And even if the Court had the authority to delve into such an analysis, Kidde has failed to put any evidence into the record from which the Court could determine that the commercially available Kidde ladder was in fact "flame resistant." Consequently, whether Kidde's packaging makes a literally false claim with respect to the Kidde ladder's flame resistance must go to.

the jury.[23]

Second, X–IT has introduced evidence from which a jury might reasonably conclude that Kidde's commercially available ladder was not successfully "tested to 1,000 pounds." *See* Pl.'s Opp. Ex. 55, Block Decl. ¶¶ 9–12. Dr. Block allegedly reviewed mechanical/strength tests performed at Kidde's request by an independent testing laboratory in North Carolina, and these tests allegedly showed that the Kidde ladder failed certain industry standards that are designed to judge how an emergency escape ladder handles weight added to the ladder in a variety of situations. *See id.* Kidde has failed to rebut this evidence. Consequently, whether Kidde's packaging makes a literally false claim with respect to the Kidde ladder's ability to hold 1,000 pounds must go to the jury.

Third, X–IT has introduced evidence that the Kidde ladder was not capable of attaching to "any window." Indeed, Kidde's CEO at the time of the 1999 Show admitted that the commercially available Kidde ladder is not capable of attaching to every window. *See* Pl.'s Opp. Ex. 31, Apperson Dep. · at 66–67. Consequently, whether Kidde's packaging makes a literally false claim that is actionable under the Lanham Act with respect to the Kidde ladder's ability to fit "any window" is an issue for the jury.

■■■ Fourth, X–IT has introduced evidence that, contrary to the Kidde package's claim, the Kidde ladder was not "safe." In addition to the Kidde ladder's alleged deficiencies with respect to flame resistance and strength, X–IT has also introduced evidence that the tests performed on Kidde's ladder at the request of Lowe's, a potential web-ladder retailer, demonstrated that Kidde's ladder contained extremely high lead-based paint content in its surface coating. *See* Pl.'s Opp. Ex. 39, Sylvia Dep. at 58–59; Pl.'s Opp. Ex. 23, Apperson Dep. at 77–78. According to Dr. Block, "[t]he Kidde ladder's paint was 44 times the level of lead allowed by governmental regulations." *See* Pl.'s Opp. Ex. 55, Block Decl. ¶ 13. The use of lead-based paint is potentially dangerous because "Kidde's packaging and instructions encourage owners to place [a Kidde escape ladder] in every upper floor room, including children's rooms. Clearly, children will have access to the ladder and the lead content in the paint is an extreme hazard." *Id.* ¶ 14. Consequently, in Dr. Block's opinion, the Kidde ladder "was not safe, nor is it now, for a number of reasons. It was not flame resistant. It had excessive

---

**23.** Two other arguments made by Kidde on this issue must be mentioned. First, Kidde relies on Virginia's "internal rules" caselaw to escape the impact of its ladders' alleged failures on the industry tests. Citing to *Pullen v. Nickens*, 226 Va. 342, 351, 310 S.E.2d 452 (1983) (holding a company's private rules inadmissible for purposes of establishing a standard of care in negligence case), Kidde argues that its decision to analyze a swatch of its webbing under NFPA 701 does not create a standard of flame resistance for judging the veracity of the statement on Kidde's packaging. *Pullen*, however, is inapplicable when the guidelines at issue reflect business or industry practice. *See Curtis v. Fairfax Hospital Systems*, 21 Va.Cir. 275, 279, —— F.Supp.3d —— (1990) (holding that a hospital's policies reflecting "industry custom" are distinguishable from "the purely private rules held inadmissible in *Pullen* "). Second, Kidde argues that the X–IT ladder also failed a flame resistance test, although the only citation support Kidde provides for this assertion demonstrates that only X–IT's "sheath" or overwrap potentially failed a flame resistance test, not the X–IT ladder's webbing. Even if Kidde could prove that the X–IT ladder failed a flame resistance test, such evidence would not be relevant to the issue of whether Kidde's commercially available packaging made false claims that are actionable under the Lanham Act.

amounts of lead paint. And it was not as strong as claimed by Kidde." *Id.* ¶ 15. Therefore, X–IT maintains that Kidde's packaging made a literally false claim by representing the Kidde ladder to be "safe." Kidde has not come forward with any evidence to rebut X–IT's evidence on this issue. Therefore, whether Kidde's packaging makes a literally false claim that is actionable under the Lanham Act with respect to the overall safety of the Kidde ladder is an issue for the jury.

As this discussion makes clear, the statements "flame resistant," "tested to 1,000 pounds," "attaches quickly to any window," and "safe" are all capable of objective confirmation, and are therefore *not* mere puffery. In addition, X–IT has produced enough evidence of the falsity of these assertions to withstand Kidde's Motion for Summary Judgment. Consequently, the literal falsity of these assertions presents an issue for the jury, and summary judgment in favor of Kidde under Count III is therefore not appropriate on this basis.

### 4. Are the Claims Made by Kidde's Packaging "Material"?

Kidde next argues that X–IT has failed to present any evidence in support of the second and third elements of a false advertising claim under the Lanham Act— that the claims at issue actually deceive or are likely to deceive a substantial segment of their audience and that the claims at issue have a material effect on purchasing decisions. *See B. Sanfield, Inc.,* 168 F.3d at 971. The record, however, does contain evidence that experts and consumers alike deem each of the product claims at issue to be material and likely to deceive. *See* Pl.'s Opp. Ex. 4, Kiecker Decl. ¶ 22. Indeed, it is hard for the Court to grasp how Kidde can argue with a straight face that consumers shopping for an emergency escape ladder would not deem claims relating to the product's strength, fire resistance, and overall safety to have a material effect on purchasing decisions, or that allegedly false statements concerning the fire resistance of a fire escape device would not be likely to deceive customers. In any event, if X–IT can prove to the satisfaction of a jury that the claims at issue are literally false, then X–IT may not need to introduce evidence of materiality, as the Court assumes in such circumstances that the statements actually misled consumers. *See Pizza Hut v. Papa John's Int'l, Inc.,* 227 F.3d 489, 497 (5th Cir.2000). Consequently, Kidde's Motion for Summary Judgment with respect to Count III cannot be sustained on this basis.

### 5. Damages

In Kidde's final attack on Count III, Kidde argues that X–IT is unable to produce any evidence to connect Kidde's allegedly false claims with actual consumer confusion, and thus a damage award in this case is inappropriate under Count III. Nonetheless, the Court finds that a Lanham Act plaintiff need not prove actual consumer confusion or lost sales because of the false or deceptive advertising to assert a Lanham Act claim; all that is required is the likelihood of deception. *See Balance Dynamics Corp. v. Schmitt Indus.,* 204 F.3d 683, 689 (6th Cir.2000). In addition, as with X–IT's Lanham Act trade-dress claim under Count II, X–IT is not required to show actual damages to maintain its Lanham Act false-advertising claim under Count III and therefore recover the remedies provided in 15 U.S.C. § 1117, including an accounting of Kidde's profits. *See Wynn Oil Co. v. American Way Serv. Corp.,* 943 F.2d 595, 606 (6th Cir.1991); *Web Printing Controls, Co. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1203 (7th Cir.1990); *Wesco Mfg. Inc. v. Tropical Attractions of Palm Beach,* 833 F.2d 1484,

1487–88 (11th Cir.1987). The Court makes no finding on whether X–IT ultimately may be entitled to actual damages under Count III or an accounting of Kidde's profits under 15 U.S.C. § 1117. Those are issues to be resolved another day, after liability has been determined. Consequently, because X–IT is not required to establish lost sales or other actual damages resulting from the alleged misrepresentations on Kidde's packaging at the 1999 Show as well as Kidde's commercially available packaging in order to potentially recover remedies that are provided in 15 U.S.C. § 1117, Kidde's motion for summary judgment on this basis as to Count III must be **DENIED**.

## D. *Count IV: Breach of Contract*

In Count IV of X–IT's Amended Complaint, X–IT sets forth a claim against Kidde for breach of contract. This claim is based on an alleged breach of the Confidentiality Agreement, executed on June 8, 1999, as well as an oral agreement between X–IT, Kidde, and Oslakovic. X–IT contends that Kidde breached the terms of the written Confidentiality Agreement by using X–IT's patent application for purposes other than to evaluate the potential transaction between the parties. X–IT also argues that Kidde breached the oral agreement because Oslakovic revealed the contents of X–IT's patent application to Kidde. Both X–IT and Kidde have moved for summary judgment on this claim.[24]

X–IT asserts that summary judgment should be granted in its favor on Count IV because (1) Oslakovic improperly provided information to Kidde from X–IT's patent application, in violation of the Confidentiality Agreement, that permitted Kidde to "design around" X–IT's "strong patent application coverage of the ladder's overwrap;" (2) Oslakovic wrongfully obtained prior art identified in X–IT's patent application in order to assist Kidde in introducing a competitive web-type ladder and to prepare Kidde's own patent application, in violation of the Confidentiality Agreement; and (3) Oslakovic shared information with Kidde about the claims contained within X–IT's patent application, in violation of the oral agreement between the parties.

Conversely, Kidde maintains that summary judgment should be granted in its favor on Count IV because there is (1) no evidence that Kidde gained information regarding X–IT's patent application, in breach of the Confidentiality Agreement[25]

---

**24.** X–IT moves for summary judgment only on the allegations surrounding Oslakovic and Kidde's wrongful use of X–IT's patent application, in breach of the Confidentiality Agreement and the oral agreement. Kidde, on the other hand, moves for summary judgment on two claims: (1) that Kidde did not breach the Confidentiality Agreement by misusing X–IT's customer account list and (2) that Kidde did not breach the Confidentiality Agreement or the oral agreement by misusing information contained in X–IT's patent application.

**25.** One of Kidde's arguments in support of its motion bears mention at this juncture. Kidde argues that certain comments made by U.S. Magistrate Judge F. Bradford Stillman, at a February 22, 2001 hearing on a variety of then-pending motions in this case, have become the "law of the case." At the hearing in question, Magistrate Judge Stillman ruled that he could "find nothing in the communications between Kidde and Oslakovic as set out in those documents in the privilege log which indicates that the communications were made for an unlawful purpose or to further an illegal scheme or reflect ongoing or future unlawful schemes or activities." Def.'s Mot. Ex. 34, Tr. of Hearing on Pending Mots., at 9. This ruling is presently on appeal to the District Court. Judge Stillman further stated that Oslokovic did not exhibit or show copies of the patent application to Kidde. *See id.* In fact, Judge Stillman also commented that the communications between Kidde and Oslakovic "appear to me to be in compliance with the [Confidentiality and oral] agreement" and

and the oral agreement; (2) no evidence that Kidde misused X–IT's customer account list, in violation of the Confidentiality Agreement; and (3) no evidence to support an award of damages.

### 1. The Confidentiality Agreement, the Oral Agreement, and the Applicable Law

■ The Confidentiality Agreement is set forth in a letter from Kidde to X–IT and dated June 8, 1999. *See* Pl.'s Mot. Ex. 14. In pertinent part, the Confidentiality Agreement states that Kidde and its representatives will use any "confidential information"[26] provided to them by X–IT "only for the purposes of evaluating the potential transaction," which refers to Kidde's proposed acquisition of X–IT. The express terms of the Confidentiality Agreement provide that it "shall be construed under the laws of the State of North Carolina." *Id.*

The oral agreement concerns Kidde's and Oslakovic's alleged promises to X–IT that Oslakovic would not share the information contained within X–IT's patent application with Kidde. *See* Pl.'s Opp. Ex. 18, Ive Aff. ¶ 9; Pl.'s Opp. Ex. 22, Oslakovic Dep. 49–51. Indeed, Apperson testified that he and Ive discussed, orally and over e-mail, that Oslakovic was "not to share the claims" within X–IT's patent application with Kidde. *See* Pl.'s Mot. Ex. 18,

Apperson Dep. at 227. The oral agreement is reflected, in part, by a cover letter, written by Ive to Oslakovic and attached to the copy of X–IT's patent application sent to Oslakovic. The cover letter states that

> [a]s per our telephone conversation, we are attempting to ensure that the specific of the patent and the information contained within it are kept separate and not shared with Kidde Safety. Kidde and X–IT Products have agreed to have you and your organization give feedback on the patent without giving Kidde specific wording or diagrams from the patent. If possible, we would like to get your thoughts on its strength and the potential it has to protect the product from infringement when it is awarded.

Def.'s Mot. Ex. 17, KS 0060.

Under North Carolina law, X–IT must prove the existence of a contract between the parties, the specific provisions of the contract breached, the facts constituting a breach, and damages resulting from that breach. *See Cantrell v. Woodhill Enters., Inc.,* 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968). Both parties agree that they executed the Confidentiality Agreement and the Court assumes the validity of this Agreement.[27] With regard to the oral agreement, however, Kidde asserted at the hearing on these motions that X–IT had not timely or properly raised its claim of

---

that the "communications were appropriate in all respects." *Id.* at 9.

The Court finds that Magistrate Judge Stillman's rulings concerned only whether the communications between Kidde and Oslakovic were subject to an exception to the attorney-client privilege. Judge Stillman did not rule on the merits of the breach of contract claim and, as a result, his comments most definitely have *not* become the "law of the case." Moreover, Judge Stillman's ruling is presently on appeal to the District Court.

**26.** As detailed in the Factual Background, the Agreement defines "confidential information" as any information that is not in the public domain at the time of its disclosure to Kidde, is not in Kidde's possession prior to X–IT's disclosure to Kidde, is not independently developed by Kidde, is not obtained by Kidde from a third-party, and is not disclosed pursuant to an order or requirement of a court, administrative agency, or other governmental body. *See id.*

**27.** Indeed, neither party attacks the validity of the Confidentiality Agreement.

an oral agreement. Despite Kidde's representations, the Court finds that X–IT included its allegation of an oral agreement in the Amended Complaint, which was filed by court order.[28] Therefore, X–IT's claim regarding the oral agreement is properly before the Court. As both parties agree that North Carolina law governs the breach of contract claims, the Court's analysis will focus on whether Kidde breached the contracts at issue and whether X–IT suffered any damages as a result of any such breach.

### 2. Did Oslakovic Breach the Confidentiality Agreement by Advising Kidde that X–IT's Patent Application Contained Claims Regarding the Overwrap?

X–IT first contends that Oslakovic violated the terms of the Confidentiality Agreement by disclosing information contained within X–IT's patent application to Kidde, which permitted Kidde to "design around" X–IT's "strong patent application coverage of the ladder's overwrap." An analysis of this argument requires a discussion of the pertinent factual background of the case.

### a. The Factual Context

In reliance on the Confidentiality Agreement, as well as the oral agreement between the parties concerning the scope of Oslakovic's review of X–IT's patent application, X–IT provided a copy of its patent application to Oslakovic in August of 1999. *See* Def.'s Mot. Ex. 17, KS 0060. Oslakovic's task was to review X–IT's patent application and to advise Kidde on the strength of the potential patent, in order to facilitate further business negotiations between Kidde and X–IT. *See* Pl.'s Opp. Ex. 22, Oslakovic Dep. at 51; Pl.'s Mot. Ex. 16, Soloman Dep. at 43–44. In sum, Kidde's decision whether to purchase X–IT depended in part on the strength of X–IT's patent application.

Oslakovic understood that X–IT shared its patent application with him pursuant to the terms of the Confidentiality Agreement.[29] Oslakovic was not free to exhibit the original or show copies of X–IT's patent application to Kidde. Oslakovic was not allowed to share the claims contained within the patent application with Kidde. *See* Pl.'s Mot. Ex. 18, Apperson Dep. at 227. Further, Kidde could not use confidential information gained from X–IT's patent application to introduce a competitive product. *See* Pl.'s Mot. Ex. 16, Soloman Dep. at 45–46.

Three of the five claims for protection in X–IT's patent application focused on the ladder's overwrap mechanism. Despite Oslakovic's knowledge about the Confidentiality Agreement, Oslakovic admits that he shared information with Kidde regarding the overwrap claims in X–IT's patent application. *See* Pl.'s Opp. Ex. 22, Oslako-

---

28. At oral argument, counsel for Kidde informed the Court that in response to an interrogatory, which asked X–IT to identify each and every contract it alleged that Kidde breached, X–IT identified *only* the Confidentiality Agreement and *not* an oral agreement. Kidde also vehemently argued to the Court that X–IT *never* supplemented its response to that interrogatory and therefore, the Court should not entertain X–IT's claims regarding an oral agreement. However, what counsel failed to bring to the Court's attention was that, subsequent to the interrogatory at issue, X–IT filed an Amended Complaint specifically alleging the existence of an oral agreement. The Amended Complaint was filed with the permission of Magistrate Judge Stillman and, therefore, is properly before the Court.

29. Pl.'s Opp. Ex. 22, Oslakovic Dep. at 26. Interestingly, however, Oslakovic states that he "never looked at" the Confidentiality Agreement prior to his deposition on December 7, 2000, and that he had only seen it "from a distance." *Id.* at 39.

vic Dep. at 64–65. Specifically, Oslakovic states that he "advised [Kidde] that the protection being sought [by X–IT] dealt generally with overwrapping, and [he asked] about what Kidde was intending to use." *Id.* at 65; Pl.'s Mot. Ex. 22, Reqs. for Admis., at 2, (Admis.No. 3). Kidde substantiates Oslakovic's statement, by acknowledging that Oslakovic reviewed X–IT's patent application and "in order to do [his] job, [he] advised [Kidde] that the protection being sought [by X–IT] dealt generally with overwrapping." *Id.*

Oslakovic states that he provided Kidde's Apperson with information about the overwrap claims in X–IT's patent application *prior to* the 1999 Show. *See* Pl.'s Opp. Ex. 22, Oslakovic Dep. at 63–65. Apperson, on the other hand, denies that he spoke with Oslakovic *prior to* the 1999 Show about the overwrap claims in X–IT's patent application. *See* Pl.'s Opp. Ex. 23, Apperson Dep. at 42–43. It is undisputed, however, that at the 1999 Show, Kidde's ladder had the same overwrap as X–IT's ladder. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 63; Pl.'s Mot. Ex. 23, Hoover Dep. at 45. It is also undisputed that after the 1999 Show, Kidde removed the overwrap and replaced it with a strap device. *See* Pl.'s Mot. Ex. 24, Apperson Dep. at 22–25; Pl.'s Mot. Ex. 23, Hoover Dep. at 45.

### b. X–IT's and Kidde's Arguments

Based on the facts presented, X–IT argues that Oslakovic disclosed information from X–IT's patent application to Kidde for a purpose other than to "evaluat[e] the potential transaction" between the parties. Instead, X–IT argues that, after Kidde learned about X–IT's overwrap claims for patent protection, Kidde then wrongfully "designed around" X–IT's pending patent claims by removing the overwrap from its ladder and replacing it with a narrow strap. X–IT specifically focuses on the

fact that Kidde's 1999 Show ladder had the same overwrap as X–IT's ladder, but after the show and after Oslakovic disclosed information to Kidde about X–IT's patent application, Kidde removed the overwrap from its Show ladder and replaced it with a 1″ wide strap (later increased to a 2″ wide strap). Based on this evidence, X–IT maintains that Oslakovic disclosed information to Kidde about X–IT's overwrap claims not to evaluate the potential transaction, but to help Kidde "design around" the X–IT ladder's claims for patent protection.

In contrast, Kidde argues that there is no evidence that either Oslakovic or Kidde breached the Confidentiality Agreement. Kidde summarily maintains that any disclosure by Oslakovic to Kidde regarding X–IT's patent application was necessary to analyze the strength of X–IT's patent application for purposes of evaluating the potential transaction between the parties. Kidde adds more fire to its argument by contending that it had decided, *prior to* the 1999 Show and *prior to* Oslakovic's receipt of X–IT's patent application, to employ a larger hooking mechanism, which would necessarily require a different overwrap than X–IT's ladder.

### c. Analysis

At the hearing on these motions, Kidde's counsel cited the deposition testimony of Pamela Calderwood, one of the Kidde employees responsible for developing Kidde's new escape ladder in June of 1999, *see* Def.'s Opp. Ex. 8, Calderwood Dep. at 33–34, for the proposition that Kidde had decided *prior to* the 1999 Show to use a larger hooking mechanism and therefore a different overwrap. Specifically, Kidde's counsel represented to the Court that Calderwood testified that

> in a company-wide design program a decision was made to go to a larger and differently styled and shaped hooking

mechanism that by its nature meant we were not going to use a hooking mechanism like the X–IT—a wrapping mechanism like the X–IT wrap because the X–IT wrap would not work with a newly designed hooking mechanism. That decision was made prior to the show.

Tr. at 58. The limited amount of Calderwood's testimony provided to the Court, however, does not support this assertion. Calderwood testified only that Kidde's ladder "changed throughout time.... It had several different design modifications that were made during the development phase.... [It had undergone] in upwards of eight to ten different revisions in prototypes ...." *Id.* Further, in describing the "material wrap" that was employed on Kidde's ladder at the 1999 Show, Calderwood stated only that

> [t]he wrap that we were working with was one that would not be self-deploying. When we had done focus testing, it had indicated that what is crucial to the successful development of the product is to deploy it after the window hooks are attached and after the product is hanging out the window. For that reason, we were very nervous about using Velcro, because what we found in our focus test is that if someone went through and deployed the product inside the house, it was then tangled and it could not be easily extended out the window in its proper format. So what we were looking at is for a material wrap that was going to bundle the rungs together.

*Id.* at 236.

This testimony does not support Kidde's assertion that it had conclusively decided, *prior to* Oslakovic's receipt of X–IT's patent application, to use a larger hooking mechanism and a different overwrap. Calderwood's testimony, which was provided specifically in answer to a question about the overwrap on Kidde's 1999 Show ladder, was only that Kidde was experi-

menting with different design options for the overwrap mechanism. Indeed, when Apperson was asked about the overwrap Kidde used on its "prototype" ladder displayed at the 1999 Show, he admitted that in August of 1999, Kidde "had really not gotten to that portion of the design [the overwrap] at this stage in the prototype. We could not have gotten to that part of the design, because the hooking mechanism was just in the process of being finalized." Def.'s Opp. Ex. 19, Apperson Dep. at 27–28.

Based on this evidence, and viewing the facts in a light most favorable to X–IT, the Court finds that a jury may reasonably conclude that Oslakovic and Kidde breached the Confidentiality Agreement by sharing information with Kidde about X–IT's overwrap claims for a purpose other than to evaluate the potential transaction between the parties. The Court recognizes, however, that this is only one inference that is reasonable in light of the facts. Accordingly, the Court likewise finds that a jury may reasonably conclude that Oslakovic and Kidde did not breach the Confidentiality Agreement. That is, a jury may find that Oslakovic's disclosures to Kidde were only for the purpose of evaluating the potential transaction between the parties. Further, a jury may find that Kidde independently decided not to use an overwrap device like X–IT's on its own ladder at a time *prior to* Oslakovic's receipt of X–IT's patent application. The Court finds that the facts presented create a genuine issue for trial.

**3. Did Oslakovic Breach the Confidentiality Agreement by Obtaining Prior Art Identified in X–IT's Patent Application To Assist Kidde in Introducing a Competitive Product and To Prepare Kidde's Own Patent Application?**

■ X–IT also contends that Kidde violated the Confidentiality Agreement by

obtaining prior art identified in X–IT's patent application not to analyze the value of X–IT's patent application for purposes of the potential transaction, but to introduce a competitive product and to prepare its own patent application on its new ladder. Kidde, in contrast, admits that Oslakovic obtained prior art identified in X–IT's patent application, but denies that it later used this information to prepare its own patent application. Instead, Kidde maintains that Oslakovic ordered some of the prior art mentioned in X–IT's patent application only to conduct his own evaluation of the strength of X–IT's patent application. Kidde adds more fuel to the fire by arguing that the prior art identified in X–IT's patent application is not subject to the Confidentiality Agreement because it constitutes information that is in the public domain. Again, a brief recitation of the relevant facts is necessary to aid the Court's analysis.

### a. Pertinent Facts

X–IT's patent application contained a recitation of prior art pertaining to escape-type ladders. Before receiving X–IT's patent application, Oslakovic had not seen or reviewed any prior art relating to emergency escape ladders. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 77. Oslakovic admitted to using X–IT's patent application before the 1999 Show to order some of the prior art contained within X–IT's patent application. *See id.* at 73. Oslakovic also states that he gathered some prior art independent of X–IT's patent application. *See id.* at 78. Ultimately, Oslakovic obtained all of the prior art identified in X–IT's patent application. *See id.* at 73.

It is undisputed that an associate from Oslakovic's law firm prepared the patent application for Kidde's competitive ladder. *See id.* at 77–78. Although the file that the associate used to prepare Kidde's

patent application contained the prior art obtained from X–IT's patent application, Oslakovic states that "[w]hether [the associate] looked at it or not, I really don't know." *Id.* at 78. Oslakovic maintains that

> [w]e had some art from [X–IT's patent application], some art from other sources. Some of it overlapped. There was art.... Whether he looked at the copy that I ordered as a result of getting it from X–IT or whether he looked at a copy that came from a searcher independently, I don't know, but he looked at the art.

*Id.* at 78–79. Further, Oslakovic provided X–IT's ladder to his associate "to make sure that we considered that to be part of the prior art." *Id.*

### b. Analysis

The Court recognizes that prior art, by definition, is not confidential information. The relationship between Oslakovic and Kidde with regard to X–IT's patent application and the Confidentiality Agreement, however, sparks a flame in the Court's eye. There is a fine line between (1) Oslakovic's role in evaluating the strength of X–IT's patent application for the purpose of advising Kidde about its potential acquisition of X–IT and (2) Oslakovic's role in preparing Kidde's patent application for a competitive escape ladder. Based on the evidence presented, and viewing the facts in a light most favorable to X–IT, the Court finds that a jury may reasonably conclude that Kidde used X–IT's patent application for a purpose other than to "evaluat[e] the potential transaction." For instance, one reasonable inference from the facts is that Oslakovic used the prior art gained by reference to X–IT's confidential patent application in order to assist the preparation of Kidde's patent application on its competitive ladder. On the other hand, the Court recognizes that in order to evaluate

the worth of X–IT's patent application, it was necessary for Oslakovic to order and analyze the prior art identified within the application. As Oslakovic explains in his deposition, "you can't evaluate the strength of a patent in a vacuum." Def.'s Mot. Ex. 32, Oslakovic Dep. at 70. For this reason, Oslakovic maintains that he ordered prior art identified by X–IT's patent application "in order to do this job on the timeline that Mr. Ive and Mr. Apperson had set for me." *Id.* at 74. As such, the Court finds that a genuine issue of material fact exists for trial and neither party is entitled to summary judgment on this issue.

### 4. Did Oslakovic Share Information with Kidde About the Claims Within X–IT's Patent Application, in Violation of the Oral Agreement?

X–IT also argues that Oslakovic shared information concerning the claims within X–IT's patent application with Kidde, in violation of the oral agreement between X–IT, Kidde, and Oslakovic, which restricted Oslakovic from revealing such information to Kidde. Again, Apperson confirmed that X–IT and Kidde entered an oral agreement regarding the scope of Oslakovic's review of X–IT's patent application. *See* Pl.'s Mot. Ex. 18, Apperson Dep. at 226–27. Specifically, Apperson stated that "Oslakovic was not to share the claims [contained within X–IT's patent application] with Kidde." *Id.* at 227. The cover letter attached to the copy of the patent application, which reflects the parties' oral agreement, requests that Oslakovic keep the "specific of the patent and the information contained within it . . . separate and not shared with Kidde." Def.'s Mot. Ex. 17, KS 0060. Additionally, it asks that Oslakovic not give Kidde "specific wording or diagrams from the patent." *Id.*

The testimony in the record points to the fact that Oslakovic did inform Kidde, at least generally, about information contained within X–IT's patent application. Whether these disclosures breached the oral agreement, however, is an issue to be resolved at trial by a finder of fact. The evidence before the Court creates a genuine issue of material fact.

The facts relevant to this issue are as follows. After analyzing X–IT's patent application before the 1999 Show, Oslakovic admits that he communicated "some of [his] conclusions" to Kidde, including whether the new Kidde ladder was covered by X–IT's patent application. *See* Def.'s Ex. 32, Oslakovic Dep. at 63–64, 97–100. Oslakovic spoke with Apperson on "at least two" occasions after receiving X–IT's patent application and prior to the 1999 Show. *See id.* at 74. On these occasions, Oslakovic advised Kidde that X–IT had patent claims that "dealt generally with overwrapping," *id.* at 65, and that X–IT's patent application made three independent claims that pertained to the X–IT ladder's cover or overwrap, *see* Pl.'s Opp. Ex. 23, Oslakovic Dep. at 63, 83. Oslakovic communicated these findings to Apperson and told Apperson that he "needed to know about what Kidde was intending to use" for Kidde's new prototype ladder. *Id.* at 65. Although Apperson acknowledges that Oslakovic asked him, *prior to* the 1999 Show, what Kidde was "intending to do relative to overwapping," he denies that he spoke with Oslakovic prior to the Show about X–IT's "patent claims around the overwrap." Pl.'s Opp. Ex. 23, Apperson Dep. at 42–43. In fact, Apperson states that he "do[es] not think [Oslakovic] mentioned that X–IT's primary goals were around overwrapping." *Id.* at 43.

Based on this evidence, the Court finds that a genuine issue of material fact exists regarding (1) the scope of the oral agree-

ment and (2) whether Oslakovic's disclosures breached the oral agreement. For these reasons, summary judgment for either party is inappropriate.

### 5. Did Kidde Breach the Confidentiality Agreement By Misusing X-IT's Customer Accounts Lists?

 The next fire that the Court must address is Kidde's argument that it is entitled to summary judgment on X-IT's claim that it misused X-IT's closed and projected customer account list.[30] In the Amended Complaint, X-IT contends that Kidde obtained sensitive business development information from X-IT that Kidde used to thwart X-IT's account development efforts. Kidde argues that it is entitled to summary judgment on this claim because (1) the names of X-IT's actual and potential customers were published in the 1998 Case Study and (2) retail stores to which X-IT marketed its ladder are public knowledge. In opposition, X-IT maintains that the customer list published in the 1998 Case Study was different from X-IT's actual customer list, which was disclosed to Kidde pursuant to the terms of the Confidentiality Agreement.

The Court finds that the potential customers that X-IT listed in its 1998 Case Study are substantially similar to the actual and proposed customers that X-IT actually targeted. *Compare* Pl.'s Opp. Ex. 8, X-IT Customer List *with* Def.'s Mot. Ex. 13, X-IT Case Study. Further, all of the closed and projected accounts that X-IT targeted are with major retail chains and catalogs. All of these major retailers are public knowledge. In fact, Kidde had pre-existing relationships with many of these

companies. X-IT, in its 1998 Case Study, had even identified Kidde as a "market leader" and acknowledged that Kidde distributed predominantly through national retailers. *See* Def.'s Mot. Ex. 13, X-IT Case Study. Although it is true that the 1998 Case Study did not include the status of X-IT's efforts with each account, the Court finds that this is immaterial.

For these reasons, the Court finds, as a matter of law, that X-IT's list of actual and projected customers does not qualify as "confidential information" as defined by the Confidentiality Agreement. Thus, the Court **GRANTS** summary judgment to Kidde with regard to X-IT's claim that Kidde misused X-IT's actual and potential customer account list.[31]

### 6. Damages

 Lastly, Kidde argues that X-IT has demonstrated no evidence to support an award of damages on X-IT's breach of contract claim. The Court disagrees.

Based on all of the above evidence, the Court finds that if a jury were to conclude that Kidde breached either the Confidentiality Agreement or the oral agreement, a jury also could reasonably find that X-IT's lost profits are proportional to Kidde's profits. Indeed, X-IT's damages expert, Richard B. Troxel ("Troxel"), has opined as to three categories of potential damages that X-IT has suffered as a result of Kidde's alleged breaches. These damage categories include X-IT's lost profits of $1,026,074, *see* Pl.'s Opp. Ex. 52, Troxel Dep. at 25, disgorgement of Kidde's profits of $643,693, *see id.* at 151, and a reasonable royalty of $3,151,654, *see id.* at 206–08. As such, the Court finds that there is

---

**30.** X-IT does not move for summary judgment on this claim.

**31.** None of the allegedly outstanding discovery in this case bears any connection with this

issue, thus X-IT's Rule 56(f) Motion will not allow it to withstand the entry of summary judgment in favor of Kidde on this narrow issue.

ample evidence to support X–IT's claim for damages as a result of Kidde's alleged breaches of contract.[32] Again, the Court is not passing on whether or in what amounts such alleged damages are recoverable—that is ultimately a question for the jury—or even whether all of X–IT's alleged damage evidence will be admissible at trial. The Court merely finds that, at this stage in the litigation, the record contains enough evidence regarding damages X–IT has allegedly suffered.

### E. *Count V: Misappropriation of Trade Secrets*

In Count V of X–IT's Amended Complaint, X–IT sets forth a claim against Kidde for misappropriation of trade secrets.[33] In support of this claim, X–IT alleges that "certain information"[34] described in the Amended Complaint constitutes trade secrets both at common law and as defined by Virginia's Uniform Trade Secrets Act ("VUTSA"), Va.Code §§ 59.1–336—59.1–343, Illinois' Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. §§ 1065 *et seq.*, and North Carolina's Trade Secrets Protection Act ("NCTSPA"), N.C. Gen.Stat. §§ 66–152–66–162. Following this, X–IT alleges that Kidde has wrongfully used and continues to wrongfully use X–IT's trade secrets in violation of these statutes. By virtue of this alleged misappropriation of trade secrets, X–IT claims that it is entitled not only to an injunction, but also to monetary relief in the form of compensatory damages, Kidde's profits, and any other award for unjust enrichment. Additionally, X–IT claims that Kidde's misappropriation was willful and malicious, thereby entitling X–IT to recovery of punitive damages, attorneys' fees, costs, and prejudgment interest.

Both X–IT and Kidde have moved for summary judgment on this claim. X–IT contends that summary judgment should be granted in its favor on Count V because (1) its patent application constitutes a trade secret; (2) Oslakovic improperly disclosed claims contained within X–IT's patent application to Kidde; and (3) Kidde wrongfully used this information to "design around" X–IT's ladder, order prior art, and introduce a competitive product. Kidde, on the other hand, maintains that summary judgment should be granted in its favor on Count V because (1) the VUTSA does not apply because neither X–IT's sharing of alleged trade secrets with Kidde nor Kidde's alleged misuse of such information had any connection with Virginia; (2) there is no evidence that Kidde misappropriated X–IT's customer account list or

---

**32.** Further, under North Carolina law, in a suit for damages for breach of contract, proof of the breach would entitle X–IT to nominal damages at the very least. *See Bowen v. Fidelity Bank,* 209 N.C. 140, 183 S.E. 266, 268 (1936); *Cole v. Sorie,* 41 N.C.App. 485, 255 S.E.2d 271, 274 (1979), *pet. for discretionary review denied,* 298 N.C. 294, 259 S.E.2d 911 (1979)

**33.** The facts supporting X–IT's breach of contract claim also support its claim for misappropriation of trade secrets. However, X–IT has filed a separate claim for misappropriation of trade secrets because it alleges that Kidde used the facts that it gained by breach of the Confidentiality Agreement and the oral

agreement to gain a competitive advantage over X–IT.

**34.** This "certain information" relates to, among other things, X–IT's patent application and X–IT's customer account list. X–IT moves for summary judgment only on the argument that its patent application constitutes a trade secret that Kidde misappropriated. Conversely, Kidde moves for summary judgment on two arguments: (1) that X–IT's customer list and X–IT's patent application do not constitute trade secrets and (2) even if the customer list and patent application were trade secrets, Kidde did not misappropriate them.

patent application so as to give rise to liability under any statute; and (3) there is no evidence to support an award of damages.

### 1. What Law Applies?

 As an initial matter, Kidde argues that the VUTSA does not apply to the case at bar because neither X–IT's sharing of alleged trade secrets with Kidde nor Kidde's alleged misuse of such information had any connection with Virginia. Therefore, the Court must first determine what law applies to X–IT's claim for misappropriation of trade secrets.

It is undisputed that this Court has supplemental jurisdiction over X–IT's state law claim of misappropriation of trade secrets. Under Virginia choice of law rules, *see Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) (a federal court adjudicating a supplemental state law claim applies the choice of law rules of the forum state), tort claims are governed by the law of the place where the wrongful act occurred, despite the fact that the effects of the act may be felt elsewhere. *See Milton v. IIT Research Institute,* 138 F.3d 519, 522 (4th Cir.1998).

The wrongs in this case—the injuries of which X–IT complains—include (1) the alleged improper disclosure by Oslakovic to Kidde of information contained within X–IT's patent application and (2) Kidde's alleged wrongful use of information from X–IT's patent application and customer account list for its own economic benefit. Oslakovic received and analyzed X–IT's patent application in his office in Rockford, Illinois. Oslakovic ordered prior art contained in X–IT's patent application from his office in Rockford, Illinois. Any communication between Oslakovic and Kidde, prior to the 1999 Show, occurred in the context of telephone conversations between Oslakovic in Rockford, Illinois and

Apperson in Mebane, North Carolina. Any communication between Oslakovic and Apperson at the 1999 Show occurred in Chicago, Illinois. X–IT shared its customer account list with Kidde in Chicago, Illinois. Further, any improper use made as a result of information gained from Oslakovic's alleged disclosure of the claims contained within X–IT's patent application—including "designing around" X–IT's ladder and developing a competitive product—as well as any improper use of X–IT's customer account list, occurred at Kidde's place of operation in Mebane, North Carolina. Based on this analysis, the Court finds that the alleged wrongful acts occurred only in Illinois and North Carolina. As such, Illinois and North Carolina law, not Virginia law, shall apply to the misappropriation of trade secrets claim.

### 2. Do X–IT's Customer Account List and Patent Application Constitute Trade Secrets?

The next issues for the Court to determine are whether (1) X–IT's customer account list and (2) the information contained within X–IT's patent application constitute trade secrets. Again, the Court notes that only Kidde has moved for summary judgment on X–IT's claim that its customer account list constitutes a trade secret. Although the Illinois and North Carolina statutes contain substantially similar definitions for what constitutes a trade secret, it is necessary to set forth both statutes individually.

#### a. Illinois Trade Secrets Act

Section 2 of the ITSA provides that

(d) 'Trade Secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial

data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. § 1065/2(d). The ITSA's focus is on the secrecy of the information sought to be protected. *See Service Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 129 Ill.Dec. 367, 535 N.E.2d 1132, 1136 (Ill.App.1989). The key to "secrecy" is the "ease with which information can be developed through proper means." *Hamer Holding Group, Inc. v. Elmore*, 202 Ill.App.3d 994, 148 Ill.Dec. 310, 560 N.E.2d 907, 918 (Ill.App.1990). That is, if the information can be "readily duplicated without involving considerable time, effort or expense, then it is not secret." *Id.*

Section 2(d)(2) of the ITSA parallels the common law factors used to determine whether information is a trade secret. These factors include

(1) the extent to which the information is known outside the employer's business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer in developing the information; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Stampede Tool Warehouse, Inc. v. May*, 272 Ill.App.3d 580, 209 Ill.Dec. 281, 651 N.E.2d 209, 215–16 (1995).

**b. North Carolina Trade Secrets Protection Act**

Under the NCTSPA, a trade secret is

business or technical information, including but not limited to a formula, pattern, program, device, compilation or information, method, technique, or process that:

(a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen.Stat. § 66–152(3). The statute further provides that a trade secret's existence is not negated "merely because the information comprising the trade secret has also been developed, used, or owned independently by more than one person." *Id.* § 66–152.

**c. Analysis**

**1. X–IT's Customer Account List**

■ The Court will first address Kidde's argument that X–IT's customer account list, *see* Pl.'s Opp. Ex. 8, does not constitute a trade secret. Kidde maintains that information regarding X–IT's potential customers was published in the 1998 X–IT Case Study and, as a result, X–IT did not engage in reasonable efforts to maintain the secrecy and confidentiality of this information. Further, Kidde argues that X–IT cannot demonstrate that Kidde ever used any of X–IT's customer account information to obtain its own retail accounts. X–IT, in response, fails to address Kidde's argument with regard to its customer account list.

Based on the evidence in the record, the Court concludes that X–IT's customer ac-

count list does *not* constitute a trade secret. In the 1998 X–IT Case Study, X–IT states that its distribution strategy was to "concentrate on major retailers," including K–Mart, Home Depot, Lowe's, Target, True Value, Caldor, Brookstones, and other "Costco-type" warehouses. *See* Def.'s Mot. Ex. 13, X–IT Case Study at 8, 12. At the same time, X–IT noted in its Case Study that "[i]n the Fire Safety product category, the market leaders are First Alert, Inc. and Walter Kidde. First Alert and Walter Kidde distribute predominantly through national retailers." *Id.* at 12. In the customer account list disclosed to Kidde, the same major retailers are listed, in addition to a host of other major national retailers.

As the published 1998 Case Study contained information regarding X–IT's target customers, this information was in the public knowledge. X–IT did not engage in reasonable efforts to maintain the secrecy of this information. Further, the names of large retail chains through which home safety products are sold, including the customers listed in the account information disclosed to Kidde, are also matters of public knowledge. This information can be readily duplicated without involving considerable time, effort, or expense. Indeed, even X–IT understood that Kidde marketed its products to these major national retailers, as evidenced by the X–IT Case Study. For these reasons, the Court finds, as a matter of law, that X–IT's customer account list does not constitute a

trade secret under either the ITSA or the NCTSPA. Therefore, Kidde's Motion for Summary Judgment as to X–IT's claim that its customer account list constitutes a trade secret is **GRANTED**.[35]

## 2. X–IT's Patent Application

■ The Court now turns to X–IT's claim that its patent application constitutes a trade secret. X–IT argues that the very fact that its patent application is a patent application entitles its to trade secret protection under both the ITSA and the NCTSPA. *See Duplan Corp. v. Deering Milliken Research Corp.*, 397 F.Supp. 1146, 1186 (D.S.C.1974) (stating that "presently pending patent applications in the United States Patent Office are trade secrets"). Although this Court recognizes that patent applications *may* be afforded trade secret status, it is not true that *all* patent applications constitute trade secrets.[36] Therefore, X–IT's better argument is that the *specific claims contained within its patent application* should be afforded trade secret protection because they derive independent actual or potential commercial value from not being generally known to others and X–IT has engaged in reasonable efforts to maintain the secrecy of this information.

Kidde argues, in opposition, that X–IT's patent application contained information that was "readily ascertainable through independent development or reverse engineering" and, as a result, does not satisfy

---

35. None of the allegedly outstanding discovery in this case bears any connection with this issue, thus X–IT's Rule 56(f) Motion will not allow it to withstand the entry of summary judgment in favor of Kidde on this narrow issue.

36. For example, an individual who files a patent application may, at the same time, consciously elect not to take reasonable steps to protect the secrecy of the information contained within the patent application. That is, the individual may choose to provide potential customers access to design information or the product itself without asking them to sign confidentiality or non-disclosure agreements. In such a case, even though the individual has filed a patent application, it would not necessarily also entitle that person to protection under trade secret law for the contents of the patent application.

the definition of a trade secret under either statute. Kidde maintains that when it purchased X–IT's ladder on the Internet and then sent the ladder to the Chinese factory, in its first attempt to allegedly make a more compact emergency escape ladder, Kidde was able to reverse engineer X–IT's ladder.[37] Kidde contends that the Chinese factory's "re-engineering occurred independently and without reference" to any confidential information received from X–IT because Kidde bought X–IT's ladder in a retail market and reproduced the ladder before X–IT disclosed its patent application to Oslakovic.

The Court agrees with Kidde on one point—the design of X–IT's ladder, in and of itself, does *not* qualify for trade secret protection. It is readily apparent that Kidde was able to reverse engineer X–IT's ladder, which it purchased over the Internet, without reference to X–IT's patent application. This fact alone negates X–IT's power to gain trade secret protection over the design of its ladder. However, X–IT does *not* argue that the *design of its ladder* should be afforded trade secret protection. Instead, X–IT contends that *the information contained within its patent application*, including X–IT's focus on the ladder's overwrap in three of its five claims for patent protection, constitutes a trade secret. Based on this important distinction, the Court agrees with X–IT that the information contained within its patent application constitutes a trade secret under both Illinois and North Carolina law.

The Court reaches its decision that the information contained within X–IT's patent application constitutes a trade secret by reference to the policies underlying patent law in general. It is elementary that the grant of a patent does not give the patent holder a right to make, use, or sell the patented product. Instead, a patent grants to the patent holder only the right to *exclude others* from making, using, offering for sale, or selling the patented product. *See* 35 U.S.C. § 154(a)(1).

Following this, the information contained within X–IT's patent application represented X–IT's "blueprint" of how to exclude others from copying its ladder. As three of the five claims within X–IT's patent application focused on the ladder's overwrap, it is clear that X–IT attached quite a significance to this feature. Indeed, the ladder's overwrap was *the* distinguishing feature of X–IT's ladder that X–IT focused upon in order to gain patent protection. X–IT's decision to focus three of its five claims for patent protection on the ladder's overwrap enjoyed, at the very least, a potential commercial value from not being generally known. The fact that Kidde wanted Oslakovic to evaluate the worth of X–IT's patent application demonstrates that the information contained within X–IT's patent application had a potential value. Further, X–IT maintained the secrecy and confidentiality of the patent application by executing a Confidentiality Agreement with Kidde prior to X–IT's disclosure to Kidde of the patent application and by not disclosing the contents of the patent application to anyone else. Indeed, everyone involved in the negotiations on behalf of X–IT and Kidde recognized that the contents of X–IT's patent application were a trade secret. As such, the Court finds that the information contained within X–IT's patent application—specifically the three claims for protection revolving around the ladder's overwrap

---

**37.** *See* Def.'s Opp. Ex. 22, Tomeo Dep. at 61. Moreover, Kidde argues that it also improved on X–IT's design at this time. *See id* One improvement Kidde contends that it made to X–IT's ladder involved the hooking mechanism, which is the device used to secure the ladder to the window. *See* Def.'s Opp. Ex. 23, Schiefer Dep. at 119.

mechanism—is worthy of trade secret protection under both the ITSA and the NCTSPA.[38]

### 3. Did Kidde Misappropriate X–IT's Trade Secrets?

■ Having determined that the information contained within X–IT's patent application constitutes a trade secret, the next issue for the Court to consider is whether Kidde misappropriated X–IT's trade secrets. Again, it is necessary to analyze the ITSA and the NCTSPA separately to resolve this issue.

#### a. Illinois Trade Secrets Act

The ITSA provides, in pertinent part, that misappropriation means

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) derived from or through a person who utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowl-

---

**38.** In its "Reply Brief to X–IT's Opposition to Kidde's Rule 72 Objections to the Magistrate Judge's Order of June 8, 2001 Regarding Production of Kidde's Patent Application," which was filed on June 29, 2001, Kidde raises a new argument as to why X–IT's patent application does not constitute a trade secret. Specifically, Kidde cites to *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1050–52 (Fed.Cir.2001), for the proposition that the publication of a patent application filed abroad under the Patent Cooperation Treaty ("PCT") destroys the trade secret status of information contained within that application.

Kidde sets forth the following facts in support of its reliance on *Group One*. On May 10, 1998, X–IT filed a patent application for its web ladder under the PCT. On May 11, 1998, X–IT filed a U.S. patent application for its web ladder. In February of 2000, X–IT's PCT patent application was published to the world. As such, Kidde argues that "after the publication of X–IT's PCT application in February of 2000, nothing in X–IT's May 11, 1998, U.S. patent application constituted trade secret information capable of being misappropriated."

Although this Court agrees, generally, with Kidde's argument, it is clear that the alleged misappropriation at issue in this case occurred *before* the publication of X–IT's PCT patent application. The alleged misappropriation of information contained within X–IT's patent application occurred between August 10, 1999—when Oslakovic received X–IT's patent application and began his review of it—and August 20, 1999—when Oslakovic returned X–IT's patent application to X–IT along with a statement that no copies of the patent application were made or retained. X–IT's PCT patent application was not published, according to Kidde, until February of 2000. Indeed, the district court in *Group One* similarly held that the defendant would be liable for damages for any "head start" it obtained by having access to the confidential information in the time period between the date of the confidential disclosure and the date of the PCT publication, and reserved that issue for trial. *See Group One*, 254 F.3d 1041, 1050. Based on this analysis, Kidde's new attempt to invalidate the trade secret status of X–IT's patent application likewise fails.

edge of it had been acquired by accident or mistake.

765 Ill. Comp. Stat. § 1065/2(b).

### b. North Carolina Trade Secrets Protection Act

Under the NCTSPA, misappropriation means

acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret.

N.C. Gen.Stat. § 66–152(1).

### c. Analysis

X–IT argues that Kidde misappropriated its trade secrets because Kidde acquired and used X–IT's trade secrets "under circumstances giving rise to a duty to maintain its secrecy or limit its use," 765 Ill. Comp. Stat. Ann. 1065/2, and by acquiring X–IT's trade secrets without X–IT's express or implied consent, *see* N.C. Gen.Stat. § 66–152(1). X–IT contends that when Oslakovic revealed information regarding X–IT's patent claims to Kidde, Kidde knew that (1) Oslakovic did not have X–IT's consent to reveal such information and (2) Oslakovic was under a continuing duty to maintain the secrecy of those claims. Indeed, based on the terms of the Confidentiality Agreement, the information contained within X–IT's patent application was only to be used for purposes of evaluating a potential business deal between X–IT and Kidde. Instead, X–IT argues that Kidde misappropriated the information contained within X–IT's patent application in order to "design around" X–

IT's ladder, order prior art, and introduce a competitive product.

In opposition, Kidde argues that there is no evidence that it used X–IT's trade secrets for any purpose other than to evaluate a potential transaction with X–IT, in accordance with the terms of the Confidentiality Agreement. In fact, Kidde argues that it had already designed a larger hooking mechanism in July of 1999, *before* X–IT disclosed its patent application to Oslakovic. Kidde contends that this larger hooking mechanism was on Kidde's 1999 Show ladder and that any wrapping mechanism Kidde might use would therefore necessarily have differed from X–IT's wrap, which was designed to encase X–IT's smaller hooking mechanism.

The evidence in the record demonstrates to the Court that Kidde held a factory-wide contest in mid-July of 1999 to solicit proposals from its employees for a new hooking mechanism—a "window hook design"—for its version of an emergency escape ladder. *See* Def.'s Opp. Ex. 21, Arnette Dep. at 134; Def.'s Mot. Ex. 15. This contest occurred *before* X–IT disclosed its patent application to Oslakovic. However, Kidde's assertion that it had made a final decision *before* the 1999 Show to change the overwrap on its ladder is unsupported by the record.[39]

Calderwood testified only that Kidde made many modifications to its ladder during the ladder's "development phase" in June of 1999 until the ladder was introduced to the market. *See* Def.'s Mot. Ex. 8, Calderwood Dep. at 33–34. Specifically, when asked to describe the overwrap that Kidde's ladder employed at the 1999 Show, Calderwood testified that

---

39. Although the Court has already addressed Kidde's argument on this point, under Count IV: Breach of Contract, the Court finds it necessary to again set forth the relevant testimony from the record.

[t]he wrap that we were working with was one that would not be self-deploying. When we had done focus testing, it had indicated that what is crucial to the successful deployment of the product is to deploy it after the window hooks are attached and after the product is hanging out over the window. For that reason, we were very nervous about using Velcro, because what we found in our focus test is if someone went through and deployed the product inside the house, it was then tangled and it could not be easily extended out the window in its proper format. So what we were looking at is for a material wrap that was going to bundle the rungs together.

*Id.* at 236. As the Court concluded with regard to the breach of contract claim, this testimony does not establish that Kidde conclusively had determined, *prior to* the 1999 Show and *prior to* Oslakovic's receipt and analysis of X–IT's patent application, to use an overwrap mechanism that differed from X–IT's. Calderwood's testimony was only that Kidde was experimenting with different design options for the wrapping device.

In fact, when Apperson was asked about the overwrap Kidde used on the "prototype" ladder displayed at the 1999 Show, he admitted that in August of 1999, Kidde "had really not gotten to that portion of the design [the overwrap] at this stage in the prototype. We could not have gotten to that part of the design, because the hooking mechanism was just in the process of being finalized." Def.'s Opp. Ex. 19, Apperson Dep. at 27–28. Based on Calderwood and Apperson's testimony therefore, it is clear to the Court that Kidde had not necessarily decided to use a different

overwrap than X–IT at the time of the 1999 Show. Kidde also argues that because its ladder had a larger hooking mechanism before the 1999 Show, X–IT's overwrap was unlikely to fit Kidde's ladder. X–IT's DiBelardino testified, however, that he inspected the Kidde ladder at the 1999 Show. Based on his inspection, DiBelardino concluded that the X–IT ladder's overwrap could fit Kidde's larger hooking mechanism. *See* Pl.'s Opp. Ex. 2, DiBelardino Dep. at 486–88.

The Court acknowledges that the negotiations between X–IT and Kidde were framed against the backdrop of the Confidentiality Agreement as well as an oral agreement between the parties and Oslakovic. These agreements barred Kidde and Oslakovic from using or disclosing any of X–IT's confidential information other than for the purpose of evaluating the potential transaction between the parties. Therefore, when Oslakovic received X–IT's patent application, he was under a continuing duty to maintain the secrecy of its contents. As a result of the Confidentiality and oral agreements, the Court finds that Oslakovic acquired X–IT's trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use, and Kidde was not to acquire or use this information without X–IT's consent.

There is testimony in the record that Oslakovic informed Apperson that the claims in X–IT's patent application "dealt generally with overwrapping" and that three of the five independent claims for patent protection pertained to the X–IT ladder's overwrap.[40] Moreover, at the 1999 Show, Kidde's ladder included the same overwrap as X–IT's ladder.[41] After

---

**40.** Indeed, Oslakovic states that Kidde retained him to opine on "whether the X–IT patent application covered Kidde's Safety ladder ...." Pl.'s Mot. Ex. 21, Oslakovic Aff. ¶ 2.

**41.** At oral argument, however, Kidde's counsel maintained that the overwrap Kidde used at the 1999 Show was nonfunctional.

the 1999 Show and after Oslakovic reviewed and analyzed X–IT's patent application, Kidde removed the overwrap and replaced it with a 1–inch wide strap (later increased to a 2–inch wide strap) for its own competitive ladder. Based on this evidence, a jury might reasonably conclude that Oslakovic improperly disclosed X–IT's trade secrets to Kidde, which allowed Kidde to "design around" the X–IT ladder's claims for protection and gain a competitive advantage over X–IT.

Additionally, Oslakovic admitted that he obtained prior art from X–IT's patent application and that this prior art may have been used to draft Kidde's patent application for its own competing ladder. *See* Pl.'s Mot. Ex. 19, Oslakovic Dep. at 72–80. Based on this testimony, the Court finds that a jury could reasonably conclude that Oslakovic informed Kidde of the prior art contained within X–IT's patent application and that Kidde used this information to gain a competitive advantage in designing its own product and preparing its own patent application. For these reasons, and viewing the evidence in a light most favorable to X–IT, a jury might reasonably conclude that Kidde did misappropriate X–IT's trade secrets by "designing around" X–IT's ladder, ordering prior art, and introducing a competitive product.

On the other hand, the Court recognizes that there is also testimony in the record that Kidde purchased one of X–IT's ladders on the Internet after the August 1998 National Hardware Show. Kidde sent this ladder to a manufacturing facility in China to examine the design of the ladder and also determine the cost of production of such a ladder. As part of this review, Kidde asked the Chinese factory to replicate X–IT's ladder as an alleged first step in creating Kidde's own version of an emergency escape ladder. In March or April of 1999, Kidde received the Chinese

version of X–IT's ladder, which X–IT maintains was merely a duplicate of its own ladder. As Kidde was able to independently reverse engineer the design of X–IT's ladder, another reasonable inference from the facts that may be drawn is that Kidde simply decided, on its own, to eliminate the overwrap mechanism from X–IT's ladder to avoid any potential infringement issues. Or, Kidde may have determined, independent of any potential infringement concerns, that a better design for securing the rungs and deploying the ladder existed, as Calderwood's testimony intimates. For these reasons, and viewing the evidence in a light most favorable to Kidde, a jury might reasonably determine that Kidde did not misappropriate X–IT's trade secrets. A genuine issue of material fact exists and therefore it is inappropriate to grant summary judgment to either party at this juncture.

### 4. Damages

■■■ Lastly, Kidde argues that X–IT has demonstrated no evidence to support an award of damages on X–IT's misappropriation of trade secrets claim. The Court disagrees.

The ITSA provides that damages for misappropriation may include "both the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss." 765 Ill. Comp. Stat. § 1065/4(a). Further, the Illinois statute states that "[i]f neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by misappropriation measured in terms of a reasonably royalty for a misappropriator's unauthorized disclosure or use of a trade secret." *Id.* If willful and malicious misappropriation exists, a court may also award reason-

able attorneys' fees as well as exemplary damages in an amount not to exceed two times the amount calculated for *either* actual loss and unjust enrichment *or* a reasonable royalty. *Id.* § 1065/4(b) & 1065/5.

The NCTSPA likewise provides that actual damages may be recovered for the misappropriation of a trade secret. *See* N.C. Gen.Stat. § 66–154(b). Actual damages under the North Carolina statute are measured by the economic loss or the unjust enrichment caused by the misappropriation, whichever is greater. *See id.* The NCTSPA also provides that punitive damages and attorneys' fees may be awarded if willful and malicious misappropriation is proven. *See id.* § 66–154(c)–(d).

Troxel, X–IT's expert on damages, has opined as to certain damages X–IT has suffered as a result of Kidde's alleged misappropriation of X–IT's trade secrets. As the Court discussed in relation to the breach of contract claim, these damages include X–IT's lost profits of $1,026.074, *see* Pl.'s Opp. Ex. 52, Troxel Dep. at 25, disgorgement of Kidde's profits of $643,693, *see id.* at 151, and a reasonable royalty of $3,151,654, *see id.* at 206–08. The Court finds that this evidence is sufficient for a jury to determine an award of damages. Further, the Court finds that a jury may reasonably determine that if Kidde misappropriated X–IT's trade secrets that its misappropriation was willful and malicious, thereby entitling X–IT to a recovery of punitive damages and attorneys' fees. The Court finds it necessary again to point out that it is not passing on whether or in what amounts such alleged damages are recoverable—that is ultimately a question for the jury—or even whether all of X–IT's alleged damage evidence will be admissible at trial. The Court merely finds that, at this stage in the litigation, the record contains enough evidence regarding damages X–IT has allegedly suffered.

For all of the above reasons, Kidde's motion with regard to X–IT's claim that its customer account list is a trade secret is **GRANTED.** Kidde's Motion for Summary Judgment as to X–IT's claim that Kidde misappropriated the contents of its patent application is **DENIED** and X–IT's Motion for Partial Summary Judgment on Count V is **DENIED** as well.

### F. *Count Six: Unfair Competition*

#### 1. Introduction

Count VI of this case is an unfair competition claim founded upon the common law of Virginia, North Carolina, and Illinois, as well as the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75–1.1—75–16.2, and the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. § 505, *et seq.* The factual basis for X–IT's unfair competition claim under Count VI is precisely the same as X–IT's claims against Kidde for copyright and trademark infringement, false advertising, breach of contract, and misappropriation of trade secrets. In many respects, Count VI is derivative of Counts I through V, and the ultimate success of Count VI may well turn on the findings of fact made by the jury with respect to Counts I through V. Therefore, to the extent that Kidde argues that summary judgment is appropriate against X–IT on Count VI because summary judgment is appropriate against X–IT on Counts I through V, Kidde's motion for summary judgment under Count VI is denied because for reasons made clear *supra,* the Court finds that X–IT has produced enough evidence at this stage of the litigation to survive a motion for summary judgment against Counts I through V; indeed, the Court has even granted summary judgment to X–IT with respect to

Count I on the issue of Kidde's liability for infringing X–IT's copyrights at the 1999 Show.

Nonetheless, as Kidde essentially argues that each and every claim X–IT has made in Count VI must also fail as a matter of law, the Court will endeavor to analyze each claim in an effort to show why summary judgment against Count VI is not appropriate.

### 2. X–IT's Unfair Competition Claim Under Common Law

■ Although the parties have not shed a great deal of light on the issue, the Court essentially understands X–IT's unfair competition claim under the common law of Virginia, North Carolina, and Illinois to closely resemble X–IT's trade dress infringement claim under Count II because the elements behind the common-law tests for unfair competition closely resemble the test for trade dress infringement. For example, Virginia has "adopted the general rule that in determining the exercise of unfair competition in the use of trademarks or tradenames, the test is whether the resemblance between them is so close that it is likely to confuse a prospective buyer or customer exercising ordinary caution in his dealings." *Rosso & Mastracco, Inc. v. Giant Food Shopping Ctr.*, 200 Va. 159, 165, 104 S.E.2d 776, 781 (1958). Similarly, in North Carolina the test for unfair competition under the common law is "whether the public is likely to be deceived." *Carolina Aniline & Extract Co. v. Ray*, 221 N.C. 269, 20 S.E.2d 59, 61 (1942). Finally, under the common law of Illinois it is accepted that an unfair competition tort is "available when the adoption and use of a product name by a defendant is likely to cause confusion in the trade as to the source of the products or is likely to lead the public to believe that defendant is in some way connected with the plaintiff."

*Barry Gilberg, Ltd. v. Craftex Corp., Inc.*, 665 F.Supp. 585, 597 (N.D.Ill.1987) (citing *Lady Esther v. Lady Esther Corset Shoppe*, 317 Ill.App. 451, 46 N.E.2d 165 (1943)).

All of these tests are therefore similar to the Court's "likelihood of confusion" analysis of X–IT's alleged trade dress infringement under Count III, and indeed federal courts applying the Virginia common law on unfair competition confirm that the common-law unfair competition claim and the Lanham Act trade dress infringement claim are closely related. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia*, 43 F.3d 922, 930 n. 10 (4th Cir. 1995). There, the Fourth Circuit stated that "[t]he test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address the likelihood of confusion as to the source of the goods or services involved." *Id.*

In the instant case, as this Opinion & Order makes clear *supra*, a triable issue of fact remains as to the likelihood of confusion among consumers as to the connection between or the source of the X–IT and Kidde packages. Consequently, summary judgment in favor of Kidde on this basis with respect to X–IT's common-law unfair competition claim under Count VI is not appropriate.

### 3. X–IT's Unfair Competition Claim under the North Carolina Unfair Trade Practices Act

X–IT also states in its Amended Complaint that the North Carolina Unfair Trade Practices Act ("NCUTPA") provides an additional claim under Count VI. That statute provides, in pertinent part

**§ 75–1.1. Methods of Competition, acts, and practices regulated; legislative policy.**

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

\* \* \* \* \* \*

### § 75.1–16 Civil action by person injured; treble damages.

If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm, or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

N.C. Gen.Stat. §§ 75–1.1, 75–16. The essential elements of a cause of action under the NCUPTA include (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) that has proximately caused actual injury to the plaintiff or his business. *See Furr v. Fonville Morisey Realty, Inc.*, 130 N.C.App. 541, 551, 503 S.E.2d 401, 408 (1998). An act is "unfair" under the statute if it "offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Johnson v. Phoenix Mutual Life Ins. Co.*, 300 N.C. 247, 262, 266 S.E.2d 610, 621 (1980), *rev'd on other grounds, Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385 (1988). Similarly, an act is "deceptive" if it has the "capacity or ten-

dency to deceive." *Johnson*, 300 N.C. at 265, 266 S.E.2d at 622. Whether a trade practice is unfair or deceptive depends upon the facts and circumstances of each case, and the impact the practice has on the marketplace. *See Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). In addition, the plaintiff need not show that he was actually deceived. *See Pinehurst Inc. v. O'Leary Bros. Realty*, 79 N.C.App. 51, 59, 338 S.E.2d 918, 923 (1986).

■ Having set forth the applicable standards, the Court now applies the facts of the instant case to the NCUPTA in an effort to see if any potential claim X–IT has against Kidde might amount to a violation of the NCUPTA. First, it is clear that X–IT's copyright infringement claim under Count I cannot form a basis for X–IT's NCUPTA claim. This is because "the Copyright Act preempts any legal or equitable right under state law which is 'equivalent' to any of the exclusive rights within the general scope of copyright, so that state law could not in fact make copyright infringement a violation" of the NCUPTA. *Nintendo, Inc. v. Aeropower Co.*, 34 F.3d 246, 251 (4th Cir.1994) (holding that, pursuant to 17 U.S.C. § 301(a), federal copyright infringement is not a violation of NCUPTA). Skipping forward to X–IT's breach of contract claim under Count IV, the law is also clear that even intentional breaches of contract unattended by substantial aggravating circumstances do not give rise to a cause of action under the NCUTPA. *See Broussard v. Meineke Disc. Muffler*, 155 F.3d 331, 345–47 (4th Cir.1998) (citing *Branch Banking & Trust Co. v. Thompson*, 107 N.C.App. 53, 418 S.E.2d 694, 700 (1992)). Therefore, absent such a showing of "substantial aggravating circumstances," X–IT's breach of contract claim cannot serve as a basis for X–IT's

NCUPTA claim.[42] Finally, as for X–IT's trade dress infringement claim under Count II, false advertising claim under Count III, and misappropriation of trade secrets claim under Count V, the factual bases for these claims may indeed provide X–IT with a cause of action under the NCUPTA. Kidde does not argue otherwise, but rather asserts more generally that such claims are by themselves fundamentally flawed and thus cannot form the basis for a cause of action under the NCUPTA. Nonetheless, the Court need not resolve this issue today. It is enough for now that X–IT has raised material issues of fact with respect to Counts II, III, IV, and V, and thus for now X–IT can piggyback its NCUPTA claim to trial on top of these other claims.

### 4. The Illinois Consumer Fraud and Deceptive Business Practices Act

▌ Finally, X–IT also asserts a claim against Kidde under Count VI for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. § 505/2. That statute proscribes, among other things, the actions set forth in the Illinois Uniform Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. Ann. § 510/2. The UDTPA defines deceptive trade practices as follows.

> A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he: .... (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services; .... (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsor-

ship, approval, status, affiliation or connection that he does not have; .... (7) represents that goods or services are a particular standard, quality or grade or that goods are a particular style or model, if they are another; [or] .... (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. *In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.*

815 Ill. Comp. Stat. Ann. § 510/2 (emphasis added).

Again, any actions that violate the UDTPA may be used as a basis for liability under Illinois Consumer Fraud Act. The only argument that Kidde makes in favor of summary judgment against X–IT's Illinois Consumer Fraud Act claim is that "X–IT cannot show that there was any underlying Lanham Act violation or other wrongful conduct." As this Opinion & Order makes clear, however, X–IT's Lanham Act claim must ultimately be resolved by a jury. Further, X–IT has also put evidence in the record that it sustained actual injuries due to Kidde's alleged Lanham Act violations, and thus Kidde's argument that X–IT's failure to show any harm mandates dismissal of X–IT's Illinois Consumer Fraud Act claim under Count VI is meritless. Consequently, Kidde's Motion for Summary Judgment on Count VI is hereby **DENIED**.

### G. *Count VII: Tortious Interference*

Kidde also has moved for summary judgment on Count VII of X–IT's Amended Complaint, which sets forth a claim for tortious interference with existing and prospective business relations. Kidde moves

---

**42.** The Court is not passing on whether "substantial aggravating circumstances" might exist in the instant case.

for summary judgment on this claim because (1) X–IT has not identified any prospective business relations entitled to protection; (2) there is no evidence that Kidde interfered with any reasonably likely business relationships; and (3) X–IT has no evidence of damage resulting from Kidde's actions. Conversely, X–IT maintains that it has stated claims for tortious interference under the common laws of Virginia, Illinois, and North Carolina.

## 1. Applicable Law

Both parties apply Virginia, Illinois, and North Carolina law to X–IT's claim of tortious interference with existing and prospective business relations. Moreover, the parties agree that these states require the same or similar elements to set forth a prima facie case of tortious interference.

Under Virginia law, the following elements are required to establish a prima facie case of tortious interference: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to X–IT; (2) Kidde's knowledge of X–IT's business relationship or expectancy; (3) intentional interference by Kidde inducing or causing a breach or termination of X–IT's business relationship or expectancy; and (4) damages to X–IT. *See Chaves v. Johnson,* 230 Va. 112, 120,

335 S.E.2d 97, 102 (1985); *Glass v. Glass,* 228 Va. 39, 51–52, 321 S.E.2d 69 (1984). The requirements for demonstrating this same cause of action under Illinois and North Carolina law are substantially similar.[43] For this reason, the Court need not draw distinctions in the applicable law when analyzing X–IT's tortious interference claim.

## 2. Does X–IT Have an Existing and/or Prospective Business Relationship with a Third Party?

X–IT argues that it satisfies the first element of the prima facie case for tortious interference because it had an existing business relationship with Home Depot's Southwest region stores as well as a prospective business relationship with Home Depot stores outside the Southwest region at the time of Kidde's alleged improper interference.

### a. Existing Business Relationship with Home Depot

 Prior to Kidde's introduction of its competitive ladder, X–IT contends that it had "100% of the worldwide sales of emergency escape web ladders." Pl.'s Opp. Ex. 18, Ive Aff. ¶ 1. In 1999, X–IT's largest retail account was with Home Depot's

**43.** Specifically, to succeed under Illinois law on a claim for tortious interference with existing and prospective business relationships, X–IT must show (1) the existence of a business relationship or expectancy of a business relationship with a probability of future economic benefit; (2) Kidde's awareness of this business relationship or expectancy; (3) Kidde's intentional and unjustified inducement of a breach of the business relationship or expectancy; and (4) damages resulting from Kidde's interference. *See HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 154–55, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (1989); *Roy v. Coyne,* 259 Ill.App.3d 269, 275, 196 Ill.Dec. 859, 630 N.E.2d 1024, 1028 (1994).

Under North Carolina law, the tortious interference with a business relationship or expectancy claim has five elements: (1) the existence of a business relationship or expectancy between X–IT and a third person; (2) Kidde's knowledge of the business relationship or expectancy; (3) intentional interference by Kidde; (4) no justification on the part of Kidde for inducing a third party to refrain from entering into a contract with X–IT that would have ensued but for the interference; and (5) actual damage to X–IT. *See United Lab., Inc. v. Kuykendall,* 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

Southwest Region.[44] X–IT's business relationship with Home Depot is substantiated by Andy Slanina, a Home Depot buyer, who stated in his deposition that he purchased X–IT's ladder directly from X–IT for sale in Home Depot stores in Home Depot's Southwest Region. *See* Pl.'s Opp. Ex. 38, Slanina Dep. at 16, 24. Although Kidde argues that X–IT is unable to point to any existing business relationship entitled to protection, the Court finds, based on the evidence in the record, that X–IT had a business relationship with Home Depot's Southwest region that is entitled to protection.

### b. Prospective Business Relationship with Home Depot

X–IT also contends that it had a prospective business relationship with other Home Depot stores because the X–IT ladder had been "approved for introduction in regions beyond the Southwest region." *Id.* ¶ 5; Pl.'s Opp. Ex. 11, Ive Dep. at 87. In support of this assertion, X–IT points to Ive's affidavit, which states that

> [a]t the time of the negotiations with Kidde, Home Depot was X–IT's largest retail account. As X–IT explained to Kidde in confidential negotiations, X–IT had landed the Home Depot account in the Southwest region and was now able to be evaluated by other Home Depot regions as our product was in the Home Depot purchasing system.

Pl.'s Opp. Ex. 18, Ive Aff, ¶ 5. Further, Ive stated in his deposition that

> based on having received a positive response from the buyer at Home Depot, we were attempting to close relationships with other buyers in other regions

of Home Depot. Normally or usually in a situation like this those other buyers will potentially look back at how the product is sold in the region where it's currently stocked, and use that information as part of the decision-making process to determine if they are going to take the product themselves and open up additional regions for us as a company.

Pl.'s Opp. Ex. 11, Ive Dep. at 87. In opposition, Kidde argues that X–IT has not identified any prospective business relationship entitled to protection. In fact, Kidde maintains that X–IT has not produced any evidence that amounts to more than a mere subjective hope that it may be able to sell ladders to additional retailers.

Under Virginia law, in order for X–IT to demonstrate that it had a business expectancy with Home Depot stores outside the Southwest region, X–IT must present objective proof that the expectancy would materialize. *See Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 301, 484 S.E.2d 892, 897 (1997). Subjective expectancies are insufficient. *See id.* That is, mere proof of X–IT's belief and hope that a future business relationship with Home Depot buyers outside the Southwest region would ensue is inadequate to sustain the cause of action. Additionally, the proof must establish a "probability" of future economic benefit to X–IT; a mere "possibility" that such a benefit may accrue will not suffice. *See id.* Illinois law requires the same "probability" of future economic benefit. *See HPI Health Care Services, Inc.*, 131 Ill.2d at 154–55, 137 Ill.Dec. 19, 545 N.E.2d at 676. Similarly, under North Carolina law, where the

---

**44.** *See* Am. Compl. ¶ 20. The Southwest Region of Home Depot includes all of the Home Depot stores in Texas, New Mexico, Arkansas, Oklahoma, Louisiana, and parts of Mississippi. *See* Pl.'s Opp. Ex. 38, Slanina Dep. at 16.

X–IT's ladder had also been sold through catalogs such as SkyMall and by Amway Distributors. *See* Am. Compl. ¶ 20. During 1999, X–IT's first full year of sales, it sold over 10,000 ladders. *See id.*

claim is based upon an alleged wrongful interference with a prospective business advantage, X–IT must show Kidde's lack of justification for inducing Home Depot to refrain from entering into a contract with X–IT that would have ensued but for the interference. *See Allied Distribs., Inc. v. Latrobe Brewing Co.,* 847 F.Supp. 376, 379 (E.D.N.C.1993); *Cameron v. New Hanover Mem'l Hosp.,* 58 N.C.App. 414, 293 S.E.2d 901, 917 (1982).

In the instant case, the Court finds that X–IT has *not* demonstrated more than a mere subjective hope of a future business relationship with Home Depot stores outside of the Southwest region. Slanina's deposition testimony bolsters this conclusion.

Q: Are you aware is the X–IT ladder being carried in any other division outside yours?

A: I'm not sure.

Q: If a ladder or any product, for that matter, is carried in another division, are you aware of other products that say a division would carry?

A: I have the ability to look it up but -

Q: Is it common from your experience with Home Depot that a division will carry a product and then another division will observe that and—and then begin to carry it?

A: I don't know that it's common, but it happens.

Q: Is it easier for, say, a second division to introduce that product into Home Depot once it's been accepted in—in an initial division?

A: I really have no opinion on that. I mean, the circumstances are all unique when it comes to introducing products.

Pl.'s Opp. Ex. 38, Slanina Dep. at 17.

Based on the evidence from Slanina's deposition, the Court is of the opinion that

X–IT cannot demonstrate that its ladder had been approved for introduction into Home Depot stores beyond the Southwest region. Slanina's testimony was that products carried in certain Home Depot stores *may* be accepted into Home Depot stores in other divisions; however, Slanina did not go so far as to state that X–IT's ladder had been accepted or purchased by Home Depot stores outside of the Southwest region. Moreover, Ive's testimony, as set forth above, does not demonstrate that other Home Depot regions had accepted X–IT's ladder. Instead, Ive merely reiterates that other Home Depot stores were able "to evaluate[ ]" X–IT's ladder for purchase after the initial Home Depot relationship in the Southwest region had blossomed and that X–IT was "attempting to close relationships with other buyers in other regions of Home Depot." This testimony in no way demonstrates objective proof that such a subjective expectancy on the part of X–IT would materialize.

In sum, the Court finds that, based on the evidence in the record, X–IT and Home Depot did enjoy an existing business relationship with one another in the Southwest region with respect to the purchase and sale of X–IT's emergency escape ladder. However, the Court finds that X–IT is not able to demonstrate that it had a prospective business relationship with Home Depot for the sale of X–IT's ladder outside of Home Depot's Southwest region. As a result, X–IT's tortious interference with a business expectancy claim may not proceed. The Court will continue, however, to analyze X–IT's tortious interference with an existing business relationship claim.

3. **Did Kidde Know of X–IT's Existing Business Relationship with Home Depot?**

X–IT is able to establish the second prong of the prima facie case for tortious

interference because Kidde does not dispute the fact that it had knowledge of X–IT's business relationship with Home Depot. Indeed, Kidde learned during confidential negotiations with X–IT where X–IT was in its sales process with each of its accounts prior to Kidde's introduction of a competitive product for retail purchase. *See* Pl.'s Opp. Ex. 18, Ive Aff. ¶ 5–6.

### 4. Did Kidde Intentionally Interfere with X–IT's Business Relationship with Home Depot So As To Cause a Breach of the Business Relationship?

With regard to the third element of the prima facie case for tortious interference, X–IT maintains that Kidde, either directly or through spreading rumors, encouraged Slanina, a Home Depot buyer, not to purchase X–IT ladders for a period of time. Specifically, X–IT refers to an instance in which Mark Traylor, an independent sales representative for Kidde, told Slanina that Kidde was developing a ladder similar to X–IT's and that Slanina, as a result, should hold off on ordering X–IT's ladder for sale in Home Depot stores.

The specific facts of the encounter between Traylor and Slanina are as follows. Slanina testified in his deposition that Traylor told him that Kidde was coming out with a ladder similar to X–IT's ladder and that Slanina should hold off on ordering X–IT's ladder for sale in Home Depot. *See* Def.'s Mot. Ex. 26, Slanina Dep., at 51–52. Consequently, Slanina inquired of both Ive and Francis Talty, X–IT's independent sales representative, about a "rumor" that Kidde may purchase X–IT because Slanina was concerned about the possible financial effect such a transaction might have on Home Depot. *See id.;* Pl.'s Opp. Ex. 18, Ive Aff., ¶ 4.

When Slanina talked to Ive, Slanina acknowledges that he "may have said that [he] heard a rumor" that Kidde was purchasing X–IT in order to "get the information out of them." *Id.* at 52. Slanina, however, also admits that he was the source of the "rumor." *See* Def.'s Mot. Ex. 26, Slanina Dep. at 52. Indeed, Slanina never heard a rumor that Kidde might be purchasing X–IT. *See id.* at 47. Instead, Slanina made an assumption, based on the information relayed to him from Traylor and based on Slanina's previous conversations with Ive, that Kidde might acquire X–IT. *See id.* at 48–51. Nonetheless, when approached by Ive, Kidde denied leaking any such information. *See* Def.'s Mot. Ex. 19, Apperson Dep., at 233.

In opposition, Kidde argues that X–IT cannot demonstrate that Kidde interfered with its existing business relationship with Home Depot so as to induce a termination of the business relationship. Instead, Kidde characterizes its actions as "fair and honest competition." In support, Kidde maintains that it enjoyed a long-standing relationship with Home Depot in that Home Depot has carried, and continues to carry, Kidde's products in its stores. To this end, Kidde states that "[t]here is no evidence that Home Depot or anyone else declined to stock X–IT's ladder because of anything [Kidde] did."

The Court finds that X–IT is unable to demonstrate the third element of the prima facie case for tortious interference. X–IT cannot prove that Kidde intentionally interfered with X–IT's existing business relationship with Home Depot so as to cause a termination of the business relationship. This is because, based on the evidence before the Court, X–IT continues to enjoy a business relationship with Home Depot's Southwest region in connection with its emergency escape ladder. In fact, Slanina testified in his December 8, 2000 deposition as follows.

Q: So on June 29, 1999, you introduced X–IT's emergency escape ladder for— again, what do you refer to those as?

A: Markets.

Q: Markets within your division?

A: Yes.

Q: By October 14th of 1999, you had made the decision to introduce it into all stores within your division, is that correct?

A: Yes.

Q: And this October 14th of 1999 was after the 1999 National Hardware Show?

A: Yes.

Q: So after having gone to Kidde's booth at the 1999 National Hardware Show, you proceeded forward with introducing X–IT's ladder to all the stores within your division?

A: Yes.

Q: *And as of today, is X–IT's ladder still being carried by all the stores within your division?*

A: *I believe it's in every store. It may be—we have specific stores that we cut SKU's from and for whatever reasons it's not associated with this, and I can't guarantee you it's in every store, but its carried in my division.*

Def.'s Opp. Ex. 26, Slanina Dep. at 97.

Additionally, Slanina states in his deposition that he "never agreed to" stop carrying X–IT's ladder in Home Depot stores in the Southwest region in favor of Kidde's competitive ladder. Slanina's deposition testimony illustrates the context behind this statement.

Q: I'm handing you another document. It appears to be—the top part of Kidde has been cut off from it, but underneath it says Safety. It appears to be a letter dated December 20th, 1999, and it is to Mike Burkett of Home Depot. Do you know Mr. Burkett?

A: Yes.

Q: And it is from—if you would turn to the second page, it has been signed by Paul Polinky [a representative of Kidde], who I believe you've also indicated you're familiar with him?

A: Yes.

Q: Now, what is Mr. Burkett's position within Home Depot?

A: He's a merchant.

Q: Would you describe his position as similar to yours?

A: Yes.

Q: Is he simply responsible for a different division?

A: Yes.

Q: Do you know what division that is that he's responsible for?

A: Our Southern division.

Q: If you would turn to the second page of this, and particularly I call your attention to the paragraph that has a number 5 next to it.

A: Uh-huh.

Q: It says: 'All divisions, all stores, have agreed to stock the new KS Emergency Escape Ladder, with an SKU number following that. Stocking orders will be forthcoming as the divisions replenish existing inventories, the exception being the Southwest division, which will require approximately six months to fulfill current vendor commitments.' Do you understand what that may be referring to?

\* \* \* \* \* \*

A: Yes.

Q: And what is—what is being described there or—if you could provide any insight on what that paragraph means.

A: You want my opinion?

Q: Yes.

A: It looks like it's saying that Mr. Polinsky, who authored the—the letter, is recapping to Mr. Burkett, who captains this category for us, that it was his understanding that all divisions, all stores, as it reads, have agreed to stock the new KS Emergency Escape Ladder.

Q: Now, if you look at that paragraph, you can also see in handwriting, Southwest division appears to be circled?

A: Yes.

Q: Do you see that?

A: Uh-huh.

Q: And then underneath that, it appears to be the word 'no' in handwriting?

A: Yes.

Q: You see that. Do you know what that might be referring to?

A: Yeah. That's my handwriting.

Q: Oh, that is your handwriting. And what—why did you write 'no' on this particular -

A: Because I never agreed to that.

Q: Okay. So, in other words, paragraph 5 misrepresents the situation as far as Home Depot with regard to the Southwest division?

A: Say that again.

Q: Paragraph 5 is inaccurate with respect to the position of the Southwest division of Home Depot and the Kidde emergency escape ladder?

\*　　\*　　\*　　\*　　\*　　\*

A: Excluding the—my note, the circle, I would say that this is what Mr. Polinsky is saying that I said I would

need six months to fulfill vendor commitments, and I never agreed to that, and that's what I was indicating by putting 'no' there, that I never agreed to that and -

\*　　\*　　\*　　\*　　\*　　\*

Q: You never agreed to switch from Kidde's emergency escape ladder—or from X–IT's emergency escape ladder to Kidde's emergency escape ladder?

A: Correct. I never agreed to.

Pl.'s Opp. Ex. 38, Slanina Dep. at 56–60. Thus, it is clear that X–IT's existing business relationship with Home Depot was not terminated even after Traylor asked Slanina to hold off on ordering X–IT's ladder for sale in Home Depot stores. Based on the evidence before the Court, it is clear that X–IT continues to enjoy a business relationship with Home Depot's Southwest region. As such, X–IT is unable to demonstrate a prima facie case for tortious interference and the Court **GRANTS** Kidde's Motion for Summary Judgment with respect to this claim.[45]

### H. *Count VIII: Unjust Enrichment and Constructive Trust*

Kidde has also moved for summary judgment on X–IT's claim of unjust enrichment, requesting the imposition of a constructive trust. X–IT's Amended Complaint states that "[a]s a direct, proximate, and intended result of Kidde's breaches of its common law duties to X–IT, Kidde has received, or will receive monies to which they are not entitled and for which it should be held accountable." Am. Compl. ¶ 126. As such, X–IT contends that such monies received by Kidde are monies that cannot be equitably kept and that Kidde should be held to be a constructive trustee

---

**45.** None of the allegedly outstanding discovery in this case bears any connection with this issue, thus X–IT's Rule 56(f) Motion will not allow it to withstand the entry of summary judgment in favor of Kidde on Count VII.

of such monies. *Id.* ¶ 127. X–IT asks that, as a constructive trustee, Kidde be required to disgorge all monies that it has received as the fruits of its wrongful acts.

A constructive trust is merely a procedural device by which a court of equity may rectify certain wrongs. *See New Amsterdam Casualty Co. v. Waller,* 301 F.2d 839, 842 (4th Cir.1962). Courts have impressed equitable remedies of this kind upon wrongfully obtained profits in a variety of contexts, including breach of fiduciary obligation or breach of contract, *see Snepp v. United States,* 444 U.S. 507, 515–16, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980), copyright infringement, *see Sheldon v. Metro–Goldwyn Corp.,* 309 U.S. 390, 399, 60 S.Ct. 681, 84 L.Ed. 825 (1940), and patent infringement, *see Tilghman v. Proctor,* 125 U.S. 136, 146, 8 S.Ct. 894, 31 L.Ed. 664 (1888). The purpose of such equity-inspired relief is "to provide just compensation for the wrong, not to impose a penalty," and such relief is "given in accordance with the principles governing equity jurisdiction, not to inflict punishment but to prevent an unjust enrichment." *Sheldon,* 309 U.S. at 399, 60 S.Ct. 681. Thus, as the Supreme Court observed in *Sheldon,* " '[t]he infringer is liable for actual, not for possible gains. The profits, therefore, which he must account for, are not those which he might reasonably have made, but those which he did make, by use of the plaintiff's invention." ' *Id.* at 400, 60 S.Ct. 681 (quoting *Tilghman,* 125 U.S. 136, 146, 8 S.Ct. 894 (1888)).

Kidde conclusively states that "[b]ecause X–IT cannot show that [Kidde] acted wrongfully or in violation of the common law, X–IT is not entitled to imposition of a constructive trust as a remedy for 'unjust' enrichment." In opposition, X–IT argues that the record "contains ample evidence" to support X–IT's common law claims, including "unfair competition and tortious interference."

As this Opinion & Order demonstrates, X–IT is able to set forth sufficient evidence to support, at the very least, its unfair competition claims. However, the Court finds that X–IT's claims for equitable relief are dependent on Kidde's unclean hands argument, which is mentioned above. As the Court plans to take evidence and hear oral argument from counsel for both parties on the first day of trial regarding Kidde's unclean hands argument, the issue of whether X–IT is entitled to certain equitable remedies is not appropriate for summary judgment. The Court will resolve this question in due course.

### VII. *Conclusion*

For all of the above reasons, the Court **GRANTS** X–IT's Motion for Partial Summary Judgment on Count I on the issue of liability with respect to Kidde's infringement of X–IT's copyright for use in Kidde's packaging, sell-sheets, and PowerPoint presentation at the 1999 National Hardware Show. In addition, for the reasons set forth below, the Court **GRANTS** (1) Kidde's Motion for Summary Judgment on Count IV with regard to X–IT's claim that Kidde misused X–IT's actual and potential customer account list; (2) Kidde's Motion for Summary Judgment on Count V with regard to X–IT's claim that X–IT's customer account list constitutes a trade secret; and (3) Kidde's Motion for Summary Judgment on Count VII as to X–IT's tortious interference claim. X–IT's Motion to Strike Kidde's Unclean Hands Evidence and Argument is **GRANTED IN PART** and **DENIED IN PART.** The Court **STRIKES** Kidde's allegations of litigation misconduct on the part of X–IT, but will hear evidence regarding X–IT's alleged pre-litigation misconduct. In all other respects, X–IT's Motion for Partial Summary Judgment is **DENIED** and Kid-

de's "Motion to Dismiss, for Judgment on the Pleadings, and for Summary Judgment" is **DENIED.**

The Clerk is **DIRECTED** to mail a copy of this Opinion & Order to all counsel of record.

**IT IS SO ORDERED.**